IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

JASON COOKSEY, HEIDI COOKSEY, AND
SARAH COOKSEY, SYDNEY COOKSEY, AND
SADIE COOKSEY, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, JASON AND HEIDI COOKSEY                    **PLAINTIFFS**

**VERSUS**                                           CAUSE NO. A2402-17-161

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z          **DEFENDANTS**

<u>SUMMONS</u>

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

**TO:**   **Hunt MH Property Management, LLC**
**c/o Registered Agent**
**Capitol Corporate Services, Inc.**
**248 E. Capitol Street, Suite 840**
**Jackson, Mississippi 39201**
**OR WHEREEVER THEY MAY BE FOUND**

<u>NOTICE TO DEFENDANT(S)</u>

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU
MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing
& Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi,
Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2nd Floor, Ocean
Springs, Mississippi 39564**.  Your response must be mailed or delivered within thirty (30) days from the
date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for
the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable
time afterward.

Issued under my hand and the seal of said Court, on this the 22 day of Dec. , 2017.

Connie Ladner     Clerk

BY: _____ D.C.



**EXHIBIT**

**A**



IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

JASON COOKSEY, HEIDI COOKSEY, AND
SARAH COOKSEY, SYDNEY COOKSEY, AND
SADIE COOKSEY, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, JASON AND HEIDI COOKSEY                          **PLAINTIFFS**

VERSUS                                        CAUSE NO. A2402-2017-107

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z        **DEFENDANTS**

## COMPLAINT

### JURY TRIAL REQUESTED

COME NOW Plaintiffs, Jason Cooksey, Heidi Cooksey, and Sarah Cooksey, Sydney

Cooksey, and Sadie Cooksey, Minors, by and through their natural guardians, Jason and Heidi

Cooksey (Plaintiffs), by and through their attorneys, Rushing & Guice, P.L.L.C., and file this

their Complaint against Forest City Southern Group, LLC now known as Hunt Southern Group,

LLC, Forest City Residential Management, LLC, Hunt MH Property Management, LLC,

Unknown John and Jane Does A through M, and Other Unknown Corporate Entities N through Z

(Defendants), and for good cause of action, states unto the Court the following, to-wit:

### PARTIES

1.

Plaintiff, Jason Cooksey ("Jason"), is an adult citizen of Harrison County, Mississippi

residing at 1568 Rachel Drive, Biloxi, Mississippi.

2.

Plaintiff, Heidi Cooksey ("Heidi"), is an adult citizen of Harrison County, Mississippi residing at 1568 Rachel Drive, Biloxi, Mississippi.

3.

Plaintiff, Sarah Cooksey ("Sarah"), is the minor child of Jason and Heidi, her natural guardians, born January 15, 2002, and is a resident of the State of Mississippi, residing at 1568 Rachel Drive, Biloxi, Mississippi.

4.

Plaintiff, Sydney Cooksey ("Sydney"), is the minor child of Jason and Heidi, her natural guardians, born December 13, 2003, and is a resident of the State of Mississippi, residing at 1568 Rachel Drive, Biloxi, Mississippi.

5.

Plaintiff, Sadie Cooksey ("Sadie"), is the minor child of Jason and Heidi, her natural guardians, born May 7, 2009, and is a resident of the State of Mississippi, residing at 1568 Rachel Drive, Biloxi, Mississippi.

6.

Defendant, Hunt Southern Group, LLC (Hunt Southern), formerly known as Forest City Southern Group, LLC (Forest City Southern) is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840,

Jackson, Mississippi 39201. Forest City Southern nka Hunt Southern is believed to be the owner of the property in issue.

7.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

8.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

9.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

10.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

11.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Plaintiffs reside. Jurisdiction is also proper pursuant to Miss. Code Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who are residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

12.

Jason is Active Duty with the Air National Guard as a Master Sergeant. Plaintiffs moved to Biloxi in 2011 when Jason was offered a position with Air National Guard Recruitment office. Jason acquired on base housing in Bayridge, an exclusive Officers and Senior enlisted Community located on Keesler Air Force Base in Biloxi, Mississippi. Prior to signing a lease, Jason viewed two different houses and provided his preference. Jason was initially assigned one of the two houses, but the assignment was changed immediately prior to signing the lease. On or about January 17, 2012, Jason entered into a Military Lease Agreement for military housing in Bayridge, located at 208 Patrick Drive, Biloxi, Mississippi in the County of Harrison (Subject Property), with Forest City Southern. See Lease Agreement attached hereto as **Exhibit "A."** Bayridge is comprised of 330 homes and is located on Keesler Air Force Base. At all times mentioned herein, Plaintiffs' home was owned, controlled or managed by one of Defendants.

13.

At the time Jason entered into the Military Lease Agreement, Bayridge was owned and operated by Forest City Southern and managed through Forest City Residential Management. In 2016, Bayridge was acquired by Hunt Southern and operated or managed through Hunt MH Property Management. Upon information and belief Forest City Southern and Hunt Southern exercised custody and control over Bayridge and acted as the owners of Bayridge through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

14.

After moving into Bayridge, Plaintiffs reported several maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was later learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the house. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses it operates.

15.

Plaintiffs' maintenance records show repeated requests for Defendants to address mold and leaking problems while they lived in Bayridge. The maintenance records show that the mold was simply "treated with moldex" instead of being removed. Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the

mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided at Bayridge, Defendants never replaced the air conditioner filters, despite reporting on the maintenance report that it was done quarterly. Plaintiffs replaced the filters on their own.

16.

On one such occasion, or about August 18, 2016, Plaintiffs asked Hunt MH Property Managers to address several mold patches and leaks in their home including in the living room ceiling and the master bedroom ceiling. Later that day, a maintenance person arrived to clean the suspected substance (maintenance technicians were instructed not to call the substance mold) and check if air conditioner ducts were sweating. The maintenance technician found that they were. The maintenance technician, Dowdy Quentin, also noted that he had cleaned the "suspected substance" from vents in the living room. Rather than addressing the root of the leaks, the maintenance technician again just cleaned the area with Tilex. This allowed for the toxic mold to continue flourishing beneath the surface.

17.

On another occasion, or about August 24, 2016, Plaintiffs showed pictures of the toxic mold to Defendants' Director of Maintenance, Terry Small (Small). Plaintiffs had pictures of the mold patches and stains from leaks in their utility room, kitchen, and master bath. Small agreed to visit with Hank Toppings, Defendants' project manager, to inspect the property. Small arrived alone and found that the the A/C ventilation system had problems and the roof possibly had a leak. He advised Plaintiffs that Defendants did not pay for mold tests, he agreed to send someone to cover the utility room ceiling, and stated that he would try to move them to a hospitality house

by the end of September. Small further advised that the work would involve removing the sheetrock and rewrapping the ducts, and that he would contact them soon.

18.

On or about August 29, 2016, Jason emailed Small asking about the repairs he had recommended and whether he could get the recommendations in writing. Small never did respond to the email. The next day, Jason stopped by the office to ask Small about these repairs in person. He was unable to get the repair suggestions in writing at this meeting.

19.

On or about September 15, 2016, Plaintiffs had Teddy Bear Restoration perform an air mold sampling in their home. The Certificate of Mold Analysis showed several different spores growing in the house, the most concerning being Stachybotrys, which can cause serious health issues. See Certificate of Mold Analysis attached hereto as **Exhibit "B."**

20.

Following the mold analysis from Teddy Bear Restoration, Plaintiffs met with Freddie Jordan (hereinafter Jordan), Housing Manager for Defendants, regarding the mold report and requested that Defendants pay for their relocation due to the toxic levels of mold in the home. This request was based upon the lease provision which provided that "relocation will be at no cost to Resident" in situations where the home becomes inhabitable. Jordan offered to move Plaintiffs into the hospitality home, but fearing for similar conditions, Plaintiffs declined the offer. Jordan said that she would send the request to move to her corporate representative.

21.

On or about September 26, 2016, Jordan reported to Plaintiffs that she was not authorized to help them move out of their mold infested home.

22.

On or about October 7, 2016, Plaintiffs met with Mary Ranson, Defendants' Director of Operations for the Southern Region, regarding their request that relocation expenses be paid by Defendant. Their request was denied once more.

23.

On October 28, 2016, Plaintiffs had additional testing performed on the Subject Property with Mold Test USA. Mold Test USA performed a 52 Point Visual Inspection and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Stachybotrys inside the Subject Property and none outside the Subject Property. These elevated levels of toxic black mold are well-known for causing serious health concerns. See Mold Test USA Mold Reports attached hereto as **Exhibits "C and D."**

24.

Plaintiffs have obtained information from other military housing families who provided them with information leading them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including others in Bayridge.

25.

Because Defendants refused to honor their contractual obligation to cover the expense of Plaintiffs' relocation, Plaintiffs incurred great expense in moving themselves. They also suffered property loss due to mold contamination and have not been compensated for any of their losses.

26.

As a direct result of the continued exposure to toxic mold located in Plaintiffs' home, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical injuries, medical expenses and property damage.

27.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

28.

In this case, Plaintiffs had two different certified mold investigators identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Stachybotrys, commonly referred to as "black mold" or "toxic mold," was identified as growing inside the house. Additionally, Aspergillus, known to be a powerful respiratory irritant, was found in the home during the air test. Both spores are particularly dangerous, as both are well known to grow in excessive numbers in damp indoor spaces and both release mycotoxins and VOCs, and have toxic impacts of their own. Both spore levels found inside the home by tape and air samples were considered "elevated" considering neither spores

were detected in the outside control levels. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs were forced to live in.

29.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

## COUNT I

## NEGLIGENCE

30.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 29.

31.

Defendants, as owners and/or managers of Bayridge:

A. Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B. Negligently failed to pay for relocation expenses and caused Plaintiffs to pay for the moving expenses;

C. Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D. Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E.   Negligently managed and maintained Bayridge;

F.   Negligently supervised their employees, agents and/or representatives;

G.   Negligently trained and supervised their employees, agents and/or representatives;

H.   Negligently inspected Bayridge for dangerous and harmful conditions;

I.   Negligently remediated the toxic mold contained in the Subject Property;

J.   Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K.   Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L.   Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.   Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

32.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT II

## GROSS NEGLIGENCE

33.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 32.

34.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

35.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

36.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 35.

37.

Defendants breached the Military Lease Agreement entered into with Plaintiffs on January 12, 2012. The contract was breached for the following reasons:

A.     Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B. Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C. The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D. Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E. Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F. Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G. Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation." Plaintiffs shouldered the entire cost of the relocation.

38.

As a direct and proximate result of Defendants' breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their

quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

### 39.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 38.

### 40.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

### 41.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 40.

### 42.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned

malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

**COUNT VI**

**FRAUDULENT CONCEALMENT**

43.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 42.

44.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.      Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.      Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.      Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.      Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.      Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

45.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 44.

46.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

47.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 46.

48.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of

Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

49.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 48.

50.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which was repeated until Plaintiffs moved out of the Subject Property.

## DISABILITY OF INFANCY

51.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 50.

52.

Sarah, Sydney and Sadie are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

## DAMAGES

53.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 52.

54.

As a direct and proximate result of the Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Jason Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Heidi Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Sarah Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

D. Plaintiff, Sydney Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for; and

E. Plaintiff, Sadie Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and

necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for.

## PUNITIVE DAMAGES

### 55.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 54.

### 56.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

### 57.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 56.

### 58.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause, for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

**JASON COOKSEY, HEIDI COOKSEY, AND
SARAH COOKSEY, SYDNEY COOKSEY,
AND SADIE COOKSEY, MINORS, BY AND
THROUGH THEIR NATURAL GUARDIANS,
JASON AND HEIDI COOKSEY, PLAINTIFFS**

BY:

**WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS 39533
TELEPHONE: (228) 374-2313
FAX: (228) 875-5987
ATTORNEYS FOR PLAINTIFFS**

Breuridge
Neighborhood

Jason Cooksey
Resident Name

_____
Resident Name

208 Patrick
Address

Bilox., mS
City/State

| Initial | Date |
|---|---|
| Initial _My_ | Date 1/17/12 |
| Initial | Date |
| Initial | Date |

# Forest City Southern Group, LLC
# Keesler AFB
# Military Lease Agreement







**EXHIBIT**

A

**THIS LEASE AGREEMENT** for military members ("Lease Agreement") is made on the "Lease Agreement Date" listed on Page 1 Number 1, between Forest City Southern Group, LLC, owner of the subject Premises (the "Owner"), and the housing eligible party or parties who signed as Resident on Page 1 Number 2 of this Lease Agreement (referred to as "Resident", whether one or more). The provisions of this Lease Agreement include the provisions of a separate Community Handbook dated as shown on Page 1 of this Lease Agreement and the provisions of any addenda to this Lease Agreement executed by the parties.

**THE PARTIES AGREE AS FOLLOWS:**

1. **Parties to Lease Agreement.** Subject to the terms and conditions of this Lease Agreement, Owner rents to Resident and Resident rents from Owner, the Premises referenced on Page 1 Number 6 of this Lease Agreement. The property is managed by Forest City Residential Management, Inc. ("FCRM"), whose address and phone numbers are specified on Page 1. FCRM is authorized to manage the Premises on behalf of Owner and to receive rents, execute leases, enforce leases, and give and accept notices, demands and service of process on behalf of, and as Agent of Owner. Resident may authorize a representative with a valid power of attorney to act on Resident's behalf, to include executing this Lease Agreement.

2. **Premises.** The property to be rented is located on the military installation specified on the Page 1 header (the "Installation"), in the neighborhood specified on Page 1 Number 5 (the "Neighborhood"), at the address specified on Page 1 Number 6 (the "Premises"), and includes the housing unit and front and back yards, and may include a garage, driveway, designated parking, and/or a carport, as applicable, plus any outside storage located in the yard. The Premises has been designated as authorized housing for a certain military grade or grades (each, a "Housing Category" and collectively, the "Housing Categories").

3. **Term/Automatic Renewal.** This Lease Agreement shall be for a term of twelve (12) months, and shall begin on the Lease Commencement Date specified on Page 1 Number 4a and terminate on the Lease Expiration Date specified on Page 1 Number 4b (the "Term").

   After expiration of the Term, this Lease Agreement will automatically continue on a month-to-month tenancy if the Lease Agreement has not been terminated by either party or the parties have not renewed the Lease Agreement for another Term. Either party may terminate the month-to-month tenancy by providing written notice at least thirty (30) days before the end of the Term. Either party may end or renew this Lease Agreement at the end of the original Term by a thirty (30) day written notice to the other party.

4. **Rent.** The Monthly Rent shall be equal to the Basic Allowance for Housing ("BAH") with dependent rate of the highest ranking military member residing in the Premises, minus a utility allowance, if applicable, provided that the Resident's military pay grade is within the Housing Category for the Premises. The Monthly Rent for foreign military personnel shall be equal to the BAH with dependent rate of the U.S. military pay grade most equivalent to the foreign military member's rank or pay grade at the time that the foreign military member accepts the Premises, minus a utility allowance, if applicable.

   If Owner provides Resident a Premises in a Housing Category higher or lower than Resident's military pay grade, then the Monthly Rent will be based on the BAH with dependent rate for the Resident's military pay grade. If Resident elects to reside in a Premises that is in a Housing Category higher or lower than Resident's military pay grade, then the parties shall execute an addendum that states the basis and amount of the Monthly Rent.

   Payment for Monthly Rent shall be made to Owner by payroll allotment/deduction through a third-party BAH processor. If third-party action is not available, then Resident shall personally establish and maintain an allotment for the Monthly Rent. In multiple service member households, the allotment shall be made by the senior service member. Resident BAH allotments shall be payable on the first day of the month for the current month's rent. Monthly Rent for any partial month at the beginning of the Term shall be prorated based on a thirty (30) day month and payment shall be made by check or money order. The method of payment for Monthly Rent by foreign military members will be on a case-by-case in accordance with the nation-to-nation support agreement.

   The Monthly Rent shall be increased/decreased when increases/decreases take effect in the Resident's BAH rate. Resident must make notification of promotion or demotion in accordance with the Community

Handbook. In multiple service member households, the senior service member's military pay grade shall be used in establishing the Premises and determining the Monthly Rent. The Monthly Rent for foreign military members shall not change for any reason during the entire Term of this Lease Agreement.

Monthly Rent includes the utilities provided by Owner pursuant to Section 7. All other utilities/services are at Resident's own expense. No security deposit is required to be paid to Owner.

Payment for electric and/or gas utilities (when applicable) and any charges or fees incurred as provided in Section 5 and/or itemized in the Community Handbook ("Additional Rent", which together with Monthly Rent is referred to as "Rent") shall be made directly to Owner. Rent not paid by allotment will be paid by personal check, certified check, cashier's check, electronic funds transfer (EFT) or money order.

Resident is responsible for executing additional documents with the Installation finance office, if required, to commence the Monthly Rent allotment and to remedy any situation that prevents the commencement of the allotment. Resident's designated representative with a power of attorney may initiate or modify the Monthly Rent allotment. If the Monthly Rent allotment is terminated or reduced below the amount of the Monthly Rent by action of Resident or Resident's designated representative while Resident is in possession of the Premises without written permission of Owner, Resident will be considered in material breach of this Lease Agreement.

After the end of the Term or earlier termination and move-out, Owner shall refund any monies due to Resident, less any monies owed to Owner, within twenty (20) business days of Owner's receipt of the BAH allotment applicable to the month of termination.

5.   **Late Fees and Returned Checks Charges.** If any Monthly Rent is not paid by the fifth (5th) day of the month, unless paid by allotment, Resident must pay a late fee of $50.00 which is deemed Additional Rent.

Resident will, within fifteen (15) days notice of a dishonored check, pay a returned check fee of $35.00, plus any late fees, if applicable, which are deemed Additional Rent. If at any time during the Term, two (2) of Resident's checks have been returned to Owner by the bank, all future payments must be paid by allotment, cashier's check, certified check or money order only.

Acceptance of any late or partial Monthly Rent or waiver of any Additional Rent is not a waiver of Owner's right to enforce other terms of the Lease Agreement.

6.   **Condition of Premises upon Commencement Date.** Resident has examined the Premises and is satisfied with its physical condition, order, and repair. Resident accepts the Premises "as is" as of the Lease Commencement Date specified on Page 1 Number 4a. Owner has inspected and inventoried the Premises and provided Resident with a Move-In/Move-Out Unit Inspection and Inventory Report (the "Inspection Report"). Within five (5) days of Lease Commencement Date, or upon occupancy by Resident, Resident shall complete and return to Owner the Inspection Report detailing any deficiencies noted with the Premises. Owner and Resident will sign the Inspection Report and Owner will provide a copy to Resident. If Resident does not return the Inspection Report to Owner, Resident accepts the Premises without exception. Any additional damage or deficiency noted by Owner at move-out will be charged to Resident.

7.   **Services and Utilities.** Owner shall be responsible for the payment of the following utilities at all times during the Term of this Lease Agreement: water, sewer, trash collection and recycling. Until the time that the Premises is individually metered for electricity and natural or LP gas, Owner shall be responsible for the payment of such utilities and Resident shall receive no utility allowance. (During this period of time, the Monthly Rent shall be equal to the BAH at the with dependent rate). After the Premises is metered, (i) Owner will provide Resident with the amount of the monthly utility allowance to be deducted from the BAH to determine the Monthly Rent, and (ii) Resident shall pay for the actual amount of electricity and/or gas used monthly.

Resident shall be responsible for the payment of telephone, cable, internet, or any other services directly contracted by Resident with a service provider. Additional information on responsibilities for telephone lines are specified in the Community Handbook. Resident acknowledges that interruptions in the delivery

of utilities do occur and Owner will make every effort to notify Resident in advance of any interruptions in utility services resulting from scheduled outages or work elsewhere in the Neighborhood.

8.  **Occupants and Permitted Use.** Resident will use the Premises as a residence for Resident and the other occupants listed on Page 1 Number 3 (collectively, the "Occupants"), except as otherwise provided herein. The Premises is to be used for residential use only, with exceptions permitted *solely* upon written approval of Owner. Resident acknowledges that the residence is a single-family dwelling and will be used for occupancy by one family only and for no other purposes, including any business purposes, except as otherwise provided herein. Occupancy by more than one family is prohibited. Procedures and requirements governing Occupants and permitted use are further specified in the Community Handbook.

    a.  Resident, Occupants, and guests will not commit any acts or use the Premises or common areas in such a way as to (i) violate any law or ordinance, including laws prohibiting the use, possession, or sale of illegal drugs; (ii) commit property damage; or (iii) create a nuisance by annoying, disturbing, inconveniencing or interfering with the quiet enjoyment, business, or peace and quiet of any other Resident, FCRM staff, contractors or other persons engaged in lawful activity in the area.

    b.  After the Lease Commencement Date, if another person comes to reside in the Premises, the Resident must provide the name of the person to the Owner to be added to the list of Occupants. If the new Occupant is over the age of eighteen (18) and does not have unrestricted and unsupervised base access, then the new Occupant must be able to meet the Installation's access requirements and FCRM's screening criteria.

    c.  Social visits are limited to thirty (30) days, except that social visits by anyone residing within a twenty (20) mile or sixty (60) minute commuting area of the Installation (whichever is longer) is limited to no more than two (2) days. Resident must register and obtain written approval from Owner for guests staying at the Premises longer than thirty (30) days. For a live-in care provider staying more than twenty-one (21) days in the Premises, Resident and the care provider will enter into an addendum with Owner and must be able to meet FCRM's screening criteria. Visits by relatives of the Resident are discussed in the Community Handbook. All visitors, guests, relatives and/or live-in care providers must be able to meet the Installation's access requirements.

    d.  Resident or an adult Occupant may conduct a business in the Premises of a type permitted by Government regulations governing the conduct of business activities in military family housing; provided that Resident obtains the written permission of Owner, which permission shall not be unreasonably withheld, and executes a Home Based Business Addendum. Residents conducting a residential business (e.g. child care) will also be required to comply with appropriate city, county, state or federal agency, office or department standards and are subject to inspection by the Government or any of these agencies. Owner's granting of permission is not a warranty that the Premises is suitable for the conduct of Resident's business. No door-to-door soliciting will be allowed and no advertising signs shall be posted on the Premises and no interior or exterior structural modifications or additions shall be made to accommodate Resident's business. Resident is responsible for obtaining the necessary permissions and/or licenses and will indemnify, save, and hold Owner harmless for any failures to obtain the necessary permissions and/or licenses and for any damages to the Premises or to third parties arising from the conduct of Resident's business. Additional rules on home based businesses are provided in the Community Handbook.

    e.  Under Government policy, no sex offender (according to a conviction and/or registered or required to be registered on a national or state sex offender registry) may reside in the Premises without the express written approval of the Installation Commander. If Resident or any Occupant becomes a convicted or registered sex offender after the Lease Commencement Date, then Resident shall immediately take the actions required by Government regulations, including the submission of any required reports.

    f.  Resident, Occupants and guests will use, store and dispose of environmentally hazardous materials/waste in accordance with the Community Handbook.

g.   Resident, Occupants and Guests will comply at all times with any military standing orders of the Installation and applicable laws and ordinances of the State and City in which the Premises is located.

9.   **Absence from Premises.**   Resident shall notify FCRM in writing of any absences from the Premises in excess of fourteen (14) consecutive days. Resident shall make arrangements for a representative to have access to and take responsibility for the Premises and shall notify Owner of the name and contact information of such representative. Resident shall assume all liability for the representative's behavior. Owner shall not be responsible for any damages resulting from Resident's absence from the Premises due to Resident's negligence, recklessness and/or intentional conduct. Additional provisions regarding absence from the Premises can be found in the Community Handbook.

10.   **Pets.**   No pets are permitted in the Premises at any time except by prior written consent given by Owner in a Pet Addendum signed by both parties. A maximum of two (2) authorized pet mammals may be permitted with Owner's consent. Keeping a pet for any duration without written consent from Owner or a signed Pet Addendum will be considered a material breach of the Lease Agreement.

A refundable pet deposit will be required, which will be used by Owner as necessary for any cleaning and/or damages caused by the pet(s) after Resident vacates the Premises. If damages caused by the pet(s) exceed the amount of the pet deposit, then Resident will be responsible for the additional cost to remedy the Premises. If none or only some of the pet deposit is required for cleaning and repair, then Owner shall remit the balance of the pet deposit to Resident within thirty (30) days after Resident vacates the Premises.

Only certain types of animals may be kept as pets:

a.   The following breeds of dogs (and dogs that have any of the following breed lineage) are deemed aggressive or potentially aggressive and will not be permitted to be boarded in the Premises or allowed in the Neighborhood: Pit Bulls, Rottweilers, Chow Chows, Doberman Pinschers, Siberian Huskies, Perro de Presa Canario, and wolf hybrids. Exceptions to this rule can be made only for (i) a certified military working dog that is being boarded by its handler/trainer or (ii) a specific dog that has been approved by the Installation Commander in writing.

b.   Exotic animals are prohibited, including, but not limited to: monkeys, pot-bellied pigs, hedgehogs, skunks, raccoons, squirrels, ferrets, rodents (including mice and rats but excluding hamsters, gerbils and guinea pigs).

c.   Reptiles, arachnids and insects are prohibited.

d.   Farm, ranch, and wild animals are prohibited.

e.   Caged birds, fish and authorized rodents (hamsters, gerbils and guinea pigs) in cages may be boarded in the Premises in addition to the two authorized pets, and do not require a Pet Addendum or pet deposit.

Residents are responsible for informing guests that guests' pets are not allowed in the Premises or common areas. Residents will not be permitted to use the Premises to care for pets belonging to other persons without the written consent of Owner. Additional information on the pet policies and pet care is provided in the Community Handbook.

11.   **Community Handbook and Rules/Regulations.**   Resident acknowledges receipt of the Community Handbook in effect as of the date of this Lease Agreement, the provisions of which are incorporated into this Lease Agreement. Resident agrees to comply with all occupancy rules and regulations contained in the Community Handbook whether now in effect or subsequently issued by Owner. Violation of the occupancy rules and regulations contained within the Community Handbook may be considered a violation of this Lease Agreement. Owner will provide thirty (30) day advance notice to Resident of a revision to the Community Handbook and then deliver the revised Community Handbook to Resident.

12. **Parking.**   Resident will operate and park all vehicles in accordance with guidelines stated in the Community Handbook. All vehicles must be licensed with current license plates and must be in operating condition. Unauthorized or illegally parked vehicles will be towed by Owner at Resident's expense. Owner assumes no responsibility or liability whatsoever for loss of or damage to any vehicle while parked in the Neighborhood. Boats, trailers, and oversized vehicles are not permitted in the Neighborhood except for loading and offloading activities unless Owner has granted permission in writing.

13. **Repairs/Alterations/Liens.**   Resident will not alter or repair the interior, exterior, or the structure of the Premises in any way without express written consent of Owner. Alteration includes, but is not limited to, painting, wallpaper, fixtures, modification of electrical appliances, or installation of telecommunication devices, including satellite dishes and/or antennae. No mechanical, electrical, plumbing or structural equipment or major appliances or configuration on any part of the Premises may be repaired, altered, modified, installed or removed without express written consent of Owner. Resident is liable for the cost to restore any alterations or repairs made by Resident, unless Owner approves that the alteration may remain in place on the Premises. Additional information on alterations, decorating and satellite dishes are provided in the Community Handbook.

Resident may not encumber the Premises or permit any person to claim or assert any lien for the improvement or repair of the Premises made by Resident. Resident shall notify all parties performing work on the Premises at Resident's expense that the Lease Agreement does not allow any such liens to attach to Owner's interest.

14. **Maintenance.**   Owner will maintain the Neighborhood and the mechanical and electrical devices within the Premises in a clean, safe, and workable condition. Resident will report all needed repairs to Owner. Service requests during regular working hours are to be reported to FCRM or other designated service request location. Repairs shall be made within a reasonable time following notification during normal business hours. Emergency maintenance service is available after hours to handle requests of a true emergency nature that cannot wait until normal business hours. If such repairs are of an emergency nature, the repairs shall be addressed within a reasonable time under the circumstances. Additional information on Owner-provided maintenance may be found in the Community Handbook.

Owner is not responsible for any inconvenience or loss caused by necessary repairs to the Premises, the Neighborhood, appliances or any other equipment, provided that, to the extent allowed by law, neither Owner nor any of Owner's contractors or agents are responsible for the damage through negligence or willful misconduct. Temporary suspension of services within the Premises and in the Neighborhood is not a basis for ending this Lease Agreement or abating Rent if Owner is actively effecting repairs.

Resident shall maintain the Premises in a neat, clean and undamaged condition, in accordance with the Community Handbook. Resident agrees to (a) dispose of all fireplace ashes, rubbish, garbage, and waste in a clean and safe manner; (b) use all plumbing, electrical, sanitary, ventilating, air conditioning facilities, if applicable, and appliances in a safe and reasonable manner; and (c) not deface, damage, or otherwise harm any part of the Premises. Any damage(s) to glass on the Premises or in any common area caused by Resident, Occupants or guests shall be paid by Resident. Resident has inspected and tested all smoke detectors and carbon monoxide detectors and determined them to be in workable condition. Resident shall be responsible for testing smoke detectors and carbon monoxide detectors on a monthly basis, and replacing batteries. Resident, Occupant or guests shall not tamper with, or adjust or disconnect any smoke detectors or carbon monoxide detectors. Violation of this provision is a material breach or default of this Lease Agreement and shall entitle Owner to exercise all remedies available under state/local law. Resident shall notify Owner of all repair needs promptly. Resident shall be liable for any damages resulting from Resident's failure to promptly notify Owner.

Owner will perform an annual physical maintenance inspection of the Premises to ensure housing maintenance quality standards. Owner will schedule the inspection with Resident at least five (5) days in advance of the date of the inspection. The inspection will be conducted during normal duty hours.

Resident is responsible for grounds maintenance of the backyard of the Premises, if fenced, and snow removal for individual entry walks, as further specified in the Community Handbook. Resident is

responsible for mowing, trimming and edging the area within the fenced backyard in accordance with grounds maintenance standards. A list of the responsibilities and standards regarding grounds maintenance is provided in the Community Handbook. Failure to maintain grounds is a material breach of this Lease Agreement. Owner may waive this requirement in certain circumstances including, but not limited to, deployment of Resident.

15. **Damage to the Premises.**

   a. If, by no fault of Resident, Occupant or any guest, the Premises is totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render the Premises totally or partially uninhabitable, either Owner or Resident may terminate this Lease Agreement by giving the other written notice within fourteen (14) days after the date of such damage, which shall be effective retroactively to the date on which the Premises became totally or partially uninhabitable. If either party elects to terminate the Lease Agreement, then Owner shall relocate the Resident according to Section 18(b). If Resident terminates, Resident shall not be subject to the Early Termination Fee noted in Section 29(c). Monthly Rent shall be abated as of the date the Premises becomes totally or partially uninhabitable. The abated amount shall be the current Monthly Rent prorated on a thirty (30) day period. If this Lease Agreement is not terminated by either party and Resident remains in the Premises, then Owner shall promptly repair the damage and Monthly Rent shall be reduced based on the extent to which the damage interferes with Resident's reasonable use of the Premises.

   b. If the damage to the Premises is a result of a negligent, reckless or deliberate action of Resident, Occupant or guests, only Owner shall have the right to terminate this Lease Agreement, and no reduction in Monthly Rent shall be made. Resident will be responsible for payment of the repair and damages to the Premises caused by Resident, Occupant or guest and to restore the Premises to its original condition, less ordinary wear and tear. Failure to pay such amount is a material breach or default of this Lease Agreement.

16. **Waiver.** If Owner does not exercise any of its rights immediately, Owner may exercise these rights at a later date, provided it is within the Term.

17. **Joint and Individual Liability.** If there is more than one Resident (i.e. multiple service members in the same family), each of them shall be jointly and individually responsible for the performance of all obligations of Resident under this Lease Agreement, including, but not limited to, any damage caused to the Premises or Neighborhood by Residents, Occupants or Residents' guest, jointly with every other Resident, and individually, whether or not in possession.

18. **Right to Relocate.** Owner reserves the right to relocate Resident due to (i) construction, renovations or demolition, or (ii) habitability conditions. Prior to Owner exercising such right, Owner will give Resident no less than a thirty (30) day advance notice and Owner and Resident will enter into a Relocation Addendum.

   a. For a relocation due to construction, renovation and/or demolition, Owner will attempt to offer Resident another Premises in the same Housing Category. If Resident accepts another Premises, then this Lease Agreement will continue and be amended as necessary for the new Premises. If Owner cannot provide a suitable Premises or Resident declines to remain on the Installation, then Resident shall be responsible for securing housing outside the Installation and Owner may terminate this Lease Agreement as provided in Section 30(b). Whether Resident moves to another Premises or moves off of the Installation, the relocation will be at no cost to Resident. Additional information on relocation can be found in the Community Handbook.

   b. If the Premises becomes uninhabitable for any reason not caused by Resident, then Owner may relocate Resident either temporarily or permanently. In either case, Owner shall be responsible for the cost of the relocation. If the relocation is temporary, then Resident can expect to move back into the Premises. If the relocation is permanent, Owner will attempt to offer Resident another Premises in the same Housing Category. If Resident accepts another Premises, then this Lease Agreement will continue and be amended as necessary for the new Premises. If Owner cannot provide a suitable

Premises or Resident declines to remain on the Installation, then Resident shall be responsible for securing housing outside the Installation and Owner shall pay the cost of the relocation, whereupon this Lease Agreement will be terminated. If Resident or his/her Occupants or guests causes the Premises to become uninhabitable, then Owner, in its sole discretion, may offer Resident another suitable Premises. Whether Resident relocates to another Premises or has to move off of the Installation, Resident will be responsible for the relocation and will pay for relocation expenses in addition to the cost to repair any habitability deficiencies that Resident, Occupants, or guests caused in the Premises.

19. **Entry onto the Premises.** Owner or anyone allowed by Owner, including but not limited to a licensed exterminator for the purpose of pest control, may enter the Premises during the hours of 8:00 a.m. - 5:00 p.m., Monday through Saturday, after giving Resident forty-eight (48) hours advance notice. If there is an emergency, Owner may enter the Premises without giving Resident advance notice. Upon notice by either party of intent to terminate tenancy, Resident agrees to permit Owner to show the Premises to prospective residents upon forty-eight (48) hours advance notice. Owner may also enter the Premises after a forty-eight (48) hour notice has been posted if the Premises appears to have been abandoned by Resident and Owner has not received notice of absence from Resident.

20. **Locks and other Entry Devices.** All devices (access cards, codes, keys, garage door openers, etc.) issued to Resident for access to common areas, garages, units, etc. are the property of Owner to be utilized solely by and held in possession of Resident and authorized Occupants. These devices are subject to the provisions in the Community Handbook and may be subject to additional rules and regulations as issued by Owner. If Resident provides an entrance device to any person without first obtaining written permission from Owner, other than a key to Resident's Premises, it shall constitute a material breach of this Lease Agreement and Owner may terminate tenancy.

Locks shall not be changed, altered or replaced nor shall new locks be added by Resident without the written permission of Owner. Any locks so permitted to be installed shall become the property of Owner and Resident must promptly provide a key to Owner.

21. **Abandonment.** Any personal property left in the Premises after Resident has vacated or has been evicted is considered abandoned. If Owner determines the personal property to be of value, Owner will mail a notice to Resident at Resident's forwarding or last known address. If Owner does not receive a response and/or the abandoned property is not claimed within fourteen (14) days, Owner has the unilateral right to dispose of said property.

22. **Assignment and Sublet.** Resident shall not sublet all or any part of the Premises, or assign or transfer this Lease Agreement or any interest in it. Any assignment, transfer or subletting of the Premises or this Lease Agreement by voluntary act of Resident, operation of law or otherwise, shall be null and void and, at the option of Owner, terminate this Lease Agreement.

23. **Breach by Resident.** Each obligation of the Lease Agreement is material and violation of any obligation or misrepresentation of any information is a breach of the Lease Agreement. Owner may, at its option, enforce the performance of this Lease Agreement and/or may give notice to Resident of its election to terminate the Lease Agreement.

If Resident does not pay Rent when due, then Owner may give Resident written notice demanding payment. If Rent is not paid within the time period specified in the notice (but not less than three [3] days after receipt of the notice), then Owner may take any or all actions regarding collections as stated in the Community Handbook. Owner may employ an attorney or collection agency to obtain the overdue Rent, or Owner may terminate this Lease Agreement. If Owner employs an attorney or collection agency, Resident must pay the fees and costs of that attorney or collection agency.

If Resident fails to comply with any of the non-monetary terms of the Lease Agreement, including damaging the Premises or violating any of the rules and regulations contained in the Community Handbook, or other restrictions, Owner will give Resident written notice ("Notice of Violation/Breach") of the violation/breach. If the damage is not repaired or the violation/breach is not corrected within thirty (30)

days from receipt of notice of violation/breach, Owner may, at its sole option: (a) correct the violation/breach or damage and charge the cost to Resident; or (b) give Resident a three (3) day notice to terminate the Lease Agreement ("Notice of Termination of Tenancy"). Notice is hereby given that Resident is responsible for paying any fines, penalties, or other assessments charged because of Resident's failure to comply with the terms of the Lease Agreement.

If the breach of the Lease Agreement is due to Resident's, Occupants' and/or guests' use of the Premises for unlawful purposes, or if Resident, Occupants or guests cause or threaten to cause injury to any person, Owner may terminate the Lease Agreement.

Neither Owner nor Resident shall forfeit or waive any existing or future right or remedy by pursuing a lawsuit. Resident's eviction by a court or other breach of this Lease Agreement or Owner's Service of a Notice of Termination of Tenancy on Resident shall not release Resident from liability for payment for the balance of the Term of the Lease Agreement.

24. **Security**. Resident acknowledges that Owner has not made any written or oral representations concerning safety of the Neighborhood or the effectiveness/operability of any security devices or security measures.

Resident acknowledges that Owner does not warrant or guaranty the safety or security of Residents, Occupants, and their guests or invitees against criminal or wrongful acts of third parties. Each Resident, Occupant, guest and invitee is responsible for protecting his or her own person and property.

Resident acknowledges that security devices or measures may fail or be thwarted by criminals or by electrical or mechanical malfunction. Therefore, Resident acknowledges that they should not rely on such devices or measures and should protect themselves and their property as if these devices or measures did not exist.

25. **Estoppel Certification**. Resident will, at any time and from time to time, not less than fifteen (15) days after request by Owner, execute, acknowledge and deliver to Owner a statement in writing, executed by Resident, certifying (a) that this Lease Agreement is unmodified and in full force and effect (or, if there have been modifications, that this Lease Agreement is in full force and effect as modified, and setting forth such modifications) and the dates to which the Rent and other sums payable hereunder have been paid; (b) that there is no existing default hereunder or specifying each such default of which the signer may have knowledge; and (c) that Resident does not have any actual or pending claim against Owner.

26. **Hold Harmless**. Unless the injury or damage is due to the specific negligence of Owner, Owner will not be liable for any injury to any person or damage or loss to any property of Resident, any Occupant, guest or invitee. Except as otherwise provided by law and this Lease Agreement, Owner will not be liable for the loss or damage to Resident's personal property from theft, vandalism, fire, water damage, smoke, Owner supplied appliances, operating systems, interruption of utility services, or other cause, unless due to the specific negligence of Owner. If for any reason Owner agrees to render services such as handling furniture, cleaning, delivering or accepting packages or providing access, Resident specifically agrees to hold Owner harmless from all liability in connection with such services.

Owner shall not be liable to Resident for any lack of access to the Premises, the Neighborhood, or any other land under the control of the Federal Government.

27. **Delivery of Premises**. Owner will make a good faith effort to make the Premises available to Resident on the Lease Commencement Date. If any delay does occur, Monthly Rent will not be due until the Premises is available to Resident. Either party may end this Lease Agreement by written notice to the other if the Premises is not available within thirty (30) days after the date the Lease Commencement Date, and any payment(s) made under this Lease Agreement will be refunded.

28. **Resident's Obligations Upon Vacating the Premises.** Resident has certain obligations prior to termination of the Lease Agreement and vacating the Premises. The obligations include:

a.   Resident shall (i) give Owner all copies of all keys or opening devices to the Premises and any common areas; (ii) vacate and surrender the Premises to Owner, empty of all persons; (iii) vacate any and all parking and/or storage space; (iv) clean and deliver the Premises to Owner in the same condition as it was delivered upon Lease Commencement Date, less ordinary wear and tear, following the cleaning requirements for move-out in Exhibit A of the Community Handbook; (v) remove all debris; and (vi) give written notice to Owner of Resident's forwarding address.

b.   Any alterations made to the Premises by Resident (including painting and wallpapering) must be restored to its original condition, unless Owner has given written approval for the alteration to remain in place. All alterations/improvements left by Resident at termination and that are made by or caused to be made by Resident, without Owner's consent, shall be deemed abandoned and may be disposed of or retained by Owner upon termination. Owner may charge Resident for restoration of the Premises to the condition it was in prior to any alterations/improvements by Resident unless Owner approved in writing for the alteration to remain.

c.   Owner shall perform a pre-move out inspection and inform Resident in writing of any potential move-out charges that may be assessed. At Resident's option, Resident may attend such pre-move out inspection. Resident shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Lease Agreement. Deficiencies identified in the pre-move out inspection and not remedied by Resident will be remedied by Owner and the cost of the remedies will be the responsibility of Resident.

d.   Owner shall perform a final move out inspection at the time Resident vacates the Premises. Resident or a Resident appointed representative with power of attorney must attend such final move out inspection. Resident will be charged a cleaning fee if the Premises is not properly cleaned. Resident will be assessed charges for any damages to the Premises, except ordinary wear and tear. If Resident or Resident representative with power of attorney does not schedule and attend an inspection of the Premises, Resident will accept Owner's assessment of damages as permitted.

e.   Move-out requirements are further specified in the Community Handbook.

29.   **Termination by Resident Prior to Expiration of Term.**

a.   Resident shall have the right to terminate this Lease Agreement if he/she: (i) retires, (ii) is released from active duty, (iii) is transferred via permanent change-of-station (PCS) beyond a twenty-five (25)-mile radius of the Installation, (iv) receives orders for deployment for more than ninety (90) days, or (v) is ordered to occupy public quarters. In such cases, Resident will furnish Owner a copy of his/her official orders not less than thirty (30) days before such termination date unless such notification cannot be made at no fault of Resident (i.e. short notice assignment). This Lease Agreement may also terminate on Resident's death, at the option of the surviving spouse or other immediate family member as provided in Section 34 below. Notwithstanding the above, Resident shall have the right to terminate this Lease Agreement as provided in the Servicemembers' Civil Relief Act, as shall Resident's dependents as provided in the Servicemembers' Civil Relief Act.

b.   In order to terminate this Lease Agreement under Section 29(a) above, Resident (or, in the case of death, the surviving spouse or personal representative of the estate) shall provide Owner a written thirty (30) day notice of intent to vacate (accompanied by appropriate forms/documents evidencing the circumstances giving rise to such right). The foregoing thirty (30) day period can be reduced or waived by Owner under special circumstances, and will be waived if such notification cannot be made at no fault of Resident (i.e. short notice assignment). If Resident terminates this Lease Agreement early under Section 29(a) above, then Resident will not be assessed a penalty for early termination. However, Resident is still responsible to turn over the Premises in accordance with the terms of this Lease Agreement and the Community Handbook. The surviving non-military spouse residing in the Premises at the time of death of Resident shall have the right to elect to either terminate the Lease Agreement as set forth above or remain in the Premises under this Lease Agreement for a maximum period of twelve (12) months from the month of Resident's death, with Rent paid directly to Owner.

c.  If Resident terminates this Lease Agreement prior to the Lease Expiration Date as shown on Page 1 Number 4b for any reason not specified herein, Resident must provide notice to Owner at least thirty (30) days prior.  Resident will be required to pay an Early Termination Fee equal to one month's Monthly Rent, together with any outstanding Additional Rent or other amounts owed to Owner as of the date of termination.  Resident shall not be required to pay the amount of Monthly Rent owed for the remainder of the Term.  The Community Handbook contains additional details on the move out process for early termination.

30.  **Termination by Owner Prior to Expiration of Term.**

a.  If Resident or Resident's family member is debarred from the Installation by the Commander in accordance with the authority provided in 18 U.S.C. § 1382, and the debarment voids Resident's status as a Resident, Resident shall vacate the Premises no later than thirty (30) days from the date of the loss of status as a Resident.  It shall then be lawful for Owner to enter into said Premises, and again have, repossess, and enjoy the same as if this Lease Agreement had not been made, and thereupon this Lease Agreement and everything contained therein shall cease and be void.  However, Owner shall have the right of action for arrears of rent or breach of covenant, and the commencement of a proceeding or suit in forcible entry and detainer or ejectment, after any default by Resident, shall be equivalent in every respect to actual entry by Owner.  In the case of any such default and entry by Owner, Owner may relet the Premises for the remainder of said Term and recover from Resident any deficiency between the amount so obtained and the Rent herein required to be paid.

b.  Owner may, at its sole discretion and after providing thirty (30) days written notice to Resident, terminate this Lease Agreement because of construction, renovation, demolition or habitability issues affecting the Premises.  If Owner terminates for any of these reasons, Owner shall provide for Resident's relocation according to Section 18(b).

c.  Owner may terminate this Lease Agreement if Resident is in default under any of the covenants, terms or conditions of this Lease Agreement including the rules and regulations contained in the Community Handbook.

d.  In addition, Owner may terminate this Lease Agreement for the following reasons:

(i)  Misuse or illegal use of the Premises, or conduct of Resident, Occupants and/or guests which is detrimental to Neighborhood safety and health; use of the Premises for commercial transactions not permitted in advance in writing by Owner;

(ii)  Unacceptable care of or damage to the Premises;

(iii)  When Resident, in the act of apparent abandonment and as a result of voluntary action, ceases to reside personally in the Premises;

(iv)  For criminal activity by any Resident, Occupant, guest or any other person under Resident's control as permitted by federal, state, and local laws.  Criminal activity includes, but is not limited to, felonies and misdemeanors; or

(v)  If the Government determines that Resident is no longer eligible for housing.

Notwithstanding the above, if Resident is no longer eligible for housing due to Resident or other Occupant being denied eligibility by the Installation Commander due to sex offender status, then Owner shall terminate this Lease Agreement.

31.  **Insurance.**  Owner shall maintain insurance that covers the Premises and contents provided by Owner.  Resident acknowledges that neither Owner nor the Government has any liability whatsoever for any loss or damage to Resident's personal property or leasehold improvements.  Resident may have rights and remedies under the Military Personnel and Civilian Employees Claims Act (MPCECA).  Resident should contact the Installation's legal office for additional information regarding MPCECA.

Owner shall, at its sole cost and expense, make Renter's Insurance available to Resident. Resident must apply through Owner for such coverage and will be insured, upon acceptance for coverage by Owner's insurer. Resident shall not be unreasonably refused insurance coverage. The insurance policy shall be a $250 deductible comprehensive, named-peril replacement cost value policy with a replacement cost endorsement valued at no less than $20,000 per eligible military member and his/her family. The policy shall cover Resident's personal property in the Premises including, without limitation, any property removable by Resident under the provisions of this Lease Agreement and all leasehold improvements installed in the Premises by or on behalf of the Resident, against loss or damage caused by the following: theft, fire or lightning, windstorm or hail, explosion, riot or civil commotion, aircraft or vehicle damage, smoke damage, vandalism or malicious mischief, loss breakage, glass breakage, falling objects, damage caused by weight of ice, snow or sleet, water damage from an accidental discharge from plumbing or Heating, Ventilating and Air Conditioning (HVAC) system, sudden and accidental tearing apart, cracking, burning, or bulging of an HVAC, fire prevention or sprinkler system or an appliance for heating water, freezing damage to plumbing, HVAC or household appliances, and electrical surge damage. The policy shall provide $100,000 in liability coverage for Residents and their families. Owner shall not be responsible for paying the deductible or providing supplemental coverage or costs for coverage provided by a different policy. Resident shall pay the $250 deductible, if required, at the time of a claim. Resident is encouraged to carry additional insurance for high value personal property. Waterbeds and aquariums in excess of thirty-five (35) gallons are not permitted without providing Owner with a valid water damage insurance policy.

32. **Weapons and Guns.** The possession of personal firearms, government-owned arms, ammunition and any other weapons will be in accordance with state, county and local laws and any applicable regulations or policies on the Installation. All firearms must be registered with FCRM using a Weapons Registration Form within three (3) days of occupancy or procurement of firearms. Firearms must also be registered as required by the Installation's security forces. Firearms and ammunition must be stored separately in safe, locked locations. Loaded firearms in the Premises are prohibited, but Resident may engage in the hand loading of ammunition. Potentially explosive components such as primers and powders must be stored in separate locked boxes. Displaying or discharging a weapon in the Neighborhood is prohibited. Hand grenades, bombs, and blasting explosives are also prohibited. Failure to adhere to this provision or other provisions within the Community Handbook regarding weapons and guns is a material breach of this Lease Agreement and may result in immediate eviction from the Premises.

33. **Resident Consent to Relocate.** In addition to any relocation pursuant to Section 18 or any Relocation Addendum, Resident consents to comply with the following relocations, if applicable:

   a. The Installation Commander shall have the authority to restrict the general public from occupancy of nonseverable housing units and designated historical housing units. In the event of vacancies in such housing units, the Installation Commander may require a Resident residing in a severable housing unit be relocated to nonseverable or designated historical housing units. The Government shall pay all costs of such relocation.

   b. If Resident is occupying a Premises with special accessibility or readily adaptable features, and Resident and Occupants do not require such features, then Resident agrees to relocate when Owner informs Resident that another family having a person with a disability requires the Premises. Resident's relocation will be at Owner's expense. Resident and Owner shall sign an Accessible/Adaptable Unit Relocation Addendum acknowledging this consent at the time this Lease is executed.

34. **Change in Resident's Status.** Resident shall notify Owner within thirty (30) days of a change in housing eligibility status (e.g. loss of dependents, divorce or separation).

Resident may request a move to a Premises in another Housing Category: (i) for the Resident's rank in the event of promotion or demotion, or (ii) if the Resident's bedroom qualification changes. In either case, the move would be voluntary and at the Resident's expense.

If Resident should die, Resident's spouse or another adult Occupant in Resident's immediate family who is residing in the Premises at the time of the death has the right to either terminate this Lease Agreement or extend it, at the same Monthly Rent, for a maximum period of twelve (12) months from the month of the Resident's death.

If any other change of status or condition causes Resident to lose housing eligibility or for an Occupant to remain in the Premises without Resident, then Resident or Occupant, as appropriate, must submit a request for retention of the Premises to the Installation Commander or delegated authority within fifteen (15) days of the change in status. If retention is denied, then the Premises must be vacated within thirty (30) days from receipt of denial. If retention is approved:

a.   The determination of Rent shall be in accordance with Section 4 of this Lease Agreement.

b.   If Resident is still receiving BAH, then Monthly Rent shall continue to be paid by allotment. If Resident is no longer entitled to BAH, then all Rent will be paid directly to Owner when due. If the Premises is retained by an Occupant(s) without Resident, then all Rent will be paid by the Occupant directly to Owner when due. The amount of Monthly Rent will continue to be the BAH rate with dependents of the Resident who vacated the Premises.

c.   All other terms and conditions of the Lease Agreement shall remain in full force and effect.

35. **Installation Commander's Rights Not Impaired**. Nothing contained in this Lease shall be construed to diminish, limit, or restrict any right, prerogative, or authority of the Installation Commander as established in law, regulation, military custom, or elsewhere. The Installation Commander has the inherent authority and obligation to ensure good order and discipline on the Installation. The Military Rules of Evidence recognize the power of the Installation Commander to authorize searches of military property and property situated on a military installation. All of the Installation (including, without limitation, any housing unit located on the Installation) is under military control and is subject to the Installation Commander's authority. The authorities of the Installation Commander include, but are not limited to, the following:

- The authority to provide force protection and police protection services in accordance with 10 U.S.C. §2872a at levels deemed appropriate by the Government for on-base privatized housing.
- The authority to promulgate and enforce security regulations and restrict public access to the Installation, to include regulations delineating parameters for authorized entry to or exit from the Installation, pursuant to 50 U.S.C. §797. Such rules shall accord privatized housing employees of Owner and its affiliates who have passed an agency background check unescorted access (with escort privileges) to the Installation.
- The authority to conduct background checks utilizing the Installation's access requirements with respect to contractor employees, privatized housing employees, and privatized housing applicants and residents.
- The authority to bar individuals, to include individuals residing in any privatized housing Unit, from the Installation pursuant to 18 U.S.C. §1382 and Department of Defense Instruction 5200.8.
- The authority to conduct inspections or searches of individuals entering, leaving, or present on the Installation pursuant to Military Rule of Evidence 314, 10 U.S.C. §802 et seq. and 50 U.S.C. §797.
- The authority to issue search authorizations based on probable cause on the Installation pursuant to Military Rule of Evidence 315, 10 U.S.C. §802 et seq. and 50 U.S.C. §797.
- The authority to conduct disaster preparedness exercises and/or emergency recovery operations on the Installation in accordance with 50 U.S.C. §797 and Department of Defense Instruction 5200.8. Exercises with the potential to disrupt privatized housing operations will be pre-coordinated with Resident at least twenty-four (24) hours in advance.
- The authority to exercise emergency health powers on the Installation pursuant to Department of Defense Directive 6200.3 in the event of a public health emergency due to biological warfare, terrorism, or other communicable disease epidemic.
- The authority to (i) approve or disapprove applications from persons seeking to rent privatized housing when either an applicant or another prospective occupant of the rental unit is a sex offender, (ii) issue barment orders to anyone living in a privatized housing unit or any visitor who is found to be a sex

offender, and (iii) establish procedures for the mandatory disclosure of information regarding sex offender status from housing applicants, Resident, and Occupants.

Any references to statutes, directives, regulations, or instructions set forth above shall be deemed to refer to both those authorities in effect at the date of lease signing and to those authorities as they may subsequently be amended, revised, superseded, rescinded, or repealed.

36. **Dispute Resolution.** This Lease Agreement is an agreement only between Resident and Owner, and is not an agreement between Owner and any Government entity. Resident and Owner agree to resolve any differences between themselves informally to the best of their ability. If Resident has a particular dispute pertaining to the Premises that Owner has not resolved to Resident's satisfaction, then Resident will follow the dispute resolution procedures specified in the Community Handbook. If Owner and Resident still cannot resolve the dispute after completing the dispute resolution procedures, then Resident must seek independent legal advice.

37. **Notices.** All notices must be in writing. Any notices to Owner will be delivered to FCRM as listed on Page 1 of the Lease Agreement and to Resident at the Premises. Delivery of a notice to the Resident or any adult Occupant is notice to all Residents and Occupants of the Premises. If Owner cannot deliver a notice to the Resident or any adult Occupant, Owner may post the notice in a conspicuous place on the Premises. The notice will be deemed received when delivered or posted on the Premises.

38. **Change in Ownership/Subordination.** This Lease Agreement and Resident's rights under this Lease Agreement are subordinate to all existing and any future financing, loans, or leases on the building or land.

39. **Severability.** If one or more of the paragraphs of this Lease Agreement are determined to be invalid, the remainder of this Lease Agreement will remain in effect.

40. **Controlling Document.** In the event of any ambiguity, conflict, inconsistency, or incongruity between the provisions or references of this Lease Agreement and the Community Handbook or any exhibits or attachments to this Lease Agreement, then the provisions of this Lease Agreement shall, in all respects, govern and control. In the event of a conflict between any addenda to this Lease Agreement and any provision within the Lease Agreement or Community Handbook, the addendum shall govern and control.

[*Signatures of parties on first page of Lease Agreement*]

# MOLD ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _1/17/12_ , between Forest City Southern Group, LLC, Owner, and _Jason Cooksey_ ("Resident"), regarding property located at _108 Patrick_ (the "Premises").

Owner desires to maintain a quality living environment for Resident. To help achieve this goal, it is important for the Owner and Resident to work together to minimize any mold growth in the Premises. This Addendum contains information for Resident, and the responsibilities of both Resident and Owner.

1. **ABOUT MOLD:** Mold is found virtually everywhere in the environment – indoors and outdoors in new and old structures. When excess moisture is present inside a Premises, mold can grow. Appropriate precautions need to be taken to minimize the potential for mold growth in the Premises.

2. **PREVENTING MOLD:** In order to minimize the potential for mold growth, Owner recommends the Resident should do the following:

   a. Keep the Premises clean – particularly the kitchen, bathroom(s), carpets and floors. Regular dusting, vacuuming and mopping removes household dirt and debris that contribute to mold growth. Use environmentally safe household cleaners. A vacuum cleaner with a HEPA filter will help remove mold spores. Immediately throw away moldy food.

   b. Do not block or cover any heating, ventilation, or air conditioning ducts. Whenever possible, maintain a temperature of 50 to 80 degrees Fahrenheit in the Housing Unit.

   c. Remove visible moisture accumulation on countertops, windows, windowsills, walls, ceilings, floors, and other surfaces as soon as reasonably possible. Periodically clean and dry the walls and floors around the sink, bathtub, shower, toilet, windows, and patio doors using a common household disinfecting cleaner. Blot dry spills on carpeting.

   d. Look for leaks in washing machine hoses, faucets, and discharge lines, especially if the leak is large enough to infiltrate into nearby walls.

   e. Use the bathroom fan when bathing or showering and allow the fan to run until all excess moisture has been vented from the bathroom. Keep the shower curtain inside the tub or fully close the shower doors when showering. After taking a shower or bath: (i) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (ii) leave bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (iii) hang towels and bath mats so they will completely dry out.

   f. Use the exhaust fan in the kitchen when cooking or while running the dishwasher and allow the fan to run until all excess moisture has been vented from the kitchen.

   g. Open windows and doors on days when the outdoor weather is warm and dry (humidity is below 50 percent) to help humid areas of the Premises dry out. Run the fan on the furnace to help circulate fresh air. Keep windows and doors closed in damp, humid, or rainy weather.

   h. Clean the lint filter in the clothes dryer after each use and promptly report any damage to the vent connection. If condensations forms in the area, wipe it dry. Dry damp clothing as quickly as possible.

    i.  Limit houseplants to a reasonable number to limit excess humidity and limit molds that could grow on the soil surface. Avoid over watering.

    j.  Do not overfill closets or storage areas. Overcrowding restricts airflow.

    k.  Promptly report to the Neighborhood Management Office:

        i.  Any leak, water damage, or signs of water infiltration;

        ii.  Any malfunction in the heating, ventilation, or air conditioning system;

        iii.  Windows or doors that do not open or close properly;

        iv.  Any areas of visible mold (except very small areas that respond to routine cleaning);

        v.  Musty or moldy odors;

        vi.  Health issues that Resident thinks may be linked to the air quality within the Premises;

        Owner will respond in accordance with this Lease to repair or remedy the situation as necessary.

3. **EXISTING MOLD:** If small areas of mold have already formed on non-porous surfaces (such as ceramic tile, Formica, vinyl flooring, metal, wood or plastic), the Environmental Protection Agency ("EPA") recommends cleaning the areas with soap or detergent and water, letting the surface dry, and then, within 24 hours, applying a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup. Tilex and Clorox contain bleach that can discolor or stain. **Follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface. Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be in adjacent areas, but not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air ("HEPA") filter can be used to help remove mold products from porous items such as sofas, chairs, drapes and carpets – provided fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

4. **DO NOT CLEAN OR APPLY HOUSEHOLD BIOCIDES TO:** (a) visible mold on porous surfaces such as sheetrock walls or ceilings; or (b) large areas of visible mold on non-porous surfaces. Instead, notify Owner in writing; Owner will take appropriate action in compliance with applicable law.

5. **COMPLIANCE:** If Resident fails to comply with this Addendum, Resident may be held responsible for damage to the Premises and any health problems that may result.

Resident:

_____

_____

Date: _2/12/17_

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: _1/17/12_



**PRO-LAB**

*Mold Report*

1675 North Commerce Parkway, Weston, FL 33326    (954) 384-4446

TEDDY BEAR RESTORATION
9230 OLD LORRAINE RD
GULFPORT, MS 39503

# Certificate of Mold Analysis

| | |
|---|---|
| Prepared for: | TEDDY BEAR RESTORATION |
| Phone Number: | (228) 896-8446 |
| Fax Number: | (228) 896-3490 |
| Project Name: | HEIDI COCKSEY |
| Test Location: | 208 PATRICK DR KAFB |
| | BILOXI, MS 39531 |
| Chain of Custody #: | 981620 |
| Received Date: | September 19, 2016 |
| Report Date: | September 20, 2016 |

Erika Piechowski, Technical Manager



Carlos Ochoa, Quality Control Manager

---

Currently there are no Federal regulations for evaluating potential health effects of fungal contamination and remediation. This information is subject to change as more information regarding fungal contaminants becomes available. For more information visit http://www.epa.gov/mold or www.nyc.gov/html/doh/html/epi/mold.shtml This document was designed to follow currently known industry guidelines for the interpretation of microbial sampling, analysis, and remediation. Since interpretation of mold analysis reports is a scientific work in progress, it may as such be changed at any time without notice. The client is solely responsible for the use or interpretation PRO-LAB/SSPTM Inc. makes no express or implied warranties as to health of a property from only the samples sent to their laboratory for analysis. The Client is hereby notified that due to the subjective nature of fungal analysis and the mold growth process, laboratory samples can and do change over time relative to the originally sampled material. PRO-LAB/SSPTM Inc. reserves the right to properly dispose of all samples after the testing of such samples are sufficiently completed or after a 7 day period, whichever is greater.

AIHA LAP, LLC
ACCREDITED LABORATORY
ENVIRONMENTAL MICROBIOLOGY
ISO/IEC 17025:2005
WWW.AIHAACCREDITEDLABS.ORG
LAB # 163230

**For more information please contact PRO-LAB at (954) 384-4446 or email info@prolabinc.com**



EXHIBIT
B



**PRO-LAB®**

1675 North Commerce Parkway, Weston, FL  33326     (954) 384-4446

**Prepared for :**  TEDDY BEAR RESTORATION

**Test Address :** HEIDI COCKSEY
208 PATRICK DR KAFB
BILOXI, MS  39531

| ANALYSIS METHOD | Spore trap analysis | | | Spore trap analysis | | | INTENTIONALLY BLANK | | | INTENTIONALLY BLANK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOCATION | INSIDE HOUSE | | | OUTSIDE HOUSE | | | | | | | | |
| COC / LINE # | 981620-1 | | | 981620-2 | | | | | | | | |
| SAMPLE TYPE & VOLUME | Z5 - 25L | | | Z5 - 25L | | | | | | | | |
| SERIAL NUMBER | Q398599 | | | Q398596 | | | | | | | | |
| COLLECTION DATE | Sep 15, 2016 | | | Sep 15, 2016 | | | | | | | | |
| ANALYSIS DATE | Sep 20, 2016 | | | Sep 20, 2016 | | | | | | | | |
| CONCLUSION | ELEVATED | | | CONTROL | | | | | | | | |
| IDENTIFICATION | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total |
| Bipolaris/Drechslera | 3 | 120 | 1 | 10 | 400 | 2 | | | | | | |
| Cercospora | | | | 16 | 640 | 3 | | | | | | |
| Cladosporium | 20 | 800 | 7 | 169 | 6,800 | 34 | | | | | | |
| Curvularia | 5 | 200 | 2 | 15 | 600 | 3 | | | | | | |
| Epicoccum | 1 | 40 | <1 | | | | | | | | | |
| Nigrospora | | | | 15 | 600 | 3 | | | | | | |
| Other Ascospores | 13 | 520 | 4 | 111 | 4,400 | 22 | | | | | | |
| Other Basidiospores | 10 | 400 | 3 | 162 | 6,500 | 33 | | | | | | |
| Penicillium/Aspergillus | 53 | 2,100 | 18 | | | | | | | | | |
| Stachybotrys | 185 | 7,400 | 64 | | | | | | | | | |
| Unidentified Spores | 1 | 40 | <1 | | | | | | | | | |
| TOTAL SPORES | 292 | 11,620 | 100 | 498 | 19,940 | 100 | | | | | | |
| MINIMUM DETECTION LIMIT | 1 | 40 | | 1 | 40 | | | | | | | |
| BACKGROUND DEBRIS | too heavy for accurate count. | | | Light | | | | | | | | |
| Cellulose Fiber | 11 | 440 | | | | | | | | | | |
| Fiberglass | 3 | 120 | | | | | | | | | | |
| Pollen | | | | 7 | 280 | | | | | | | |

| OBSERVATIONS & COMMENTS | Counts are estimated. Actual numbers of spores probably much higher. | | | | |
|---|---|---|---|---|---|

Background debris qualitatively estimates the amount of particles that are not pollen or spores and directly affects the accuracy of the spore counts. The categories of Light, Moderate, Heavy and Too Heavy for Accurate Count, are used to indicate the amount of deposited debris. Increasing amounts of debris will obscure small spores and can prevent spores from impacting onto the slide. The actual number of spores present in the sample is likely higher than reported if the debris estimate is 'Heavy' or 'Too Heavy for Accurate Count'. All calculations are rounded to two significant figures and therefore, the total percentage of spore numbers may not equal 100%.

* Minimum Detection Limit. Based on the volume of air sampled, this is the lowest number of spores that can be detected and is an estimate of the lowest concentration of spores that can be read in the sample.
NA = Not Applicable.

Spores that were observed from the samples submitted are listed on this report. If a spore is not listed on this report it was not observed in the samples submitted.

Interpretation Guidelines: A determination is added to the report to help users interpret the mold analysis results. A mold report is only one aspect of an indoor air quality investigation. The most important aspect of mold growth in a living space is the availability of water. Without a source of water, mold generally will not become a problem in buildings. These determinations are in no way meant to imply any health outcomes or financial decisions based solely on this report. For questions relating to medical conditions you should consult an occupational or environmental health physician or professional.
CONTROL is a baseline sample showing what the spore count and diversity is at the time of sampling. The control sample(s) is usually collected outside of the structure being tested and used to determine if this sample(s) is similar in diversity and abundance to the inside sample(s).
ELEVATED means that the amount and/or diversity of spores, as compared to the control sample(s), and other samples in our database, are higher than expected. This can indicate that fungi have grown because of a water leak or water intrusion. Fungi that are considered to be indicators of water damage include, but are not limited to: Chaetomium, Fusarium, Memnoniella, Stachybotrys, Scopulariopsis, Ulocladium.
NOT ELEVATED means that the amount and/or the diversity of spores, as compared to the control sample and other samples in our database, are lower than expected and may indicate no problematic fungal growth.
UNUSUAL means that the presence of current or former growth was observed in the analyzed sample. An abundance of spores are present, and/or growth structures including hyphae and/or fruiting bodies are present and associated with one or more of the types of mold/fungi identified in the analyzed sample.
NORMAL means that no presence of current or former growth was observed in the analyzed sample. If spores are recorded they are normally what is in the air and have settled on the surface(s) tested.



**PRO-LAB®**

1675 North Commerce Parkway, Weston, FL  33326     (954) 384-4446

Chain of Custody #  981620

░░░░░░░ Inside House

▬▬▬▬ Outside House

**Spores per cubic meter**



1675 North Commerce Parkway, Weston, FL 33326 (954) 384-4446

| Identification | Outdoor Habitat | Indoor Habitat | Possible Allergic Potential Not an opinion or interpretation | Comments |
|---|---|---|---|---|
| Bipolaris/Drechslera | Common everywhere. Frequently associated with grasses, but also found on plant material, decaying food, and soil. | | Common Type I (hay fever and asthma), fungal sinusitis | This is a group of like-looking spores that include Bipolaris, Drechslera, Exserohilum, and sometimes Helminosporium. They cannot be consistently separated by spore morphology and are thus grouped together. Must be cultured to consistly separate the genera. |
| Cercospora | Common everywhere, especially growing on leaves. | Not known to grow indoors. | None known | |
| Cladosporium | The most common spore type reported in the air worldwide. Found on dead and dying plant litter, and soil. | Commonly found on wood and wallboard. Commonly grows on window sills, textiles and foods. | Type I (hay fever and asthma). Type III (hypersensitivity pneumonitis) allergies | A very common and important allergen source both outdoors and indoors. |
| Curvularia | Commonly found everywhere on soil and plant debris. | Capable of growing on many cellulytic substrates like wallboard and wood. | Type I (hay fever and asthma) and common cause of allergenic sinusitis. | |
| Epicoccum | Commonly found everywhere. Grows on plant debris, insects and soil. | Capable of growing on several different substrates, notably wallboard and paper. | Type I (hay fever and asthma) allergies. | Very common in the summer, especially in the midwest and during harvest time. |
| Negrospora | Commonly found everywhere. Grows on decaying plant material. | Does not normally grow on building materials, but occasionally can be found growing on wallboard | Type I (hay fever and asthma) allergies. | Very distinctive spore that is easy to identify. |
| Ascospores | Common everywhere. Constitutes a large part of the biospora outside. Can reach very high numbers in the air outside during the spring and summer. Can increase in numbers during and after rainfalls | Very few of this group grow inside. The notable exception is Chaetomium, Ascotricha and Peziza. | Little known for most of this group of fungi. Dependent on the type (see Chaetomium and Ascotricha) | |
| Basidiospores | Commonly found everywhere, especially in the late summer and fall. These spores are from Mushrooms | Mushrooms are not normally found growing indoors, but can grow on wet lumber, especially in crawlspaces. Sometimes mushrooms can be seen growing in flower pots indoors. | Some allergenicity reported. Type I (hay fever, asthma) and Type III (hypersensitivity pneumonitis) | Among the group of Mushrooms (Basidiomycetes) are dry rot fungi Serpula and Poria that are particularly destructive to buildings. |
| Penicillium/Aspergillus | Common everywhere. Normally found in the air in small amounts in outdoor air. Grows on nearly everything | Wetted wallboard, wood, food, leather, etc. Able to grow on many substrates indoors | Type I (hay fever and asthma) allergies and Type III (hypersensitivity pneumonitis) allergies. | This is a combination group of Penicillium and Aspergillus and is used when only the spores are seen. The spores are so similar that they cannot be reliably separated into their respective genera |



1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4448

| Identification | Outdoor Habitat | Indoor Habitat | Possible Allergic Potential<br>Not an opinion or interpretation | Comments |
|---|---|---|---|---|
| Stachybotrys | Grows in the soil and decaying plant material. | Wallboards and other paper products that are wetted. Needs high water content in the substrate to grow. Not normally seen growing indoors unless the building material has been wetted. Unusual / Not Normal to be growing indoors. | Type I (hay fever and asthma) allergies. | Wet spored mold that generally must be dried out and disturbed before spores can be found in the air. Spores of this type of mold should not be observed in significant numbers in the air above background/control. If growth and/or significantly higher than background/control spore numbers are reported, corrective action should be considered to eliminate the water source, reduce moisture levels and/or spore numbers in the living space. |
| Unidentified Spores | Common everywhere. Grow on decaying plant litter and other plant-derived material. | Wetted cellulosic material. | None known. | This group of spores is reserved for spores whose identity is unknown. These kinds of spores have usually never been seen before in spore traps by our laboratory and/or are of such morphology that they cannot be identified with any degree of certainty to a particular genus. |



1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

**Prepared for :** TEDDY BEAR RESTORATION

**Test Address :** HEIDI COCKSEY

208 PATRICK DR KAFB

BILOXI, MS  39531

## Indoor Air Quality Testing

**Introduction**
The fungi are a large group of organisms that include mold. In nature, the fungi and mold help breakdown and recycle nutrients in the environment. Mold are the most common type of fungi that grow indoors. Mold are microscopic organisms that live on plants, in the soil, and on animals, in fact almost anywhere food and moisture are available. Mold is everywhere present in the outdoor and normal indoor environments. It is in the air and on surfaces as settled dust. Exposure to mold is inevitable in everyday life. Thus, exposure to mold is considered part of a normal activity for most people. Only environments for which extraordinary preparations have been taken don't have mold present in the air or on surfaces.

**Understanding Mold**
Under the right conditions (moisture, a food source, and time) mold will grow, multiply and produce spores. Mold grows throughout nature as well as the built environment. Mold reproduces by microscopic cells called "spores" that can be spread easily through the air. Mold spores are always present in the indoor and outdoor air. There are mold that can grow on any organic substrate including wood, paper, carpet, food, ceiling tiles, dried fish, carpet, or any surface where dust has accumulated. When excessive moisture or water accumulates indoors, mold growth will often occur, particularly if the moisture problem remains undiscovered or un-addressed. There is no practical way to eliminate all mold spores in the indoor environment. The way to control indoor mold growth is to control the amount of moisture available to the mold.

Mold growth can become a problem in your home or office where there is sufficient moisture and the right foodstuff is available. The key to preventing mold growth is to prevent all moisture problems. Of course, hidden mold can grow when there is water available behind walls, sinks, floors, etc. Indications of hidden moisture problems are discoloration of ceiling or walls, warped floors or condensation on the windows or walls.

**Controlling Moisture**
The most critical step in solving a mold problem is to accurately identify and fix the source(s) of moisture that allowed the growth to occur. In order to prevent mold from growing, it is important that water damaged areas be dried within a 24-48 hour period. If a small amount of mold is present in the home, the mold can be cleaned up with a mild detergent and the excess water or moisture removed. It is not necessary to try and kill the mold or its spores. You can carefully remove the moldy materials if necessary.  There are many common sources of excess moisture that can contribute to indoor mold growth. Some of the primary means of moisture entry into homes and buildings are water leakage (such as roof or plumbing leaks), vapor migration, capillary movement, air infiltration, humidifier use, and inadequate venting of kitchen and bath humidity. The key to controlling moisture is to generally reduce indoor humidity within 35% - 60% (depending what climate you live in) and fix all leaks whatever their cause.

**Mold Growth Sources**
If the source of moisture is not easily detected or you have a hidden water leak, mold testing can be helpful. Often a roof leak or a plumbing leak can be identified as the source. The difficulty arises when there is an odor present or when an occupant shows signs of mold exposure but no visible mold can be seen. Excess water intrusion can also lead to dry rot of lumber and cause a serious structural defect in buildings.

**Health Related Risks**
Based on the Institute of Medicine and the National Academy of Sciences, dampness and mold in homes is associated with increases in several adverse health effects including cough, upper respiratory symptoms, wheeze, and exacerbation of asthma. Mold and fungi contain many known allergens and toxins that can adversely affect your health. Scientific evidence suggests that the disease of asthma may be more prevalent in damp affected buildings. Dampness and mold in homes, office buildings and schools represent a public health problem. The Institute of Medicine concluded, "When microbial contamination is found, it should be eliminated by means that not only limit the possibility of recurrence but also limit exposure of occupants and persons conducting the remediation".



PRO-LAB®

1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

## Mold Sampling Methods

The goal of sampling is to learn about the levels of mold growth and amplification in buildings. There are no EPA or OSHA standards for levels of fungi and mold in indoor environments. There are also no standard collection methods. However, several generally accepted collection methods are available to inspectors to study mold (and bacteria) in indoor environments. Comparison with reference samples can be a useful approach. Reference samples are usually taken outdoors and sometimes samples can be taken from "non-complaint" areas. In general, indoor fungal concentrations should be similar to or lower than outdoor levels. High levels of mold only found inside buildings often suggest indoor amplification of the fungi. Furthermore, the detection of water-indicating fungi, even at low levels, may require further evaluation. There are several types of testing methods that can detect the presence of mold. They can be used to find mold spores that are suspended in air, in settled dust, or mold growing on surfaces of building materials and furnishings. There are different methods that can identify types of live mold and dead mold in a sampled environment. Mold spores can be allergenic and toxic even when dead.

All sampled material obtained in the laboratory is analyzed using modern microscopic methods, standard and innovative mycological techniques, analyzed at 630 – 1,000 times magnification.

Testing for mold with an accredited laboratory is the best way to determine if you have mold and what type of mold it is.

## Surface Sampling Methods

Surface sampling can be useful for differentiating between mold growth and stains of various kinds. This type of sampling is used to identify the type of mold growth that may be present and help investigate water intrusion. Surface sampling can help the interpretation of building inspections when used correctly. The following are the different types of surface samples that are commonly used to perform a direct examination of a specific location. Spore counts per area are not normally useful.

### Tape (or tape-lift)
These samples are collected using clear adhesive tape or adhesive slide for microscopic examination of suspect stains, settled dust and spores. Tape lifts are an excellent, non-destructive method of sampling. The laboratory is usually able to determine if the there is current or former mold growth or if only normally settled spores were sampled.

### Bulk
This is a destructive test of materials (e.g., settled dust, sections of wallboard, pieces of duct lining, carpet segments, return-air filters, etc.) to determine if they contain or show mold growth. Bulk sampling collects a portion of material small enough to be transported conveniently and handled easily in the laboratory while still representing the material being sampled. A representative sample is taken from the bulk sample and can be cultured for species identification or analyzed using direct microscopy for genus identification. The laboratory is usually able to determine if the there is current or former mold growth or if only normally settled spores were sampled.

### Swab
A sterile cotton or synthetic fiber-tipped swab is used to test an area of suspected mold growth. Samples obtained using this method can be cultured for species identification or analyzed using direct microscopy for genus identification. The laboratory is usually able to determine if there is current or former mold growth or if only normally settled spores were sampled. Identified spores are generally reported as "present/absent".

### Carpet (filter-type) Cassette
A carpet cassette is used with a portable air pump (flow rate usually doesn't matter) to collect mold, pollen and other particulates. Samples obtained using this method can be cultured for species identification or analyzed using direct microscopy for genus identification. This method is usually used to determine a presence or absence of water-indicating mold in a carpet. The laboratory is usually able to determine if the there is current or former mold growth or if only normally settled spores were sampled.



1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

## Air Sampling Methods

Air samples are possibly the most common type of environmental sample that investigators collect to study bioaerosols (mold, pollen, particulates). The physics of removing particles from the air and the general principles of good sample collection apply to all airborne materials, whether biological or other origin. Therefore, many of the basic principles investigators use to identify and quantify other airborne particulate matter can be adapted to bioaerosol sampling. Common to all aerosol samplers is consideration of collection efficiency. The following are the two most common forms of air sampling methods.

**"Non-Viable Methods"**  *(The Laboratory results are reported in "spores per cubic meter (sp/m3)*

**Z5 Cassette**
The $Z^5$ spore trap is used with a portable air pump (5 liters/minute for 1 to 5 minutes) to rapidly collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small slit at the top of the cassette and spores are trapped on a sticky surface on a small glass slide inside the cassette. They are efficient at collecting spores as small as 1µm.

**Micro5 Cassette**
The Micro5 Microcell spore trap cassette is used with a portable air pump (5 liters/minute for 1 to 5 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small circular hole at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. They are efficient at collecting spores as small as 0 8µm.

**Air-O-Cell Cassette**
The Air-O-Cell spore trap cassette is used with a portable air pump (15 liters/minute for 1 to 10 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small opening at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. These cassettes are efficient at collecting spores as small as 2.6µm.

**Allergenco-D Cassette**
The Allergenco-D spore trap cassette is used with a portable air pump (15 liters/minute for 1 to 10 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small opening at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. These cassettes are efficient at collecting spores as small as 1.7µm.

**"Viable Methods"**  *(The Laboratory results are reported in "colony forming units per cubic meter (CFU/m3)*

**Agar Impaction Plates**
The agar impaction plates are used with a portable air pump (28.3 liters/minute for 1 to 3 minutes) to collect airborne mold. This is called "viable sampling" because it only grows what is alive at the time of testing. Air is drawn through a 200-400 holes at the top of the impactor and spores are trapped in the agar media. The agar plate should be shipped to the laboratory immediately or kept cool until it can be shipped. These cassettes are 90% efficient at collecting spores as small as 0.7µm. The laboratory results are reported in "colony forming units per cubic meter (CFU/$m^3$)".



1875 North Commerce Parkway, Weston, FL 33326    (954) 384-4446

## Data Interpretation

Information (data) on mold in buildings can consist of the simple observation of fungal growth on a wall, analytical measurements from hundreds of environmental samples, or the results of a survey of building occupants with and without particular building-related conditions. Data interpretation is the process whereby investigators make decisions on (a) the relevance to human exposure of environmental observations and measurements, (b) the strength of associations between exposure and health status, and (c) the probability of current or future risks. These interpretation steps are followed by decisions on what measures can be taken to interrupt exposure and prevent future problems.

### Remediation of Mold

Prevention of mold growth indoors is only possible if the factors that allow it to grow are identified and controlled. When prevention has failed and visible growth has occurred in a home or building, remediation and/or restoration may be required. The extent of the mold growth will determine the scope of the remediation required. The goal of remediation is to remove or clean mold-damaged material using work practices that protect occupants by controlling the dispersion of mold from the work area and protect the workers from exposure to mold. You should consult a professional when contemplating fixing a large area of mold growth. Generally, remediation requires (a) removal of porous materials showing extensive microbial growth, (b) physical removal of surface microbial growth on non-porous materials to typical background levels, and (c) reduction of moisture to levels that do not support microbial growth. Identification of the conditions that contributed to microbial proliferation in a home or building is the most important step in remediation  No effective control strategy can be implemented without a clear understanding of the events or building dynamics responsible for microbial growth. Following the completion of the remediation process, mold testing should be performed to obtain clearance.

### Symptoms of Mold Exposure

The most common symptoms of mold exposure are runny nose, eye irritation, cough, congestion, and aggravation of asthma. Individuals with persistent health problems that appear to be related to mold or other types of air quality contaminant exposure should see their physicians for a referral to specialists who are trained in occupational/environmental medicine or related specialties and are knowledgeable about these types of exposures. Decisions about removing individuals from an affected area must be based on the results of such medical evaluation. Mold is naturally present in outdoor environments and we share the same air between the indoor and outdoor, it is impossible to eliminate all mold spores indoors.

### Ten Things You Should Know About Mold

1) Potential health effects and symptoms associated with mold exposures include allergic reactions, asthma, and other respiratory problems.

2) There is no practical way to completely eliminate mold and mold spores in the indoor environment. The way to control indoor mold growth is to control moisture.

3) If mold is a problem in your home or building, you must clean up the mold and eliminate sources of moisture.

4) To prevent mold growth any source of a water problem or leak must be repaired.

5) Indoor humidity must be reduced (generally below 60%) to reduce the chances of mold growth by: adequately venting bathrooms, dryers, and other moisture-generating sources to the outside; using air conditioners and de-humidifiers; increasing ventilation; and using exhaust fans whenever cooking, dishwashing and cleaning.

6) Clean and dry any damp or wet building materials and furnishings within 24-48 hours to prevent mold growth.

7) Clean mold off of hard surfaces with water and detergent and dry completely.

8) Prevent condensation: reduce the potential for condensation on cold surfaces (e.g., windows, piping, exterior walls, roof, or floors) by adding insulation.

9) In areas where there is a perpetual moisture problem on the floor, do not install carpeting

10) Mold can be found almost anywhere. Mold can grow on wood, paper, carpet, foods; almost anything can support some mold growth provided there is moisture, time to grow and food to eat.



1675 North Commerce Parkway, Weston, FL 33326    (954) 384-4446

## References & Resources

Bioaerosols  Assessment and Control, Janet Macher, Sc.D., M.P.H., Editor. 1999  ACGIH, 1330 Kemper Meadow Drive, Cincinnati, OH 45240-1634.

Health Implications of Fungi in Indoor Environments, Edited by R.A. Samson. 1994. Elsevier Science, P.O. Box 945, Madison Square Station, New York, NY 10159-0945.

Damp Indoor Spaces and Health, Institute of Medicine of the National Academies, Washington, DC, 2004

Field Guide for the Determination of Biological Contaminants in Environmental Samples, 2nd Edition, Edited by L-L. Hung, et al  AIHA, Fairfax, VA, 2005.

Recognition, Evaluation, and Control of Indoor Mold, Edited by B. Prezant, et al. AIHA, Fairfax, VA, 2008.

## Useful Websites

www.acgih.org/resources/links.htm
American Conference of Governmental Industrial Hygienists - information on Indoor Air Quality and useful links

www.cal-iaq.org
California Indoor Air Quality Program - California Indoor Air Quality resources and useful links

www.health.state.ny.us/environmental/indoors/air/mold.htm
New York State Department of Health - New York state recommendations for IAQ, indoor mold inspections, remediation, and prevention

http://www.nyc.gov/html/doh/html/epi/moldrpt1.shtml
Guidelines for Assessment and Remediation of Fungi in Indoor Environments – a good reference for mold clean up and removal

orf.od.nih.gov/PoliciesAndGuidelines/ORFPolicies/MoldPrevPolicy.htm
National Institutes of Health - information mold prevention and remediation

http://www.niehs.nih.gov/health/topics/agents/mold/index.cfm
National Institute of Environmental Health Sciences - information on mold

www.epa.gov/mold/
United States Environmental Protection Agency website on mold and moisture

www.aaaai.org/nab/index.cfm?p=faq
American Academy of Allergy, Asthma, and Immunology – information on mold and allergies and outdoor allergens

http://www.aanma.org/?s=mold
Allergy & Asthma Network – information for homes about allergies and asthma

http://www.homeenergyresourcemn.org
Minnesota Department of Commerce Energy Information Center – good information on moisture control in homes

http://eetd.lbl.gov/ie/
Governmental Indoor Environment Department – good information on indoor health, comfort and energy efficiency in buildings

http://www.osha.gov/dts/shib/shib101003.html
Occupational US Department of Labor (OSHA) - A Brief Guide to Mold in the Workplace



# 52-Point Visual Inspection

Prepared for

Site Address  *3.9 Patrick Dr.*

City  *Biloxi*　　　　State  *MS*　Zip  *39531*

Inspector  *Brad Smith*

Date  *10-27-2016*　　　Time  *5:00 pm*

This inspection for mold or fungi is performed for a fee to visually inspect for signs of a mold like substance, fungi or growth. It may also include air, swab or bulk tests to be performed with their associated lab fees.

A fee is charged per sample. All fees must be paid prior to sending in any samples. Sample tests should be considered at each area that visible evidence is present. Whether this report reveals mold in the building or not, the customer, building owner or potential buyer should consider:

1. Whether or not to have any sample tests performed at any area that was noted in the report.
   - **We always suggest to have a Direct ID Sample for visible microbial growth.**
   - **If someone is sick in your home, we always suggest to have the areas they spend most of their time in to be tested.**

2. Whether or not to hire a qualified mold remediation company or industrial hygienist for further consultation, inspection or corrective procedures, either now, before the lab tests results, or afterwards.

**Important:** If you do have mold and it must be removed, you are strongly encouraged to obtain the services of a qualified remediation contractor. If a homeowner or contractor unfamiliar with containment, removal and safety practices performs remediation activities, building occupants can be put at elevated health risks and mold may spread to areas that previously had no contamination. Failure to eliminate source(s) of moisture in the building that are allowing mold to flourish will render remediation efforts ineffective.

| Client Present | Age of Home | Weather | Exterior Temp |
|---|---|---|---|
| *yes* | *10* | *Clear & Sunny* | *80°* |



# 52-Point Visual Inspection

# OUTSIDE

| | | | | |
|---|---|---|---|---|
| 1 | Is there standing water in the yard? | | Yes ☐ | No ☒ |
| 2 | Does the land slope towards the home or building? | | Yes ☐ | No ☒ |
| 3 | Are gutters present? | | Yes ☒ | No ☐ |
| 4 | Are downspouts present? | | Yes ☒ | No ☐ |
| 5 | Is there vegetation against house or building? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)

# ROOF (Do not climb onto roof)

| | | | | |
|---|---|---|---|---|
| 6 | Are there missing or broken shingles? | How many? | Yes ☐ | No ☒ |
| 7 | Are the shingles older than 10 years? | | Yes ☐ | No ☒ |
| 8 | Are any flanges around the vents loose? | | Yes ☐ | No ☒ |
| 9 | Is any flashing loose? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)

# Foundation Type

| 10 | Basement ☐ | Crawl ☒ | Slab ☐ |
|---|---|---|---|

# Basement

| | | | |
|---|---|---|---|
| 11 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 12 | Are there any carpeted areas? | Yes ☒ | No ☐ |
| 13 | Is there a sump pump? | Yes ☐ | No ☒ |

Comments:



# 52-Point Visual Inspection

## Crawl Space (Enter only if safe to do so)

| # | Question | | Yes | No |
|---|----------|---|-----|-----|
| 14 | Are there any leaks? | | ☒ | ☐ |
| 15 | Is there microbial growth? | *Around HVAC vents* | ☒ | ☐ |
| 16 | Is there a vapor barrier? | | ☒ | ☐ |
| 17 | Is the vapor barrier totally sealed and intact? | | ☒ | ☐ |
| 18 | Is the crawl space totally encapsulated? | | ☒ | ☐ |
| 19 | Is there room for you to crawl? | | ☒ | ☐ |
| 20 | Is there any rot? | | ☐ | ☒ |
| 21 | Is the insulation intact? | | ☒ | ☐ |
| 22 | Is the insulation wet? | | ☐ | ☒ |
| 23 | Is the duct work intact? | | ☒ | ☐ |
| 24 | Any condensation around the ducts? | | ☐ | ☒ |
| 25 | Are the floor joists intact? | | ☒ | ☐ |
| 26 | Is there a dehumidifier in place? | | ☐ | ☒ |
| 27 | Are any vents blocked off? | | ☐ | ☒ |

Comments:



## 52-Point Visual Inspection

# INSIDE

## Microbial Activity

| | | | Yes | No |
|---|---|---|---|---|
| 30 | Any Microbial Activity? (e.g., carpet, drapes, walls, ceilings, cabinets, etc.) | | ☐ | ☒ |
| 31 | Is there a musty odor present? | | Yes ☐ | No ☒ |
| 32 | Are there any water marks? | | Yes ☒ | No |

Comments:

## Attic

| | | Yes | No |
|---|---|---|---|
| 33 | Anything suspicious? (including lack of proper ventilation) | Yes ☐ | No ☒ |

**DUE TO LIABILITY, WE DO NOT GO INTO THE ATTIC UNLESS THERE IS A SUSPECTED AREA OF CONCERN.

Comments:

## Kitchen and Laundry

| | | Yes | No |
|---|---|---|---|
| 34 | Is the dryer ventilation intact? | Yes ☒ | No ☐ |
| 35 | Are there any leaks behind the washer? | Yes ☐ | No ☒ |
| 36 | Are there any leaks under or behind refrigerator? | Yes ☐ | No ☒ |
| 37 | Are there any leaks under kitchen sink? | Yes ☐ | No ☒ |

Comments:



# 52-Point Visual Inspection

## Bedroom/Office(s)

**Indicate Name of Bedroom/offices

| | | R01 | | R02 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☒ | No ☐ | Yes ☒ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |

**Indicate Name of Bedroom/offices

| | | R03 | | R04 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |

**Indicate Name of Bedroom/offices

| | | R05 | | R06 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

**Indicate Name of Bedroom/offices

| | | R07 | | R08 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

**Indicate Name of Bedroom/offices

| | | R09 | | R10 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

**Indicate Name of Bedroom/offices

| | | R11 | | R12 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

Comments:



**52-Point Visual Inspection**

## Bathroom(s)

**If more than 2 bathrooms, please describe in comment section

| | | Bathroom 1 | | Bathroom 2 | |
|---|---|---|---|---|---|
| | | Yes | No | Yes | No |
| 42 | Exhaust fan(s) present and getting proper suction? | ☒ | ☐ | ☒ | ☐ |
| 43 | Any leaks under the sink? | ☐ | ☒ | ☐ | ☒ |
| 44 | Are all bathtub seals intact? | ☒ | ☐ | ☒ | ☐ |
| 45 | Are there any leaks around the bathtub? | ☐ | ☒ | ☐ | ☒ |
| 46 | Any leaks around hot the water heater? | ☐ | ☒ | ☐ | ☒ |

Comments:

There appeared to be a leak of some sort at the bottom of shower door.

Insulation of top of hot water heater had microbial growth

## HVAC

| | | Yes | No |
|---|---|---|---|
| 47 | Is there a return vent? | ☒ | ☐ |
| 48 | Is any furniture sitting on top or blocking HVAC registers? | ☐ | ☒ |

Comments: (Note condition of return and ducts)

## Relative Humidity Indoors

49. Readings /Comments:

69 % Humidity

## Moisture Indoors

50. Readings /Comments:

9 % – 15 %

**MoldTest USA**

## 52-Point Visual Inspection

Do You Recommend Remediation?   Yes ☐   No ☐   Possibly ☒

49. Explanation:

If test results come back positive for toxic mold home owners need to remediate and not be exposed to it

## Issues of Concern

50. Comments:

51. Recommended Preventative Measures:

## Inspector Recommends These Areas to Test

52. *We always recommend a Tape Lift Sample for anything visual that appears to be microbial.*

Tape lift of HVAC because of visual microbial growth



# 52-Point Visual Inspection

## THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days. *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial Laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.
**\*If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!**

Please call the office before sampling. Thank you!
877-554-6653 (Office Hours 9am-7pm EST, MON-FRI)
Our customer spoke with_____at MTUSA.

**Please have Customer Initial the following:**

I agree to pay $_____ for the inspection and testing. The inspector completed the 52 Point Inspection and I am satisfied with services rendered.          **Initial:**

## Signatures

**Inspector Signature:**          **Date:**

10·28·2016

**Customer Signature:**          **Date:**

2016/027

Would you like Mold Test USA to recommend professionals to give you estimates on needed repairs?          Yes          No

I do not wish to have a written protocol at this time. If I choose to have protocol written at a later date and it exceeds 7 days, Mold Test USA will need to retest in order to have a properly written protocol.

**Inspector Signature:**          **Date:**

10-28-2016

**Customer Signature:**          **Date:**

2016/027

Newton
Laboratory

# NML-20161031-Rushing and Guice PLLC. - 208 Patrick Dr

## Spore Analysis Completed for



1101 1st Street South EXT Suite B, Columbia, SC 29209

803-778-0582

admin@moldtestusa.com

| | |
|---|---|
| Collected Date | 10/28/2016 |
| Collected Street Address | 208 Patrick Dr |
| Collected & Relinquished by | Jumal Smith |
| # of Sample Sent | 3 |
| Received Date | 10/31/2016 |
| # of Sample Received & Accepted | 3 |
| Analyzed Date | 10/31/2016 |
| Accepted & Analyzed by | Janna Komorowski |
| Approved by | Crystal Hernandez |

Thank you for using Newton Microbial Laboratory for your mold test analysis. Spore trap analysis is the best approach to for fungal contamination in remediation. In the context and developed to follow current industry guidelines for the interpretation of microbial samples, analysis, and remediation. Newton Microbial Laboratory bears no responsibility for sample collection, individual results...

## Spore Analysis Completed by

Janna Komorowski
Laboratory Director, B.A. in Biological Sciences

*[signature]*

Crystal Hernandez
Operations Director, B.A. in Biology

*[signature]*

Laboratory

1101 1st Street South EXT Suite C, Columbia SC 29209

EXHIBIT
D

©2013-2016 Newton Microbial Laboratory

Newton Laboratory

| Property/Customer Name | Rushing and Guice PLLC - 208 Patrick Dr | | Site Street Address | 208 Patrick Dr | | Site City | Biloxi | | Site State | MS | | Site Zip | 39531 |

**Company Email:** 
**Site Street Address:** 208 Patrick Dr
**Company Phone Number:** 803-776-0562
**Company Name:** Mold TEST USA

**Company Address:** 1101 1st Street South EXT. Suite B, Columbia, SC 29209

| | | Site City | Biloxi | Site State | MS |
| --- | --- | --- | --- | --- | --- |
| Date Collected | 10/28/2016 | Date Received | 10/31/2016 | | |
| Sample Collected by | Jamal Smith | Date Reported | 10/31/2016 | | |

Newton ML ID Number: NML-2016J031-Rushing and Guice PLLC - 208 Patrick Dr

| | SPC0001 | | | SPC0002 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Sample ID Number | SPC0001 | | | SPC0002 | | | | | |
| Sample Name/Location | Control/Outside | | | Outside | | | | | |
| Volume (L) | 150 | | | 150 | | | | | |
| Background* | 4 | | | 4 | | | | | |
| Limit of Detection (Spore/M³) | 7 | | | 7 | | | | | |
| Sample Type | Spore Count | | | Spore Count | | | | | |

| Organism | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Alternaria | 1 | 7 | 4.55% | Not Detected | | | | | |
| Ascospores | Not Detected | | | 1 | 7 | 5.88% | | | |
| Aspergillus/Penicillium | 3 | 20 | 33.64% | 5 | 33 | 29.41% | | | |
| Basidiospores | 8 | 53 | 36.36% | 5 | 33 | 29.41% | | | |
| Bipolaris/Drechslera | Not Detected | | | Not Detected | | | | | |
| Chaetomium | Not Detected | | | Not Detected | | | | | |
| Cladosporium | 3 | 20 | 13.64% | 1 | 7 | 5.88% | | | |
| Curvularia | 2 | 13 | 9.09% | 1 | 7 | 5.88% | | | |
| Epicoccum | Not Detected | | | Not Detected | | | | | |
| Fusarium | Not Detected | | | 1 | 7 | 5.88% | | | |
| Memnoniella | Not Detected | | | Not Detected | | | | | |
| Myxomycetes/Smuts | 3 | 20 | 13.64% | 2 | 13 | 11.76% | | | |
| Pithomyces | 1 | 7 | 4.55% | Not Detected | | | | | |
| Stachybotrys | Not Detected | | | Not Detected | | | | | |
| Stemphylium | Not Detected | | | Not Detected | | | | | |
| Torula | Not Detected | | | Not Detected | | | | | |
| Trichoderma | Not Detected | | | Not Detected | | | | | |
| Ulocladium | Not Detected | | | Not Detected | | | | | |
| Unspecified Spore | 1 | 7 | 4.55% | 1 | 7 | 5.88% | | | |
| Total | 22 | 147 | 100.00% | 17 | 113 | 100.00% | | | |

| Hyphal Fragment | 7 | Not Detected | |
| --- | --- | --- | --- |
| Spore Ct + Dander | na | na | |
| Fiber | na | na | |
| Pollen | na | na | |

Color Code: Common Outdoor | Common Indoor | Elevated Counts | Water Damage Indicator

Comments

Newton
Laboratory

Newton MLI D #
2016031 Rushing and Guice PLLC - 208 Patrick Dr



©2013-2016 Newton Microbial Laboratory

# Newton Laboratory

## Spore Trap Count Explanation

| | |
|---|---|
| **Volume** | Flow Rate * Flow Rate Minute |
| **Background** | None: Recollect |
| | 1: <5% |
| | 2: 5% ≤ Background Coverage < 25% |
| | 3: 25% ≤ Background Coverage < 70% |
| | 4: 70% ≤ Background Coverage < 90% |
| | 5: 90% ≤ Background Coverage < 100%, Recollect |
| **Cts/M³** | Spore Counts per Cubic Meter |
| **Hyphal Fragment** | Fragments of hyphae. Can be an additional indicator of possible mold presences |
| **Unspecified Spore** | Less commonly identified spore type |
| **Limit of Detection** | 1 spore count per coverage examined area |
| **Sample Type** | |
| **Spore Count** | Spore Trap Cassettes  Identification & Enumeration of Fungal Spores |
| **Spore Count+** | Spore Trap Cassettes  Identification & Enumeration of Fungal Spores |
| | + Total Dander, Fiber, and Pollen Count |





*Uncertainty available upon request

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

Newton ML ID #
20161031 Rushing and Guice PLLC. - 208 Patrick Dr

| Site Name | Rushing and Guice PLLC. - 208 Patrick Dr | Site Address | 208 Patrick Dr | Site City | Biloxi | Site State | MS | Site Zip | 39531 |
|---|---|---|---|---|---|---|---|---|---|

Company Email: admin@moldtestusa.com

Company Phone Number: 803-776-0562

Date Received: 10/28/2016

Date Received: 10/31/2016

Company Address: 1101 1st Street South EXT. Suite B, Columbia, SC 29209

Company Name: Mold TEST USA

Sample Collected by: Jumai Smith

Date Reported: 10/31/2016

| Newton ML ID Number | NML-20161031-Rushing and Guice PLLC. - 208 Patrick Dr |
| Sample ID Number | DIR 0001 |
| Sample Name | Downstairs HVAC Vent |
| Sample Type | Direct ID - Tape |

| Organism | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alternaria | ND | | | | | | | | | | | | | | | |
| Ascospores | ND | | | | | | | | | | | | | | | |
| Aspergillus\|Penicillium | ND | | | | | | | | | | | | | | | |
| Basidiospores | ND | | | | | | | | | | | | | | | |
| Bipolaris\|Drechslera | ND | | | | | | | | | | | | | | | |
| Chaetomium | ND | | | | | | | | | | | | | | | |
| Cladosporium | ND | | | | | | | | | | | | | | | |
| Curvularia | ND | | | | | | | | | | | | | | | |
| Epicoccum | ND | | | | | | | | | | | | | | | |
| Fusarium | ND | | | | | | | | | | | | | | | |
| Memnoniella | ND | | | | | | | | | | | | | | | |
| Myxomycetes\|Smuts | ND | | | | | | | | | | | | | | | |
| Pithomyces | ND | | | | | | | | | | | | | | | |
| Stachybotrys | ND | | | | | | | | | | | | | | | |
| Stemphylium | ND | | | | | | | | | | | | | | | |
| Torula | ND | | | | | | | | | | | | | | | |
| Trichoderma | ND | | | | | | | | | | | | | | | |
| Ulocladium | ND | | | | | | | | | | | | | | | |
| Unspecified Spore | ND | | | | | | | | | | | | | | | |

ND = Not Detected

| Hyphal Fragment | Heavy | | | |
| Background Debris | Light | | | |

Comments

| Color Code | Common Outdoor | Common Indoor | Water Damage Indicator | Color Code |

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

# Direct Identification Explanation

## Direct ID

| | |
|---|---|
| Trace | Spore Count less than 10 |
| Light | Estimated Spore Counts between 11 and 100 |
| Medium | Estimated Spore Counts between 101 and 1000 |
| High | Estimated Spore Counts above 1000 |

## Hyphal Fragment/Background Debris

| | |
|---|---|
| Not Detected | Not Found in the Sample |
| Light | Found Traces throughout the Sample |
| Moderate | Found Some throughout the Sample |
| Heavy | Found All throughtout the Sample |

## Unspecified Spore

Less commonly identified spore type



## Sample Type

| | | |
|---|---|---|
| Direct ID-Swab | Swab for ID only | ID and Quantitative Enumeration of Spores |
| Direct ID-Swab+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Tape | Swab for ID only | ID and Quantitative Enumeration of Spores |
| Direct ID-Tape+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Bulk | Swab for ID only | ID and Quantitative Enumeration of Spores |
| Direct ID-Bulk+ | Swab for ID + Spore Count | *ID and Enumeration with Spore Count |
| Culture | Air Plate, Swab, Bulk | Identification and Enumeration of Mold only |

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory




# Alternaria



**Growth & Distribution**

- Alternaria is one of the most common and widely distributed molds on the planet (2). The reproductive spores become airborne easily and are prolific in the atmosphere worldwide.
- **Growth Rate:** Rapid Mature with 0.5 to 8 days (34)
- **Water activity:** 0.85-0.88 (1)
- **Outdoors:** In the outdoor environment, Alternaria is found in soil, water and plant material: it plays an important role in vegetable matter decomposition (1). Airborne Alternaria spore counts are often higher around farming and agricultural operations, particularly during harvesting processes when spores are released into the air in large numbers. (3) It is well studied as a plant pathogen having saprophytic effects on a wide variety of vegetation and is often the source of early blights in crops (2). It reaches peak concentrations during late summer and fall (2).
- **Indoors:** Alternaria can be found growing indoors on textiles, dust, wood, carpeting, flooring, drywall or gypsum board, wall paper, furniture, and other cellulose materials. It can be found in humidifiers, heating and air conditioning units, inside of ductwork, and surrounding damp areas i.e. sinks, showers, and windows(1).

**Health Effects**

- **Allergenic**
  - Considered by some to be among the most common mold allergens in the US (1).
  - Alternaria can cause allergy symptoms following ingestion, inhalation, injection or direct contact.
  - Alternaria spores are airborne allergens (1). Reactions due to inhalation may increase during peak concentration times in late summer and early fall.
  - Inhalation of high concentrations by sensitive individuals may manifest in Type I and Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III).

- **Pathogen**
  - Invasion is rare but can occur, particularly in immunocompromised individuals. Cases of onychomycosis (nail infection), sinusitis, ulcerated cutaneous infections, keratitis, phaeohyphomycosis, as well as osteomyelitis and peritonitis in patients undergoing peritoneal dialysis have been reported (1,4).
  - Can occasionally cause phaeohyphomycosis (fungal infection), usually in subcutaneous tissue (6).

- **Toxins/ Metabolites**
  - Alternariol (antifungal uses), AME (alternariol monomethylether), tenuazonic acid, & altertoxins (1)

Found in Sample(s)
AIR          *Control/Outside••••••••••••••
DIRECT       •••••••••••••••

(List of references can be found at http://newtonlaboratory.com/glossary)

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory





## Growth and Distribution

Ascospores refers to spores produced in a sac-like structure known as an ascus (plural asci). These spores are specific to fungi of the phylum Ascomycota. Ascomycota is a broad division containing a large number of genera and individual species. Identification of the genus and/or species based on spore morphology alone is not always possible, therefore these spores are often given the more general classification of "Ascospores" in microscopic analysis.

- Ascospores are found worldwide with prevalence and distribution depending on particular genus and species.
- **Outdoors:** Ascospores are found ubiquitously in outdoor environments; often found on dead and decaying plant material.
- Many types are known to have pathogenic or parasitic properties in plants.
- **Indoors:** Common substrates include damp building materials such as gypsum or lumber, carpeting, dust, and other organic materials.

## Health Effects

- **Allergen**
  - Ascospores can be allergenic to sensitive individuals, most often producing Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III). (5)
  - Reactions due to spore inhalation may increase following rain or high humidity. (5)
  - Unlike some fungi which rely on air currents for spore dispersal, ascomycetes are capable of a more active form of spore dispersal that utilizes water droplets to catapult their spores into the air. Various species of Ascospores are known to use this method to liberate spores every single day, regardless of air flow. Subsequently, exposure to ascospores may be more consistent from day to day than exposure to other spores which are only dispersed with adequate air currents. For this reason these spores may be of particular interest in cases of chronic respiratory disease such as asthma and rhinitis (5).

- **Pathogen**
  - Some types can be pathogenic; dependent upon genus and species.

- **Toxins\Metabolites**
  - Vary greatly depending on genus and species.

Found in Sample(s)
AIR                **Outside••••••••••••••**
DIRECT           **••••••••••••••••**

(5) List of references can be found at http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

20161031 Rushing and Guice PLLC - 208 Patrick Dr
Newton MS, ID #



# Aspergillus/Penicillium

**Growth & Distribution (7):**

Aspergillus & Penicillium are incredibly adaptive and abundant organisms. Their distribution is world-wide with many species possessing abilities to tolerate environmental conditions that challenge other molds (i.e. extreme temperatures & pH levels, restricted water availability and exposure to radiation). Colony growth rates are rapid for many species. Mature colonies are capable of quickly producing large numbers of spores. Because of the morphological similarity of the spores, the two genera are typically grouped together as "Aspergillus-Penicillium."

- **Growth Rate:** Usually Rapid – Mature within 3-4 days; however, some species are slower(6).
- **Water Activity:** Aspergillus: 0.93-0.97 & Penicillium: 0.88 – 0.99 (33, 35)
- **Outdoors:** Both can be found outdoors on a variety of substrates- particularly plant materials such as cereals, grains, decaying wood, and soil (7).
- **Indoors:** Found indoors on organic materials such as wood, textiles, cellulose materials, carpeting, painted surfaces, and food stuffs such as cheeses, butter/margarine meats, breads, fruits and vegetables. Halotolerant species may be found growing on refrigerated foods (7). Penicillium is used in cheese production and is responsible for the veins in blue cheese.

**Health Effects**

- **Allergen:**

  - Because these spores are so abundant, daily exposure to Aspergillus/Penicillium is very common in both indoor and outdoor environments. Often this exposure occurs without any noticeable reaction or symptoms. However, sensitivities may develop in some instances- especially with prolonged exposure to high spore concentrations. This can result in allergic responses.

  - Spores may progress further into the respiratory system than other common spores due to their small aerodynamic diameter.

  - Penicillium is the mold from which the antibiotic Penicillin was first derived. Penicillin is now made synthetically. It does not contain the mold Penicillium. Allergy to one does not necessarily imply allergy to the other.

- **Pathogen (6,7):**

  - There are approximately 175 species of Aspergillus, only about 20 of which are known to cause disease in humans.
  - Diseases caused by Aspergillus are known as aspergillosis and include invasive infection, colonization, & toxicosis.
  - Certain species of Penicillium are considered pathogens. Infection may occur in skin, blood, bone marrow, internal organs or lymph nodes. (6). In the immunocompromised (particularly HIV patients or those who have recently been in Southeast Asia) P. *marneffei* can cause severe infection capable of affecting respiratory, lymphatic, and nervous systems.

- **Toxins/Metabolites:**

  - Different species of Aspergillus/Penicillium are associate with an array of mycotoxins and metabolites, some of which are medically significant in humans. The importance of these toxins can vary from species to species and depends largely on the prevalence of that species.

(List of references can be found at: http://newtonlabgrown.com/glossary)

| Found in Sample(s) | |
| --- | --- |
| AIR | •Control/Outside·Outside•••••••••••• |
| DIRECT | •••••••••••••••• |

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

# Bipolaris / Drechslera



## Growth & Distribution:

- Bipolaris, Drechslera, Exserohilum, & Helminthosporium are dematiaceous fungi, producing spores which are elongate, cylindrical, often with numerous septations or cells. These genera are grouped together due to spore similarity. These spores are common in both indoor and outdoor environments. They are found world wide with some species being exceptionally tolerant of dry environments (6).

- Growth Rate: Rapid – Mature within 5 days (6)

- Water Activity: 0.80 (this is a generalized number for common molds) (26)

- Outdoors: These molds are most commonly found on grasses, grains and other plant materials. Bipolaris can be a plant pathogen causing spots, blights, rots, and other symptoms in staple crops like rice, wheat, and sorghum. In the past, plant disease caused by Bipolaris invasion has caused starvation of large human populations. In 1943-1944 the Bengal famine in India was caused by *Bipolaris oryzae* disease in rice. In the 1970s, *Bipolaris maydis* was responsible for a devastating leaf blight resulting in huge losses of corn crops in the USA & UK. (11)

- Indoors: These mold may be found on water damaged materials, food stuffs, houseplants, and other organic materials.

## Health Effects:

- Allergenic:
  - These molds are highly common in both indoor and outdoor environments; most people have some level of exposure on a daily basis.
  - In sensitive individuals can manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- Pathogenic:
  - Bipolaris (rapid growth – mature within 5 days) can be pathogenic in rare instances, particularly in immunocompromised. May invade bone, cornea (keratomycosis), skin, aorta, lung, central nervous system or cause brain lesions (6).
  - Exserohilum (rapid growth – mature within 5 days) can cause phaeohyphomycosis (infection of mycelia/hyphae of dematiaceous fungi), most commonly in nasal sinuses, skin, subcutaneous tissue, and cornea. Rare reports of fatal disseminated infection (6).

- Mycotoxins/Metabolites:
  - Cytochalasin, sporidesmin, sterigmatocystin (7)

Found in Sample(s)
AIR
DIRECT

<Control/Outside>Outside•••••••••••
••••••••••••••••••

( List of references can be found at: http://freentolaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton Laboratory

Newton ML ID #
Newton Laboratory · 208 Patrick Dr
20160131 Rushing and Guice PLLC · 208 Patrick Dr

# Cladosporium



## Growth & Distribution:

- Cladosporium are found in air and soil worldwide. Cladosporium are among the most common airborne fungi (4). Spores are produced in abundance and easily disperse through the air. Extremely common on decaying organic matter. These mold are common plant pathogens. Molds of this genus are dematiaceous with over 40 named species (1).
- **Growth Rate:** Moderately Rapid – Mature within 7 days. (6)
- **Water Activity:** 0.85-0.88 (1)
- **Outdoors:** Cladosporium can be found on food sources such as cereals, fruit, vegetables. Commonly found on dead plants and shrubs in temperate regions. Halotolerant (salt tolerant) species exist. (7) The most common species isolated from plant materials & soils (*C. cladosporioides*) experiences peak airborne spore concentrations between June/July and September/October in temperate climates (2).
- **Indoors:** Cladosporium can be found on water damaged materials (i.e. plaster, paint, textiles, gypsum, wall paper, wood, moist window sills). May affect food sources such as cheeses, butter/margarine, vegetables, fruits and vegetables(7). Often found on the surface of fiberglass duct liners, in bathroom showers, and on basement walls (2). Some studies have reported Cladosporium in 70% of homes examined in the US & 100% of homes examined in Canada (1).

## Health Effects:

- **Allergen:**
  - Allergic reaction to airborne spores are of particular importance because these spores exist in in such high concentrations in the air. Symptoms may increase during peak concentrations from June-October. Sensitization may occur. (1)
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Is pathogenic in humans very rarely, reported cases include skin lesions, keratitis, onychomycosis, sinusitis, pulmonary infections (1).

- **Mycotoxins/Metabolites:**
  - Cladosporic acid (12)
  - Gibberellin (hormone influencing developmental processes in plants) & ergosterol (precursor to vitamin D2 which may have anti-tumor properties). (1)
  - Toxic effects have been seen in animals (chicken embryos & horses) but not known to be reported in humans to date (1,2).

Found in Sample(s)
AIR          •Control/Outside-Outside••••••••••••
DIRECT       •••••••••••••••

[1]list of references can be found at http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

Newton MxL ID #
20161011 Rushing and Guice PLLC - 208 Patrick Dr



## Curvularia

### Growth & Distribution

- Curvularia is found world-wide with a particular preference for the tropics and warmer climates (7). Spores usually have a unique curved shape caused by an enlarged central cell (2). Airborne spores are common in both indoor and outdoor environments worldwide.

- **Growth Rate:** Moderately rapid - 4 to 12 days (32)

- **Water activity:** 0.80 (this is a generalized number for common molds) (26)

- **Outdoors:** Curvularia is typically seen growing on plant material. They are weakly pathogenic to plants and are the cause of leaf spots, seedling blight, and failing of seedling germination (2).

- **Indoors:** Curvularia may be found growing on materials containing cellulose such as woods and grains. Growth is less frequent indoors but may be seen on food.(7)

### Health Effects:

- **Allergen:**

  - Poorly studied but believed to be an allergen and irritant (13).

  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis &allergic sinusitis (Type III). (5)

- **Pathogen:**

  - Believed to cause corneal infections in the immunocompromised  (14)

  - Opportunistic infections of cornea and sinuses, nails, subcutaneous tissue, and systemic organs. Dissemination to the brain can occur rarely. (6)

  - Can be causal agent in mycetoma (6):

    - Infections of subcutaneous tissue and skin. Untreated, chronic infections may progress to involve muscle, fascia & bone. Typically seen on the lower leg or foot, rarely disseminated.

    - Fungi enters the skin via wound, a nodule slowly develops into a tumor or abnormal tissue mass beneath the skin, cavities are formed within the mass and discharge occurs.

    - This is a rare condition which is not contagious. (6) Most infections occur in immunocompromised  hosts. (2)

- **Toxins/Metabolites:**

  - Some toxins produced- mainly studied in plants.

(1 List of references can be found at http://newtonlaboratory.com/glossary

Found as a molkid
AIR                *Control/Outside-Outside• • • • • • • • • • • •
DIRECT          • • • • • • • • • • • • • • •

Page 12 of 16

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

# Fusarium



**Growth & Distribution**
- Worldwide distribution. Spores are sickle-shaped and contain numerous cells. Spores are common in both indoor and outdoor air.
- **Growth Rate:** Rapid – Mature within 4 days (6)
- **Water Activity:** 0.86–0.91 (4)
- **Outdoors:** Fusarium is common on plant materials (particularly cereals such as grain) and in soil. Many species are pathogenic in plants and may cause root rot, stem rot, vascular wilt, or fruit rot (4). Can also cause rot and mycotoxin contamination of stored crops and grains (4). Spore concentrations are typically higher around water sources, agricultural areas, and during summer (1).
- **Indoors:** Fusarium spores are commonly found indoors as a result of normal air exchange from the outdoor environment. However, growth of Fusarium colonies indoors is rare & is typically a sign of high moisture. This mold may be found on water damaged cellulose, in heating & air conditioning units or ductwork, in stagnant dehumidifier water, in or around appliances such as dishwashers or washing machines, and in bathrooms or kitchens. (4)

**Health Effects:**
- **Allergen:**
  - One of the most common positive dermal tests in mold allergen panels (1).
  - Studies have shown that Fusarium can cause eye irritation and erythema (skin redness) (1).
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)
    - Reactions due to spore inhalation may be increased with proximity to agricultural/farming operations or during peak concentration in summer seasons.
- **Pathogen:**
  - Numerous species of Fusarium can cause infections including mycetoma, eye infections, sinusitis, septic arthritis, and nail infections (6). Typically seen in the immunocompromised.
  - Cause of disseminated systemic infections in severely neutropenic (neutrophil deficient) hosts (6). Unfortunately fatality rates in these instances are high, with the prognosis depending on the immune status of the host (1).
  - Agent of Hyalohyphomycoses (formation a colorless, septate hyphae in tissue; can cause acute inflammation & necrosis or invasion of blood vessels resulting in thrombosis & infarction)(6).
- **Toxins/Metabolites:**
  - Fumonisin, fusaric acid, fusarin, fusarochromanone, moniliformin, trichothecenes (deoxynivalinol, T2 toxin), zearlenol, Zearalenone (12)
  - Ingesting food prepared from grain contaminated with toxigenic species can result in disease (6) - Possible cytotoxic, nephrotoxic, tremorgenic, immunosuppressive, & carcinogenic effects in humans and animals (1).

(List of References can be found at: http://newtonlabinc.com/glossary

Found in Sample(s):
AIR          **Outside••••••••••••
DIRECT     •••••••••••••••

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory



# Myxomycetes

## Growth & Distribution

- Myxomycetes is a large class with approximately 500 individual species and worldwide distribution (25). Interestingly, these organisms are no longer considered to be true fungi like other molds, but have been reclassified as protozoans. These organisms belong to group commonly called "slime molds" that exhibit an amoeba-like stage. Spores are common in both indoor and outdoor environments worldwide (15). Spores can be dispersed by air, arthropods and other animals due to their small size (4 – 20 µm)(25).

- **Growth Rate:** Generally Rapid – Mature within 2 to 4 day; however, specific growth rate does depend on species (24).

- **Water Activity:** 0.80 (this is a generalized number for common molds)(26).

- **Outdoors**
  - Found in soil, decaying plant material (especially damp wood), and dung. Species of Myxomycetes are not as geographically constricted as most organisms; most Myxomycetes species can be found world wide. (15)

- **Indoors**
  - Can be found growing indoors on damp building materials such as cardboard, wallpaper, gypsum board, wood, etc.

## Health Effects:

- **Allergen:**
  - These spores are very common in both indoor and outdoor air. They are small, foreign particles which may be inhaled deep into the respiratory system and may cause allergic responses.
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Unknown

- **Toxins/Metabolites:**
  - Unknown

Founded in
AIR     •Control•Outside•Outside••••••••••••
Direct     •••••••••••••••••

(List of references can be found at: http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

20161031 Rushing and Guice PLLC - 208 Patrick Dr

Newton MLID #



# Pithomyces

## Growth & Distribution:

The colonies grow fairly fast, usually dark (grey to black) in color, while occasionally being yellowish white in color, suede- like to downy, with multicellular conidia (phragmo- or dictyoconidia) forming on peg- like extensions. The conidia extensions are oblong, segmented, verrucose and light brown in color. (4, 29) These spores can be distributed by light winds, rain, and by grazing sheep (27).

- **Growth Rate:** Rapid – Mature within 5 days (6)
- **Water Activity:** 0.80 – 0.89 (28)
- **Outdoors**
  – Can be found on soil and litter (4). During sheep grazing can be found on herbage due to dry litter. (27)
- **Indoors**
  – Can be found on paper (30).

## Health Effects:

– **Allergen:**
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

– **Pathogen:**
  - Can very rarely cause infection in the immunocompromised  (6).
  - Can cause onychomycosis (29).
  - One case of peritonitis reported in a patient with vulvar cancer. (29)

– **Toxins/Metabolites:**
  - Sporidesmin (a mycotoxin which causes facial eczema in sheep)(31).

(List of references can be found at http://newtonlaboratory.com/glossary)

Found in Sample(s)
AIR          •Control/Outside•••••••••••••
DIRECT       ••••••••••••••••

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

# Stachybotrys





**Growth & Distribution**

– Stachybotrys is found worldwide. One species in particular, *Stachybotrys chartarum* (sometimes called "black mold" or "toxic mold"), has gained attention recently following concerns about indoor air quality and mold contamination.

• **Growth Rate:** Moderately Rapid – Usually mature with 7 days. Growth may be slower on medias that are not high in cellulose.

• **Water Activity:** Minimal 0.94; Optimal >0.98 (1)

• **Outdoors**

– Found on decaying plant material and in soil. May contaminate grains, tobacco, wood pulp, and other plant debris. Spore concentrations are generally low in outside air.

• **Indoors**

– Typically found growing indoors on materials containing cellulose with high water content. This can include water damaged **building materials such as wood, gypsum board, wall paper, textiles, carpeting, and cardboard. Stachybotrys does not generally grow without prolonged access to moisture, usually lasting days or weeks. It is also not well suited for competition against** other molds. Spores do not become airborne easily and generally settle out of the air quickly. For this reason, airborne spores are often the result of recent physical disturbance of colonies. (1)

**Health Effects:**

– **Allergen:**

• In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

– **Pathogen:**

• No reported cases of human or animal infection (1).

– **Toxins/Metabolites:**

• May be associated with pulmonary hemorrhage & hemosiderosis in infants (6).

• Has frequently been suggested as a contributing agent in a variety of illnesses reported by occupants of water damaged buildings; however, establishing a firm causal relationship requires further study (6).

• The species S. chartarum produces several mycotoxins that may affect humans and animals after ingestion, inhalation, or absorption (1).

• Grisecfulvin, trichothecenes (isosatratoxin, roridin, satratoxin, trichodermol, trichoverrol (12)

(1List of references can be found at: http://newtonlaboratories.com/glossary



Found in Sample(s)
AIR
DIRECT

················
*Downstairs HVAC Vent**················

## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
### SECOND JUDICIAL DISTRICT

JASON COOKSEY, HEIDI COOKSEY, AND
SARAH COOKSEY, SYDNEY COOKSEY, AND
SADIE COOKSEY, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, JASON AND HEIDI COOKSEY
    **PLAINTIFFS**

**VERSUS**
    CAUSE NO. _A2402-17-H/1_

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z
    **DEFENDANTS**

### <u>SUMMONS</u>

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

**TO:**    **Hunt Southern Group, LLC fka Forest City Southern Group, LLC**
    **c/o Registered Agent**
    **Capitol Corporate Services, Inc.**
    **248 E. Capitol Street, Suite 840**
    **Jackson, Mississippi 39201**
    **OR WHEREEVER THEY MAY BE FOUND**



### <u>NOTICE TO DEFENDANT(S)</u>

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing & Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi, Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2nd Floor, Ocean Springs, Mississippi 39564**. Your response must be mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and the seal of said Court, on this the _22_ day of _Dec._ _____, 2017.

BY: _____ _Connie Ladner_ Clerk
    _____ D.C.

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT



JASON COOKSEY, HEIDI COOKSEY, AND
SARAH COOKSEY, SYDNEY COOKSEY, AND
SADIE COOKSEY, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, JASON AND HEIDI COOKSEY                    **PLAINTIFFS**

**VERSUS**                                    CAUSE NO. A2402 2017-407

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z          **DEFENDANTS**

## COMPLAINT

### JURY TRIAL REQUESTED

COME NOW Plaintiffs, Jason Cooksey, Heidi Cooksey, and Sarah Cooksey, Sydney Cooksey, and Sadie Cooksey, Minors, by and through their natural guardians, Jason and Heidi Cooksey (Plaintiffs), by and through their attorneys, Rushing & Guice, P.L.L.C., and file this their Complaint against Forest City Southern Group, LLC now known as Hunt Southern Group, LLC, Forest City Residential Management, LLC, Hunt MH Property Management, LLC, Unknown John and Jane Does A through M, and Other Unknown Corporate Entities N through Z (Defendants), and for good cause of action, states unto the Court the following, to-wit:

### PARTIES

1.

Plaintiff, Jason Cooksey ("Jason"), is an adult citizen of Harrison County, Mississippi residing at 1568 Rachel Drive, Biloxi, Mississippi.

2.

Plaintiff, Heidi Cooksey ("Heidi"), is an adult citizen of Harrison County, Mississippi residing at 1568 Rachel Drive, Biloxi, Mississippi.

3.

Plaintiff, Sarah Cooksey ("Sarah"), is the minor child of Jason and Heidi, her natural guardians, born January 15, 2002, and is a resident of the State of Mississippi, residing at 1568 Rachel Drive, Biloxi, Mississippi.

4.

Plaintiff, Sydney Cooksey ("Sydney"), is the minor child of Jason and Heidi, her natural guardians, born December 13, 2003, and is a resident of the State of Mississippi, residing at 1568 Rachel Drive, Biloxi, Mississippi.

5.

Plaintiff, Sadie Cooksey ("Sadie"), is the minor child of Jason and Heidi, her natural guardians, born May 7, 2009, and is a resident of the State of Mississippi, residing at 1568 Rachel Drive, Biloxi, Mississippi.

6.

Defendant, Hunt Southern Group, LLC (Hunt Southern), formerly known as Forest City Southern Group, LLC (Forest City Southern) is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840,

Jackson, Mississippi 39201. Forest City Southern nka Hunt Southern is believed to be the owner of the property in issue.

7.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

8.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

9.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

10.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

### 11.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Plaintiffs reside. Jurisdiction is also proper pursuant to Miss. Code Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who are residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

### 12.

Jason is Active Duty with the Air National Guard as a Master Sergeant. Plaintiffs moved to Biloxi in 2011 when Jason was offered a position with Air National Guard Recruitment office. Jason acquired on base housing in Bayridge, an exclusive Officers and Senior enlisted Community located on Keesler Air Force Base in Biloxi, Mississippi. Prior to signing a lease, Jason viewed two different houses and provided his preference. Jason was initially assigned one of the two houses, but the assignment was changed immediately prior to signing the lease. On or about January 17, 2012, Jason entered into a Military Lease Agreement for military housing in Bayridge, located at 208 Patrick Drive, Biloxi, Mississippi in the County of Harrison (Subject Property), with Forest City Southern. See Lease Agreement attached hereto as **Exhibit "A."** Bayridge is comprised of 330 homes and is located on Keesler Air Force Base. At all times mentioned herein, Plaintiffs' home was owned, controlled or managed by one of Defendants.

13.

At the time Jason entered into the Military Lease Agreement, Bayridge was owned and operated by Forest City Southern and managed through Forest City Residential Management. In 2016, Bayridge was acquired by Hunt Southern and operated or managed through Hunt MH Property Management. Upon information and belief Forest City Southern and Hunt Southern exercised custody and control over Bayridge and acted as the owners of Bayridge through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

14.

After moving into Bayridge, Plaintiffs reported several maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was later learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the house. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses it operates.

15.

Plaintiffs' maintenance records show repeated requests for Defendants to address mold and leaking problems while they lived in Bayridge. The maintenance records show that the mold was simply "treated with moldex" instead of being removed. Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the

mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided at Bayridge, Defendants never replaced the air conditioner filters, despite reporting on the maintenance report that it was done quarterly. Plaintiffs replaced the filters on their own.

16.

On one such occasion, or about August 18, 2016, Plaintiffs asked Hunt MH Property Managers to address several mold patches and leaks in their home including in the living room ceiling and the master bedroom ceiling. Later that day, a maintenance person arrived to clean the suspected substance (maintenance technicians were instructed not to call the substance mold) and check if air conditioner ducts were sweating. The maintenance technician found that they were. The maintenance technician, Dowdy Quentin, also noted that he had cleaned the "suspected substance" from vents in the living room. Rather than addressing the root of the leaks, the maintenance technician again just cleaned the area with Tilex. This allowed for the toxic mold to continue flourishing beneath the surface.

17.

On another occasion, or about August 24, 2016, Plaintiffs showed pictures of the toxic mold to Defendants' Director of Maintenance, Terry Small (Small). Plaintiffs had pictures of the mold patches and stains from leaks in their utility room, kitchen, and master bath. Small agreed to visit with Hank Toppings, Defendants' project manager, to inspect the property. Small arrived alone and found that the the A/C ventilation system had problems and the roof possibly had a leak. He advised Plaintiffs that Defendants did not pay for mold tests, he agreed to send someone to cover the utility room ceiling, and stated that he would try to move them to a hospitality house

by the end of September. Small further advised that the work would involve removing the sheetrock and rewrapping the ducts, and that he would contact them soon.

18.

On or about August 29, 2016, Jason emailed Small asking about the repairs he had recommended and whether he could get the recommendations in writing. Small never did respond to the email. The next day, Jason stopped by the office to ask Small about these repairs in person. He was unable to get the repair suggestions in writing at this meeting.

19.

On or about September 15, 2016, Plaintiffs had Teddy Bear Restoration perform an air mold sampling in their home. The Certificate of Mold Analysis showed several different spores growing in the house, the most concerning being Stachybotrys, which can cause serious health issues. See Certificate of Mold Analysis attached hereto as **Exhibit "B."**

20.

Following the mold analysis from Teddy Bear Restoration, Plaintiffs met with Freddie Jordan (hereinafter Jordan), Housing Manager for Defendants, regarding the mold report and requested that Defendants pay for their relocation due to the toxic levels of mold in the home. This request was based upon the lease provision which provided that "relocation will be at no cost to Resident" in situations where the home becomes inhabitable. Jordan offered to move Plaintiffs into the hospitality home, but fearing for similar conditions, Plaintiffs declined the offer. Jordan said that she would send the request to move to her corporate representative.

21.

On or about September 26, 2016, Jordan reported to Plaintiffs that she was not authorized to help them move out of their mold infested home.

22.

On or about October 7, 2016, Plaintiffs met with Mary Ranson, Defendants' Director of Operations for the Southern Region, regarding their request that relocation expenses be paid by Defendant. Their request was denied once more.

23.

On October 28, 2016, Plaintiffs had additional testing performed on the Subject Property with Mold Test USA. Mold Test USA performed a 52 Point Visual Inspection and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Stachybotrys inside the Subject Property and none outside the Subject Property. These elevated levels of toxic black mold are well-known for causing serious health concerns. See Mold Test USA Mold Reports attached hereto as **Exhibits "C and D."**

24.

Plaintiffs have obtained information from other military housing families who provided them with information leading them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including others in Bayridge.

25.

Because Defendants refused to honor their contractual obligation to cover the expense of Plaintiffs' relocation, Plaintiffs incurred great expense in moving themselves. They also suffered property loss due to mold contamination and have not been compensated for any of their losses.

26.

As a direct result of the continued exposure to toxic mold located in Plaintiffs' home, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical injuries, medical expenses and property damage.

27.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

28.

In this case, Plaintiffs had two different certified mold investigators identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Stachybotrys, commonly referred to as "black mold" or "toxic mold," was identified as growing inside the house. Additionally, Aspergillus, known to be a powerful respiratory irritant, was found in the home during the air test. Both spores are particularly dangerous, as both are well known to grow in excessive numbers in damp indoor spaces and both release mycotoxins and VOCs, and have toxic impacts of their own. Both spore levels found inside the home by tape and air samples were considered "elevated" considering neither spores

were detected in the outside control levels. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs were forced to live in.

29.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

## COUNT I

## NEGLIGENCE

30.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 29.

31.

Defendants, as owners and/or managers of Bayridge:

A.   Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B.   Negligently failed to pay for relocation expenses and caused Plaintiffs to pay for the moving expenses;

C.   Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D.   Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E.   Negligently managed and maintained Bayridge;

F.   Negligently supervised their employees, agents and/or representatives;

G.   Negligently trained and supervised their employees, agents and/or representatives;

H.   Negligently inspected Bayridge for dangerous and harmful conditions;

I.   Negligently remediated the toxic mold contained in the Subject Property;

J.   Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K.   Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L.   Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.   Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

32.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety, anguish and upset,  losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT II

## GROSS NEGLIGENCE

### 33.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 32.

### 34.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

### 35.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

### 36.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 35.

### 37.

Defendants breached the Military Lease Agreement entered into with Plaintiffs on January 12, 2012. The contract was breached for the following reasons:

A.      Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B.    Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C.    The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D.    Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E.    Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.    Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.    Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation." Plaintiffs shouldered the entire cost of the relocation.

38.

As a direct and proximate result of Defendants' breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their

quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

### 39.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 38.

### 40.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

### 41.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 40.

### 42.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned

malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

**COUNT VI**

**FRAUDULENT CONCEALMENT**

43.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 42.

44.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.     Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.     Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.     Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.     Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.     Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

45.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 44.

46.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

47.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 46.

48.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of

Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

49.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 48.

50.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which was repeated until Plaintiffs moved out of the Subject Property.

## DISABILITY OF INFANCY

51.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 50.

52.

Sarah, Sydney and Sadie are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

## DAMAGES

53.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 52.

54.

As a direct and proximate result of the Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Jason Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Heidi Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Sarah Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

D. Plaintiff, Sydney Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for; and

E. Plaintiff, Sadie Cooksey, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and

necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for.

## PUNITIVE DAMAGES

### 55.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 54.

### 56.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

### 57.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 56.

### 58.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause, for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

**JASON COOKSEY, HEIDI COOKSEY, AND
SARAH COOKSEY, SYDNEY COOKSEY,
AND SADIE COOKSEY, MINORS, BY AND
THROUGH THEIR NATURAL GUARDIANS,
JASON AND HEIDI COOKSEY, PLAINTIFFS**

BY: _____

**WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS  39533
TELEPHONE: (228) 374-2313
FAX:  (228) 875-5987
ATTORNEYS FOR PLAINTIFFS**

# Forest City Southern Group, LLC
# Keesler AFB
# Military Lease Agreement





Version 09 2011

**EXHIBIT**

A

THIS LEASE AGREEMENT for military members ("Lease Agreement") is made on the "Lease Agreement Date" listed on Page 1 Number 1, between Forest City Southern Group, LLC, owner of the subject Premises (the "Owner"), and the housing eligible party or parties who signed as Resident on Page 1 Number 2 of this Lease Agreement (referred to as "Resident", whether one or more). The provisions of this Lease Agreement include the provisions of a separate Community Handbook dated as shown on Page 1 of this Lease Agreement and the provisions of any addenda to this Lease Agreement executed by the parties.

## THE PARTIES AGREE AS FOLLOWS:

1. **Parties to Lease Agreement.** Subject to the terms and conditions of this Lease Agreement, Owner rents to Resident and Resident rents from Owner, the Premises referenced on Page 1 Number 6 of this Lease Agreement. The property is managed by Forest City Residential Management, Inc. ("FCRM"), whose address and phone numbers are specified on Page 1. FCRM is authorized to manage the Premises on behalf of Owner and to receive rents, execute leases, enforce leases, and give and accept notices, demands and service of process on behalf of, and as Agent of Owner. Resident may authorize a representative with a valid power of attorney to act on Resident's behalf, to include executing this Lease Agreement.

2. **Premises.** The property to be rented is located on the military installation specified on the Page 1 header (the "Installation"), in the neighborhood specified on Page 1 Number 5 (the "Neighborhood"), at the address specified on Page 1 Number 6 (the "Premises"), and includes the housing unit and front and back yards, and may include a garage, driveway, designated parking, and/or a carport, as applicable, plus any outside storage located in the yard. The Premises has been designated as authorized housing for a certain military grade or grades (each, a "Housing Category" and collectively, the "Housing Categories").

3. **Term/Automatic Renewal.** This Lease Agreement shall be for a term of twelve (12) months, and shall begin on the Lease Commencement Date specified on Page 1 Number 4a and terminate on the Lease Expiration Date specified on Page 1 Number 4b (the "Term").

   After expiration of the Term, this Lease Agreement will automatically continue on a month-to-month tenancy if the Lease Agreement has not been terminated by either party or the parties have not renewed the Lease Agreement for another Term. Either party may terminate the month-to-month tenancy by providing written notice at least thirty (30) days before the end of the Term. Either party may end or renew this Lease Agreement at the end of the original Term by a thirty (30) day written notice to the other party.

4. **Rent.** The Monthly Rent will be equal to the Basic Allowance for Housing ("BAH") with dependent rate of the highest ranking military member residing in the Premises, minus a utility allowance, if applicable, provided that the Resident's military pay grade is within the Housing Category for the Premises. The Monthly Rent for foreign military personnel shall be equal to the BAH with dependent rate of the U.S. military pay grade most equivalent to the foreign military member's rank or pay grade at the time that the foreign military member accepts the Premises, minus a utility allowance, if applicable.

   If Owner provides Resident a Premises in a Housing Category higher or lower than Resident's military pay grade, then the Monthly Rent will be based on the BAH with dependent rate for the Resident's military pay grade. If Resident elects to reside in a Premises that is in a Housing Category higher or lower than Resident's military pay grade, then the parties shall execute an addendum that states the basis and amount of the Monthly Rent.

   Payment for Monthly Rent shall be made to Owner by payroll allotment/deduction through a third party BAH processor. If third-party action is not available, then Resident shall personally establish and maintain an allotment for the Monthly Rent. In multiple service member households, the allotment shall be made by the senior service member. Resident BAH allotments shall be payable on the first day of the month for the current month's rent. Monthly Rent for any partial month at the beginning of the Term shall be prorated based on a thirty (30) day month and payment shall be made by check or money order. The method of payment for Monthly Rent by foreign military members will be on a case-by-case in accordance with the nation-to-nation support agreement.

   The Monthly Rent shall be increased/decreased when increases/decreases take effect in the Resident's BAH rate. Resident must make notification of promotion or demotion in accordance with the Community

Handbook. In multiple service member households, the senior service member's military pay grade shall be used in establishing the Premises and determining the Monthly Rent. The Monthly Rent for foreign military members shall not change for any reason during the entire Term of this Lease Agreement.

Monthly Rent includes the utilities provided by Owner pursuant to Section 7. All other utilities/services are at Resident's own expense. No security deposit is required to be paid to Owner.

Payment for electric and/or gas utilities (when applicable) and any charges or fees incurred as provided in Section 5 and/or itemized in the Community Handbook ("Additional Rent", which together with Monthly Rent is referred to as "Rent") shall be made directly to Owner. Rent not paid by allotment will be paid by personal check, certified check, cashier's check, electronic funds transfer (EFT) or money order.

Resident is responsible for executing additional documents with the Installation finance office, if required, to commence the Monthly Rent allotment and to remedy any situation that prevents the commencement of the allotment. Resident's designated representative with a power of attorney may initiate or modify the Monthly Rent allotment. If the Monthly Rent allotment is terminated or reduced below the amount of the Monthly Rent by action of Resident or Resident's designated representative while Resident is in possession of the Premises without written permission of Owner, Resident will be considered in material breach of this Lease Agreement.

After the end of the Term or earlier termination and move-out, Owner shall refund any monies due to Resident, less any monies owed to Owner, within twenty (20) business days of Owner's receipt of the BAH allotment applicable to the month of termination.

5   **Late Fees and Returned Checks Charges.** If any Monthly Rent is not paid by the fifth (5th) day of the month, unless paid by allotment, Resident must pay a late fee of $50.00 which is deemed Additional Rent.

Resident will, within fifteen (15) days notice of a dishonored check, pay a returned check fee of $35.00, plus any late fees, if applicable, which are deemed Additional Rent. If at any time during the Term, two (2) of Resident's checks have been returned to Owner by the bank, all future payments must be paid by allotment, cashier's check, certified check or money order only.

Acceptance of any late or partial Monthly Rent or waiver of any Additional Rent is not a waiver of Owner's right to enforce other terms of the Lease Agreement.

6   **Condition of Premises upon Commencement Date.** Resident has examined the Premises and is satisfied with its physical condition, order, and repair. Resident accepts the Premises "as is" as of the Lease Commencement Date specified on Page 1 Number 4a. Owner has inspected and inventoried the Premises and provided Resident with a Move-In/Move-Out Unit Inspection and Inventory Report (the "Inspection Report"). Within five (5) days of Lease Commencement Date, or upon occupancy by Resident, Resident shall complete and return to Owner the Inspection Report detailing any deficiencies noted with the Premises. Owner and Resident will sign the Inspection Report and Owner will provide a copy to Resident. If Resident does not return the Inspection Report to Owner, Resident accepts the Premises without exception. Any additional damage or deficiency noted by Owner at move-out will be charged to Resident.

7   **Services and Utilities.** Owner shall be responsible for the payment of the following utilities at all times during the Term of this Lease Agreement: water, sewer, trash collection and recycling. Until the time that the Premises is individually metered for electricity and natural or LP gas, Owner shall be responsible for the payment of such utilities and Resident shall receive no utility allowance. (During this period of time, the Monthly Rent shall be equal to the BAH at the with dependent rate). After the Premises is metered, (i) Owner will provide Resident with the amount of the monthly utility allowance to be deducted from the BAH to determine the Monthly Rent, and (ii) Resident shall pay for the actual amount of electricity and/or gas used monthly.

Resident shall be responsible for the payment of telephone, cable, internet, or any other services directly contracted by Resident with a service provider. Additional information on responsibilities for telephone lines are specified in the Community Handbook. Resident acknowledges that interruptions in the delivery

of utilities do occur and Owner will make every effort to notify Resident in advance of any interruptions in utility services resulting from scheduled outages or work elsewhere in the Neighborhood.

8. **Occupants and Permitted Use**. Resident will use the Premises as a residence for Resident and the other occupants listed on Page 1 Number 3 (collectively, the "Occupants"), except as otherwise provided herein. The Premises is to be used for residential use only, with exceptions permitted *solely* upon written approval of Owner. Resident acknowledges that the residence is a single-family dwelling and will be used for occupancy by one family only and for no other purposes, including any business purposes, except as otherwise provided herein. Occupancy by more than one family is prohibited. Procedures and requirements governing Occupants and permitted use are further specified in the Community Handbook.

   a. Resident, Occupants, and guests will not commit any acts or use the Premises or common areas in such a way as to (i) violate any law or ordinance, including laws prohibiting the use, possession, or sale of illegal drugs, (ii) commit property damage, or (iii) create a nuisance by annoying, disturbing, inconveniencing or interfering with the quiet enjoyment, business, or peace and quiet of any other Resident, HCRM staff, contractors or other persons engaged in lawful activity in the area.

   b. After the Lease Commencement Date, if another person comes to reside in the Premises, the Resident must provide the name of the person to the Owner to be added to the list of Occupants. If the new Occupant is over the age of eighteen (18) and does not have unrestricted and unsupervised base access, then the new Occupant must be able to meet the Installation's access requirements and HCRM's screening criteria.

   c. Social visits are limited to thirty (30) days, except that social visits by anyone residing within a twenty (20) mile or sixty (60) minute commuting area of the Installation (whichever is longer) is limited to no more than two (2) days. Resident must register and obtain written approval from Owner for guests staying at the Premises longer than thirty (30) days. For a live-in care provider staying more than twenty-one (21) days in the Premises, Resident and the care provider will enter into an addendum with Owner and must be able to meet HCRM's screening criteria. Visits by relatives of the Resident are discussed in the Community Handbook. All visitors, guests, relatives and/or live-in care providers must be able to meet the Installation's access requirements.

   d. Resident or an adult Occupant may conduct a business in the Premises of a type permitted by Government regulations governing the conduct of business activities in military family housing; provided that Resident obtains the written permission of Owner, which permission shall not be unreasonably withheld, and executes a Home Based Business Addendum. Residents conducting a residential business (e.g. child care) will also be required to comply with appropriate city, county, state or federal agency, office or department standards and are subject to inspection by the Government or any of these agencies. Owner's granting of permission is not a warranty that the Premises is suitable for the conduct of Resident's business. No door-to-door soliciting will be allowed and no advertising signs shall be posted on the Premises and no interior or exterior structural modifications or additions shall be made to accommodate Resident's business. Resident is responsible for obtaining the necessary permissions and/or licenses and will indemnify, save, and hold Owner harmless for any failures to obtain the necessary permissions and/or licenses and for any damages to the Premises or to third parties arising from the conduct of Resident's business. Additional rules on home based businesses are provided in the Community Handbook.

   e. Under Government policy, no sex offender (according to a conviction and/or registered or required to be registered on a national or state sex offender registry) may reside in the Premises without the express written approval of the Installation Commander. If Resident or any Occupant becomes a convicted or registered sex offender after the Lease Commencement Date, then Resident shall immediately take the actions required by Government regulations, including the submission of any required reports.

   f. Resident, Occupants and guests will use, store and dispose of environmentally hazardous materials/waste in accordance with the Community Handbook.

g.  Resident, Occupants and Guests will comply at all times with any military standing orders of the Installation and applicable laws and ordinances of the State and City in which the Premises is located.

9.  **Absence from Premises.**  Resident shall notify FCRM in writing of any absences from the Premises in excess of fourteen (14) consecutive days. Resident shall make arrangements for a representative to have access to and take responsibility for the Premises and shall notify Owner of the name and contact information of such representative. Resident shall assume all liability for the representative's behavior. Owner shall not be responsible for any damages resulting from Resident's absence from the Premises due to Resident's negligence, recklessness and/or intentional conduct. Additional provisions regarding absence from the Premises can be found in the Community Handbook.

10. **Pets**  No pets are permitted in the Premises at any time except by prior written consent given by Owner in a Pet Addendum signed by both parties. A maximum of two (2) authorized pet mammals may be permitted with Owner's consent. Keeping a pet for any duration without written consent from Owner or a signed Pet Addendum will be considered a material breach of the Lease Agreement.

A refundable pet deposit will be required, which will be used by Owner as necessary for any cleaning and/or damages caused by the pet(s) after Resident vacates the Premises. If damages caused by the pet(s) exceed the amount of the pet deposit, then Resident will be responsible for the additional cost to remedy the Premises. If none or only some of the pet deposit is required for cleaning and repair, then Owner shall remit the balance of the pet deposit to Resident within thirty (30) days after Resident vacates the Premises.

Only certain types of animals may be kept as pets.

a.  The following breeds of dogs (and dogs that have any of the following breed lineage) are deemed aggressive or potentially aggressive and will not be permitted to be boarded in the Premises or allowed in the Neighborhood: Pit Bulls, Rottweilers, Chow Chows, Doberman Pinschers, Siberian Huskies, Perro de Presa Canario, and wolf hybrids. Exceptions to this rule can be made only for (i) a certified military working dog that is being boarded by its handler/trainer or (ii) a specific dog that has been approved by the Installation Commander in writing.

b.  Exotic animals are prohibited, including, but not limited to: monkeys, pot-bellied pigs, hedgehogs, skunks, raccoons, squirrels, ferrets, rodents (including mice and rats but excluding hamsters, gerbils and guinea pigs).

c.  Reptiles, arachnids and insects are prohibited.

d.  Farm, ranch, and wild animals are prohibited.

e.  Caged birds, fish and authorized rodents (hamsters, gerbils and guinea pigs) in cages may be boarded in the Premises in addition to the two authorized pets, and do not require a Pet Addendum or pet deposit.

Residents are responsible for informing guests that guests' pets are not allowed in the Premises or common areas. Residents will not be permitted to use the Premises to care for pets belonging to other persons without the written consent of Owner. Additional information on the pet policies and pet care is provided in the Community Handbook.

11. **Community Handbook and Rules/Regulations.**  Resident acknowledges receipt of the Community Handbook in effect as of the date of this Lease Agreement, the provisions of which are incorporated into this Lease Agreement. Resident agrees to comply with all occupancy rules and regulations contained in the Community Handbook whether now in effect or subsequently issued by Owner. Violation of the occupancy rules and regulations contained within the Community Handbook may be considered a violation of this Lease Agreement. Owner will provide thirty (30) day advance notice to Resident of a revision to the Community Handbook and then deliver the revised Community Handbook to Resident.

12. **Parking.** Resident will operate and park all vehicles in accordance with guidelines stated in the Community Handbook. All vehicles must be licensed with current license plates and must be in operating condition. Unauthorized or illegally parked vehicles will be towed by Owner at Resident's expense. Owner assumes no responsibility or liability whatsoever for loss of or damage to any vehicle while parked in the Neighborhood. Boats, trailers, and oversized vehicles are not permitted in the Neighborhood except for loading and offloading activities unless Owner has granted permission in writing.

13. **Repairs/Alterations/Liens.** Resident will not alter or repair the interior, exterior, or the structure of the Premises in any way without express written consent of Owner. Alteration includes, but is not limited to, painting, wallpaper, fixtures, modification of electrical appliances, or installation of telecommunication devices, including satellite dishes and/or antennae. No mechanical, electrical, plumbing or structural equipment or major appliances or configuration on any part of the Premises may be repaired, altered, modified, installed or removed without express written consent of Owner. Resident is liable for the cost to restore any alterations or repairs made by Resident, unless Owner approves that the alteration may remain in place on the Premises. Additional information on alterations, decorating and satellite dishes are provided in the Community Handbook.

Resident may not encumber the Premises or permit any person to claim or assert any lien for the improvement or repair of the Premises made by Resident. Resident shall notify all parties performing work on the Premises at Resident's expense that the Lease Agreement does not allow any such liens to attach to Owner's interest.

14. **Maintenance.** Owner will maintain the Neighborhood and the mechanical and electrical devices within the Premises in a clean, safe, and workable condition. Resident will report all needed repairs to Owner. Service requests during regular working hours are to be reported to FCRM or other designated service request location. Repairs shall be made within a reasonable time following notification during normal business hours. Emergency maintenance service is available after hours to handle requests of a true emergency nature that cannot wait until normal business hours. If such repairs are of an emergency nature, the repairs shall be addressed within a reasonable time under the circumstances. Additional information on Owner-provided maintenance may be found in the Community Handbook.

Owner is not responsible for any inconvenience or loss caused by necessary repairs to the Premises, the Neighborhood, appliances or any other equipment, provided that, to the extent allowed by law, neither Owner nor any of Owner's contractors or agents are responsible for the damage through negligence or willful misconduct. Temporary suspension of services within the Premises and in the Neighborhood is not a basis for ending this Lease Agreement or abating Rent if Owner is actively effecting repairs.

Resident shall maintain the Premises in a neat, clean and undamaged condition, in accordance with the Community Handbook. Resident agrees to (a) dispose of all fireplace ashes, rubbish, garbage, and waste in a clean and safe manner; (b) use all plumbing, electrical, sanitary, ventilating, air conditioning facilities, if applicable, and appliances in a safe and reasonable manner, and (c) not deface, damage, or otherwise harm any part of the Premises. Any damage(s) to glass on the Premises or in any common area caused by Resident, Occupants or guests shall be paid by Resident. Resident has inspected and tested all smoke detectors and carbon monoxide detectors and determined them to be in workable condition. Resident shall be responsible for testing smoke detectors and carbon monoxide detectors on a monthly basis, and replacing batteries. Resident, Occupant or guests shall not tamper with, or adjust or disconnect any smoke detectors or carbon monoxide detectors. Violation of this provision is a material breach or default of this Lease Agreement and shall entitle Owner to exercise all remedies available under state/local law. Resident shall notify Owner of all repair needs promptly. Resident shall be liable for any damages resulting from Resident's failure to promptly notify Owner.

Owner will perform an annual physical maintenance inspection of the Premises to ensure housing maintenance quality standards. Owner will schedule the inspection with Resident at least five (5) days in advance of the date of the inspection. The inspection will be conducted during normal duty hours.

Resident is responsible for grounds maintenance of the backyard of the Premises, if fenced, and snow removal for individual entry walks, as further specified in the Community Handbook. Resident is

responsible for mowing, trimming and edging the area within the fenced backyard in accordance with grounds maintenance standards. A list of the responsibilities and standards regarding grounds maintenance is provided in the Community Handbook. Failure to maintain grounds is a material breach of this Lease Agreement. Owner may waive this requirement in certain circumstances including, but not limited to, deployment of Resident.

15   **Damage to the Premises.**

    a.   If, by no fault of Resident, Occupant or any guest, the Premises is totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render the Premises totally or partially uninhabitable, either Owner or Resident may terminate this Lease Agreement by giving the other written notice within fourteen (14) days after the date of such damage, which shall be effective retroactively to the date on which the Premises became totally or partially uninhabitable. If either party elects to terminate the Lease Agreement, then Owner shall relocate the Resident according to Section 18(b). If Resident terminates, Resident shall not be subject to the Early Termination Fee noted in Section 29(c). Monthly Rent shall be abated as of the date the Premises becomes totally or partially uninhabitable. The abated amount shall be the current Monthly Rent prorated on a thirty (30) day period. If this Lease Agreement is not terminated by either party and Resident remains in the Premises, then Owner shall promptly repair the damage and Monthly Rent shall be reduced based on the extent to which the damage interferes with Resident's reasonable use of the Premises.

    b    If the damage to the Premises is a result of a negligent, reckless or deliberate action of Resident, Occupant or guests, only Owner shall have the right to terminate this Lease Agreement, and no reduction in Monthly Rent shall be made. Resident will be responsible for payment of the repair and damages to the Premises caused by Resident, Occupant or guest and to restore the Premises to its original condition, less ordinary wear and tear. Failure to pay such amount is a material breach or default of this Lease Agreement.

16   **Waiver.** If Owner does not exercise any of its rights immediately, Owner may exercise these rights at a later date, provided it is within the Term.

17.   **Joint and Individual Liability.** If there is more than one Resident (i.e. multiple service members in the same family), each of them shall be jointly and individually responsible for the performance of all obligations of Resident under this Lease Agreement, including, but not limited to, any damage caused to the Premises or Neighborhood by Residents, Occupants or Residents' guest, jointly with every other Resident, and individually, whether or not in possession.

18.   **Right to Relocate.** Owner reserves the right to relocate Resident due to (i) construction, renovations or demolition, or (ii) habitability conditions. Prior to Owner exercising such right, Owner will give Resident no less than a thirty (30) day advance notice and Owner and Resident will enter into a Relocation Addendum.

    a.   For a relocation due to construction, renovation and/or demolition, Owner will attempt to offer Resident another Premises in the same Housing Category. If Resident accepts another Premises, then this Lease Agreement will continue and be amended as necessary for the new Premises. If Owner cannot provide a suitable Premises or Resident declines to remain on the Installation, then Resident shall be responsible for securing housing outside the Installation and Owner may terminate this Lease Agreement as provided in Section 30(b). Whether Resident moves to another Premises or moves off of the Installation, the relocation will be at no cost to Resident. Additional information on relocation can be found in the Community Handbook.

    b.   If the Premises becomes uninhabitable for any reason not caused by Resident, then Owner may relocate Resident either temporarily or permanently. In either case, Owner shall be responsible for the cost of the relocation. If the relocation is temporary, then Resident can expect to move back into the Premises. If the relocation is permanent, Owner will attempt to offer Resident another Premises in the same Housing Category. If Resident accepts another Premises, then this Lease Agreement will continue and be amended as necessary for the new Premises. If Owner cannot provide a suitable

Premises or Resident declines to remain on the Installation, then Resident shall be responsible for securing housing outside the Installation and Owner shall pay the cost of the relocation, whereupon this Lease Agreement will be terminated. If Resident or his/her Occupants or guests causes the Premises to become uninhabitable, then Owner, in its sole discretion, may offer Resident another suitable Premises. Whether Resident relocates to another Premises or has to move off of the Installation, Resident will be responsible for the relocation and will pay for relocation expenses in addition to the cost to repair any habitability deficiencies that Resident, Occupants, or guests caused in the Premises.

19. **Entry onto the Premises.**  Owner or anyone allowed by Owner, including but not limited to a licensed exterminator for the purpose of pest control, may enter the Premises during the hours of 8:00 a.m. - 5:00 p.m., Monday through Saturday, after giving Resident forty-eight (48) hours advance notice. If there is an emergency, Owner may enter the Premises without giving Resident advance notice. Upon notice by either party of intent to terminate tenancy, Resident agrees to permit Owner to show the Premises to prospective residents upon forty-eight (48) hours advance notice. Owner may also enter the Premises after a forty-eight (48) hour notice has been posted if the Premises appears to have been abandoned by Resident and Owner has not received notice of absence from Resident.

20. **Locks and other Entry Devices.**  All devices (access cards, codes, keys, garage door openers, etc.) issued to Resident for access to common areas, garages, units, etc. are the property of Owner to be utilized solely by and held in possession of Resident and authorized Occupants. These devices are subject to the provisions in the Community Handbook and may be subject to additional rules and regulations as issued by Owner. If Resident provides an entrance device to any person without first obtaining written permission from Owner, other than a key to Resident's Premises, it shall constitute a material breach of this Lease Agreement and Owner may terminate tenancy.

Locks shall not be changed, altered or replaced nor shall new locks be added by Resident without the written permission of Owner. Any locks so permitted to be installed shall become the property of Owner and Resident must promptly provide a key to Owner.

21. **Abandonment.**  Any personal property left in the Premises after Resident has vacated or has been evicted is considered abandoned. If Owner determines the personal property to be of value, Owner will mail a notice to Resident at Resident's forwarding or last known address. If Owner does not receive a response and/or the abandoned property is not claimed within fourteen (14) days, Owner has the unilateral right to dispose of said property.

22. **Assignment and Sublet.**  Resident shall not sublet all or any part of the Premises, or assign or transfer this Lease Agreement or any interest in it. Any assignment, transfer or subletting of the Premises or this Lease Agreement by voluntary act of Resident, operation of law or otherwise, shall be null and void and, at the option of Owner, terminate this Lease Agreement.

23. **Breach by Resident.**  Each obligation of the Lease Agreement is material and violation of any obligation or misrepresentation of any information is a breach of the Lease Agreement. Owner may, at its option, enforce the performance of this Lease Agreement and/or may give notice to Resident of its election to terminate the Lease Agreement.

If Resident does not pay Rent when due, then Owner may give Resident written notice demanding payment. If Rent is not paid within the time period specified in the notice (but not less than three [3] days after receipt of the notice), then Owner may take any or all actions regarding collections as stated in the Community Handbook. Owner may employ an attorney or collection agency to obtain the overdue Rent, or Owner may terminate this Lease Agreement. If Owner employs an attorney or collection agency, Resident must pay the fees and costs of that attorney or collection agency.

If Resident fails to comply with any of the non-monetary terms of the Lease Agreement, including damaging the Premises or violating any of the rules and regulations contained in the Community Handbook, or other restrictions, Owner will give Resident written notice ("Notice of Violation/Breach") of the violation/breach. If the damage is not repaired or the violation/breach is not corrected within thirty (30)

days from receipt of notice of violation/breach. Owner may, at its sole option: (a) correct the violation/breach or damage and charge the cost to Resident, or (b) give Resident a three (3) day notice to terminate the Lease Agreement ("Notice of Termination of Tenancy"). Notice is hereby given that Resident is responsible for paying any fines, penalties, or other assessments charged because of Resident's failure to comply with the terms of the Lease Agreement.

If the breach of the Lease Agreement is due to Resident's, Occupants' and/or guests' use of the Premises for unlawful purposes, or if Resident, Occupants or guests cause or threaten to cause injury to any person, Owner may terminate the Lease Agreement.

Neither Owner nor Resident shall forfeit or waive any existing or future right or remedy by pursuing a lawsuit. Resident's eviction by a court or other breach of this Lease Agreement or Owner's Service of a Notice of Termination of Tenancy on Resident shall not release Resident from liability for payment for the balance of the Term of the Lease Agreement.

24. **Security**. Resident acknowledges that Owner has not made any written or oral representations concerning safety of the Neighborhood or the effectiveness/operability of any security devices or security measures.

Resident acknowledges that Owner does not warrant or guaranty the safety or security of Residents, Occupants, and their guests or invitees against criminal or wrongful acts of third parties. Each Resident, Occupant, guest and invitee is responsible for protecting his or her own person and property.

Resident acknowledges that security devices or measures may fail or be thwarted by criminals or by electrical or mechanical malfunction. Therefore, Resident acknowledges that they should not rely on such devices or measures and should protect themselves and their property as if these devices or measures did not exist.

25. **Estoppel Certification**. Resident will, at any time and from time to time, not less than fifteen (15) days after request by Owner, execute, acknowledge and deliver to Owner a statement in writing, executed by Resident, certifying (a) that this Lease Agreement is unmodified and in full force and effect (or, if there have been modifications, that this Lease Agreement is in full force and effect as modified, and setting forth such modifications) and the dates to which the Rent and other sums payable hereunder have been paid; (b) that there is no existing default hereunder or specifying each such default of which the signer may have knowledge; and (c) that Resident does not have any actual or pending claim against Owner.

26. **Hold Harmless**. Unless the injury or damage is due to the specific negligence of Owner, Owner will not be liable for any injury to any person or damage or loss to any property of Resident, any Occupant, guest or invitee. Except as otherwise provided by law and this Lease Agreement, Owner will not be liable for the loss or damage to Resident's personal property from theft, vandalism, fire, water damage, smoke, Owner supplied appliances, operating systems, interruption of utility services, or other cause, unless due to the specific negligence of Owner. If for any reason Owner agrees to render services such as handling furniture, cleaning, delivering or accepting packages or providing access, Resident specifically agrees to hold Owner harmless from all liability in connection with such services.

Owner shall not be liable to Resident for any lack of access to the Premises, the Neighborhood, or any other land under the control of the Federal Government.

27. **Delivery of Premises**. Owner will make a good faith effort to make the Premises available to Resident on the Lease Commencement Date. If any delay does occur, Monthly Rent will not be due until the Premises is available to Resident. Either party may end this Lease Agreement by written notice to the other if the Premises is not available within thirty (30) days after the date the Lease Commencement Date, and any payment(s) made under this Lease Agreement will be refunded.

28. **Resident's Obligations Upon Vacating the Premises**. Resident has certain obligations prior to termination of the Lease Agreement and vacating the Premises. The obligations include:

a    Resident shall (i) give Owner all copies of all keys or opening devices to the Premises and any common areas, (ii) vacate and surrender the Premises to Owner, empty of all persons; (iii) vacate any and all parking and/or storage space; (iv) clean and deliver the Premises to Owner in the same condition as it was delivered upon Lease Commencement Date, less ordinary wear and tear, following the cleaning requirements for move-out in Exhibit A of the Community Handbook; (v) remove all debris; and (vi) give written notice to Owner of Resident's forwarding address.

b    Any alterations made to the Premises by Resident (including painting and wallpapering) must be restored to its original condition, unless Owner has given written approval for the alteration to remain in place. All alterations/improvements left by Resident at termination and that are made by or caused to be made by Resident, without Owner's consent, shall be deemed abandoned and may be disposed of or retained by Owner upon termination. Owner may charge Resident for restoration of the Premises to the condition it was in prior to any alterations/improvements by Resident unless Owner approved in writing for the alteration to remain.

c    Owner shall perform a pre-move out inspection and inform Resident in writing of any potential move-out charges that may be assessed. At Resident's option, Resident may attend such pre-move out inspection. Resident shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Lease Agreement. Deficiencies identified in the pre-move out inspection and not remedied by Resident will be remedied by Owner and the cost of the remedies will be the responsibility of Resident.

d.   Owner shall perform a final move out inspection at the time Resident vacates the Premises. Resident or a Resident appointed representative with power of attorney must attend such final move out inspection. Resident will be charged a cleaning fee if the Premises is not properly cleaned. Resident will be assessed charges for any damages to the Premises, except ordinary wear and tear. If Resident or Resident representative with power of attorney does not schedule and attend an inspection of the Premises, Resident will accept Owner's assessment of damages as permitted.

e    Move out requirements are further specified in the Community Handbook.

### 29  Termination by Resident Prior to Expiration of Term.

a.   Resident shall have the right to terminate this Lease Agreement if he/she: (i) retires, (ii) is released from active duty, (iii) is transferred via permanent change-of-station (PCS) beyond a twenty-five (25)-mile radius of the Installation, (iv) receives orders for deployment for more than ninety (90) days, or (v) is ordered to occupy public quarters. In such cases, Resident will furnish Owner a copy of his/her official orders not less than thirty (30) days before such termination date unless such notification cannot be made at no fault of Resident (i.e. short notice assignment). This Lease Agreement may also terminate on Resident's death, at the option of the surviving spouse or other immediate family member as provided in Section 34 below. Notwithstanding the above, Resident shall have the right to terminate this Lease Agreement as provided in the Servicemembers' Civil Relief Act, as shall Resident's dependents as provided in the Servicemembers' Civil Relief Act.

b.   In order to terminate this Lease Agreement under Section 29(a) above, Resident (or, in the case of death, the surviving spouse or personal representative of the estate) shall provide Owner a written thirty (30) day notice of intent to vacate (accompanied by appropriate forms/documents evidencing the circumstances giving rise to such right). The foregoing thirty (30) day period can be reduced or waived by Owner under special circumstances, and will be waived if such notification cannot be made at no fault of Resident (i.e. short notice assignment). If Resident terminates this Lease Agreement early under Section 29(a) above, then Resident will not be assessed a penalty for early termination. However, Resident is still responsible to turn over the Premises in accordance with the terms of this Lease Agreement and the Community Handbook. The surviving non-military spouse residing in the Premises at the time of death of Resident shall have the right to elect to either terminate the Lease Agreement as set forth above or remain in the Premises under this Lease Agreement for a maximum period of twelve (12) months from the month of Resident's death, with Rent paid directly to Owner.

c.   If Resident terminates this Lease Agreement prior to the Lease Expiration Date as shown on Page 1 Number 4b for any reason not specified herein, Resident must provide notice to Owner at least thirty (30) days prior. Resident will be required to pay an Early Termination Fee equal to one month's Monthly Rent, together with any outstanding Additional Rent or other amounts owed to Owner as of the date of termination. Resident shall not be required to pay the amount of Monthly Rent owed for the remainder of the Term. The Community Handbook contains additional details on the move out process for early termination.

30   **Termination by Owner Prior to Expiration of Term**

a.   If Resident or Resident's family member is debarred from the Installation by the Commander in accordance with the authority provided in 18 U S C § 1382, and the debarment voids Resident's status as a Resident, Resident shall vacate the Premises no later than thirty (30) days from the date of the loss of status as a Resident. It shall then be lawful for Owner to enter into said Premises, and again have, repossess, and enjoy the same as if this Lease Agreement had not been made, and thereupon this Lease Agreement and everything contained therein shall cease and be void. However, Owner shall have the right of action for arrears of rent or breach of covenant, and the commencement of a proceeding or suit in forcible entry and detainer or ejectment, after any default by Resident, shall be equivalent in every respect to actual entry by Owner. In the case of any such default and entry by Owner, Owner may relet the Premises for the remainder of said Term and recover from Resident any deficiency between the amount so obtained and the Rent herein required to be paid.

b.   Owner may, at its sole discretion and after providing thirty (30) days written notice to Resident, terminate this Lease Agreement because of construction, renovation, demolition or habitability issues affecting the Premises. If Owner terminates for any of these reasons, Owner shall provide for Resident's relocation according to Section 18(b).

c.   Owner may terminate this Lease Agreement if Resident is in default under any of the covenants, terms or conditions of this Lease Agreement including the rules and regulations contained in the Community Handbook.

d.   In addition, Owner may terminate this Lease Agreement for the following reasons:

(i)   Misuse or illegal use of the Premises, or conduct of Resident, Occupants and/or guests which is detrimental to Neighborhood safety and health; use of the Premises for commercial transactions not permitted in advance in writing by Owner;

(ii)   Unacceptable care of or damage to the Premises;

(iii)   When Resident, in the act of apparent abandonment and as a result of voluntary action, ceases to reside personally in the Premises;

(iv)   For criminal activity by any Resident, Occupant, guest or any other person under Resident's control as permitted by federal, state, and local laws. Criminal activity includes, but is not limited to, felonies and misdemeanors; or

(v)   If the Government determines that Resident is no longer eligible for housing

Notwithstanding the above, if Resident is no longer eligible for housing due to Resident or other Occupant being denied eligibility by the Installation Commander due to sex offender status, then Owner shall terminate this Lease Agreement.

31.   **Insurance.** Owner shall maintain insurance that covers the Premises and contents provided by Owner. Resident acknowledges that neither Owner nor the Government has any liability whatsoever for any loss or damage to Resident's personal property or leasehold improvements. Resident may have rights and remedies under the Military Personnel and Civilian Employees Claims Act (MPCECA). Resident should contact the Installation's legal office for additional information regarding MPCECA

Owner shall, at its sole cost and expense, make Renter's Insurance available to Resident. Resident must apply through Owner for such coverage and will be insured, upon acceptance for coverage by Owner's insurer. Resident shall not be unreasonably refused insurance coverage. The insurance policy shall be a $250 deductible comprehensive, named-peril replacement cost value policy with a replacement cost endorsement valued at no less than $20,000 per eligible military member and his/her family. The policy shall cover Resident's personal property in the Premises including, without limitation, any property removable by Resident under the provisions of this Lease Agreement and all leasehold improvements installed in the Premises by or on behalf of the Resident, against loss or damage caused by the following: theft, fire or lightning, windstorm or hail, explosion, riot or civil commotion, aircraft or vehicle damage, smoke damage, vandalism or malicious mischief, loss breakage, glass breakage, falling objects, damage caused by weight of ice, snow or sleet, water damage from an accidental discharge from plumbing or Heating, Ventilating and Air Conditioning (HVAC) system, sudden and accidental tearing apart, cracking, burning, or bulging of an HVAC, fire prevention or sprinkler system or an appliance for heating water, freezing damage to plumbing, HVAC or household appliances, and electrical surge damage. The policy shall provide $100,000 in liability coverage for Residents and their families. Owner shall not be responsible for paying the deductible or providing supplemental coverage or costs for coverage provided by a different policy. Resident shall pay the $250 deductible, if required, at the time of a claim. Resident is encouraged to carry additional insurance for high value personal property. Waterbeds and aquariums in excess of thirty-five (35) gallons are not permitted without providing Owner with a valid water damage insurance policy.

32. **Weapons and Guns.** The possession of personal firearms, government-owned arms, ammunition and any other weapons will be in accordance with state, county and local laws and any applicable regulations or policies on the Installation. All firearms must be registered with FCRM using a Weapons Registration Form within three (3) days of occupancy or procurement of firearms. Firearms must also be registered as required by the Installation's security forces. Firearms and ammunition must be stored separately in safe, locked locations. Loaded firearms in the Premises are prohibited, but Resident may engage in the hand loading of ammunition. Potentially explosive components such as primers and powders must be stored in separate locked boxes. Displaying or discharging a weapon in the Neighborhood is prohibited. Hand grenades, bombs, and blasting explosives are also prohibited. Failure to adhere to this provision or other provisions within the Community Handbook regarding weapons and guns is a material breach of this Lease Agreement and may result in immediate eviction from the Premises.

33. **Resident Consent to Relocate.** In addition to any relocation pursuant to Section 18 or any Relocation Addendum, Resident consents to comply with the following relocations, if applicable:

    a.  The Installation Commander shall have the authority to restrict the general public from occupancy of nonseverable housing units and designated historical housing units. In the event of vacancies in such housing units, the Installation Commander may require a Resident residing in a severable housing unit be relocated to nonseverable or designated historical housing units. The Government shall pay all costs of such relocation.

    b.  If Resident is occupying a Premises with special accessibility or readily adaptable features, and Resident and Occupants do not require such features, then Resident agrees to relocate when Owner informs Resident that another family having a person with a disability requires the Premises. Resident's relocation will be at Owner's expense. Resident and Owner shall sign an Accessible/Adaptable Unit Relocation Addendum acknowledging this consent at the time this Lease is executed.

34. **Change in Resident's Status.** Resident shall notify Owner within thirty (30) days of a change in housing eligibility status (e.g. loss of dependents, divorce or separation).

    Resident may request a move to a Premises in another Housing Category: (i) for the Resident's rank in the event of promotion or demotion, or (ii) if the Resident's bedroom qualification changes. In either case, the move would be voluntary and at the Resident's expense.

If Resident should die, Resident's spouse or another adult Occupant in Resident's immediate family who is residing in the Premises at the time of the death has the right to either terminate this Lease Agreement or extend it, at the same Monthly Rent, for a maximum period of twelve (12) months from the month of the Resident's death.

If any other change of status or condition causes Resident to lose housing eligibility or for an Occupant to remain in the Premises without Resident, then Resident or Occupant, as appropriate, must submit a request for retention of the Premises to the Installation Commander or delegated authority within fifteen (15) days of the change in status. If retention is denied, then the Premises must be vacated within thirty (30) days from receipt of denial. If retention is approved:

a.  The determination of Rent shall be in accordance with Section 4 of this Lease Agreement.

b.  If Resident is still receiving BAH, then Monthly Rent shall continue to be paid by allotment.  If Resident is no longer entitled to BAH, then all Rent will be paid directly to Owner when due.  If the Premises is retained by an Occupant(s) without Resident, then all Rent will be paid by the Occupant directly to Owner when due.  The amount of Monthly Rent will continue to be the BAH rate with dependents of the Resident who vacated the Premises.

c.  All other terms and conditions of the Lease Agreement shall remain in full force and effect.

35. **Installation Commander's Rights Not Impaired.**  Nothing contained in this Lease shall be construed to diminish, limit, or restrict any right, prerogative, or authority of the Installation Commander as established in law, regulation, military custom, or elsewhere. The Installation Commander has the inherent authority and obligation to ensure good order and discipline on the Installation. The Military Rules of Evidence recognize the power of the Installation Commander to authorize searches of military property and property situated on a military installation. All of the Installation (including, without limitation, any housing unit located on the Installation) is under military control and is subject to the Installation Commander's authority. The authorities of the Installation Commander include, but are not limited to, the following:

*   The authority to provide force protection and police protection services in accordance with 10 U.S.C. §2872a at levels deemed appropriate by the Government for on-base privatized housing.
*   The authority to promulgate and enforce security regulations and restrict public access to the Installation, to include regulations delineating parameters for authorized entry to or exit from the Installation, pursuant to 50 U.S.C. §797. Such rules shall accord privatized housing employees of Owner and its affiliates who have passed an agency background check unescorted access (with escort privileges) to the Installation.
*   The authority to conduct background checks utilizing the Installation's access requirements with respect to contractor employees, privatized housing employees, and privatized housing applicants and residents.
*   The authority to bar individuals, to include individuals residing in any privatized housing Unit, from the Installation pursuant to 18 U.S.C. §1382 and Department of Defense Instruction 5200.8.
*   The authority to conduct inspections or searches of individuals entering, leaving, or present on the Installation pursuant to Military Rule of Evidence 314, 10 U.S.C. §802 et seq. and 50 U.S.C. §797.
*   The authority to issue search authorizations based on probable cause on the Installation pursuant to Military Rule of Evidence 315, 10 U.S.C. §802 et seq. and 50 U.S.C. §797.
*   The authority to conduct disaster preparedness exercises and/or emergency recovery operations on the Installation in accordance with 50 U.S.C. §797 and Department of Defense Instruction 5200.8. Exercises with the potential to disrupt privatized housing operations will be pre-coordinated with Resident at least twenty-four (24) hours in advance.
*   The authority to exercise emergency health powers on the Installation pursuant to Department of Defense Directive 6200.3 in the event of a public health emergency due to biological warfare, terrorism, or other communicable disease epidemic.
*   The authority to (i) approve or disapprove applications from persons seeking to rent privatized housing when either an applicant or another prospective occupant of the rental unit is a sex offender, (ii) issue barment orders to anyone living in a privatized housing unit or any visitor who is found to be a sex

offender, and (iii) establish procedures for the mandatory disclosure of information regarding sex offender status from housing applicants, Resident, and Occupants.

Any references to statutes, directives, regulations, or instructions set forth above shall be deemed to refer to both those authorities in effect at the date of lease signing and to those authorities as they may subsequently be amended, revised, superseded, rescinded, or repealed.

36. **Dispute Resolution.** This Lease Agreement is an agreement only between Resident and Owner, and is not an agreement between Owner and any Government entity. Resident and Owner agree to resolve any differences between themselves informally to the best of their ability. If Resident has a particular dispute pertaining to the Premises that Owner has not resolved to Resident's satisfaction, then Resident will follow the dispute resolution procedures specified in the Community Handbook. If Owner and Resident still cannot resolve the dispute after completing the dispute resolution procedures, then Resident must seek independent legal advice.

37. **Notices.** All notices must be in writing. Any notices to Owner will be delivered to FCRM as listed on Page 1 of the Lease Agreement and to Resident at the Premises. Delivery of a notice to the Resident or any adult Occupant is notice to all Residents and Occupants of the Premises. If Owner cannot deliver a notice to the Resident or any adult Occupant, Owner may post the notice in a conspicuous place on the Premises. The notice will be deemed received when delivered or posted on the Premises.

38. **Change in Ownership/Subordination.** This Lease Agreement and Resident's rights under this Lease Agreement are subordinate to all existing and any future financing, loans, or leases on the building or land.

39. **Severability.** If one or more of the paragraphs of this Lease Agreement are determined to be invalid, the remainder of this Lease Agreement will remain in effect.

40. **Controlling Document.** In the event of any ambiguity, conflict, inconsistency, or incongruity between the provisions or references of this Lease Agreement and the Community Handbook or any exhibits or attachments to this Lease Agreement, then the provisions of this Lease Agreement shall, in all respects, govern and control. In the event of a conflict between any addenda to this Lease Agreement and any provision within the Lease Agreement or Community Handbook, the addendum shall govern and control.

*[Signatures of parties on first page of Lease Agreement]*

# MOLD ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _1/7/12_ , between
Forest City Southern Group, LLC, Owner, and _Jasm Cooksey_
("Resident"), regarding property located at _108 Patrick_
(the "Premises").

Owner desires to maintain a quality living environment for Resident. To help achieve this goal, it is important for the Owner and Resident to work together to minimize any mold growth in the Premises. This Addendum contains information for Resident, and the responsibilities of both Resident and Owner.

1. **ABOUT MOLD:** Mold is found virtually everywhere in the environment – indoors and outdoors in new and old structures. When excess moisture is present inside a Premises, mold can grow. Appropriate precautions need to be taken to minimize the potential for mold growth in the Premises.

2. **PREVENTING MOLD:** In order to minimize the potential for mold growth, Owner recommends the Resident should do the following:

   a. Keep the Premises clean – particularly the kitchen, bathroom(s), carpets and floors. Regular dusting, vacuuming and mopping removes household dirt and debris that contribute to mold growth. Use environmentally safe household cleaners. A vacuum cleaner with a HEPA filter will help remove mold spores. Immediately throw away moldy food.

   b. Do not block or cover any heating, ventilation, or air conditioning ducts. Whenever possible, maintain a temperature of 50 to 80 degrees Fahrenheit in the Housing Unit.

   c. Remove visible moisture accumulation on countertops, windows, windowsills, walls, ceilings, floors, and other surfaces as soon as reasonably possible. Periodically clean and dry the walls and floors around the sink, bathtub, shower, toilet, windows, and patio doors using a common household disinfecting cleaner. Blot dry spills on carpeting.

   d. Look for leaks in washing machine hoses, faucets, and discharge lines, especially if the leak is large enough to infiltrate into nearby walls.

   e. Use the bathroom fan when bathing or showering and allow the fan to run until all excess moisture has been vented from the bathroom. Keep the shower curtain inside the tub or fully close the shower doors when showering. After taking a shower or bath: (i) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (ii) leave bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (iii) hang towels and bath mats so they will completely dry out.

   f. Use the exhaust fan in the kitchen when cooking or while running the dishwasher and allow the fan to run until all excess moisture has been vented from the kitchen.

   g. Open windows and doors on days when the outdoor weather is warm and dry (humidity is below 50 percent) to help humid areas of the Premises dry out. Run the fan on the furnace to help circulate fresh air. Keep windows and doors closed in damp, humid, or rainy weather.

   h. Clean the lint filter in the clothes dryer after each use and promptly report any damage to the vent connection. If condensations forms in the area, wipe it dry. Dry damp clothing as quickly as possible.

i. Limit houseplants to a reasonable number to limit excess humidity and limit molds that could grow on the soil surface. Avoid over watering.

j. Do not overfill closets or storage areas. Overcrowding restricts airflow.

k. Promptly report to the Neighborhood Management Office:

  i. Any leak, water damage, or signs of water infiltration;

  ii. Any malfunction in the heating, ventilation, or air conditioning system;

  iii. Windows or doors that do not open or close properly;

  iv. Any areas of visible mold (except very small areas that respond to routine cleaning);

  v. Musty or moldy odors;

  vi. Health issues that Resident thinks may be linked to the air quality within the Premises;

  Owner will respond in accordance with this Lease to repair or remedy the situation as necessary.

3. **EXISTING MOLD:** If small areas of mold have already formed on non-porous surfaces (such as ceramic tile, Formica, vinyl flooring, metal, wood or plastic), the Environmental Protection Agency ("EPA") recommends cleaning the areas with soap or detergent and water, letting the surface dry, and then, within 24 hours, applying a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup. Tilex and Clorox contain bleach that can discolor or stain. **Follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface. Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be in adjacent areas, but not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air ("HEPA") filter can be used to help remove mold products from porous items such as sofas, chairs, drapes and carpets – provided fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

4. **DO NOT CLEAN OR APPLY HOUSEHOLD BIOCIDES TO:** (a) visible mold on porous surfaces such as sheetrock walls or ceilings; or (b) large areas of visible mold on non-porous surfaces. Instead, notify Owner in writing; Owner will take appropriate action in compliance with applicable law.

5. **COMPLIANCE:** If Resident fails to comply with this Addendum, Resident may be held responsible for damage to the Premises and any health problems that may result.

Resident:

Date: 2012 a m

Forest City Residential Management, Inc.
Agent for Owner

By:

Date: 1/17/12



1675 North Commerce Parkway, Weston, FL  33326   (954) 384-4446

TEDDY BEAR RESTORATION
9230 OLD LORRAINE RD
GULFPORT, MS  39503

# Certificate of Mold Analysis

Prepared for:          TEDDY BEAR RESTORATION
Phone Number:          (228) 896-8446
Fax Number:            (228) 896-3490
Project Name:          HEIDI COCKSEY
Test Location:         208 PATRICK DR KAFB
                       BILOXI, MS  39531
Chain of Custody #:    981620
Received Date:         September 19, 2016
Report Date:           September 20, 2016

Erika Piechowski, Technical Manager          Carlos Ochoa, Quality Control Manager

During the issuance of conditioning data for evaluating potential health risks or changed structural and remediation. This information is subject to change as more information regarding fungi contaminants becomes available. For more information, visit our web pages or at www.prolabinc.com or visit our material safety data sheet. This document was designed to follow current industry guidelines for the interpretation of microbial sampling analysis and remediation. Since interpretation of mold analysis methods is scientific work in progress, it may also be changed at any time without notice. The client is solely responsible for the use or interpretation. PRO LAB SSFTM thus makes no express or implied warranties as to health of a property, nor only the sample as sent for the accuracy for analysis. The Client is hereby notified that due to the inherent unpredictability and the mold growth process, laboratory samples can and do change over time relative to the originally sampled material of PRO LAB SSFTM Inc. reserves the right to properly dispose of all samples after the testing of such samples are sufficiently completed or otherwise necessary whichever is greater.



AIHA LAP, LLC
ACCREDITED LABORATORY
ENVIRONMENTAL MICROBIOLOGY
ISO/IEC 17025:2005

LAP# 161539

For more information please contact PRO-LAB at (954) 384-4446 or email info@prolabinc.com



EXHIBIT
B



**PRO-LAB**®

1675 North Commerce Parkway, Weston, FL  33326    (954) 384-444 6

Prepared for : TEDDY BEAR RESTORATION

Test Address : HEIDI COCKSEY
208 PATRICK DR KAFB
BILOXI, MS  39531

| ANALYSIS METHOD | Spore trap analysis | | | Spore trap analysis | | | INTENTIONALLY BLANK | | | INTENTIONALLY BLANK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOCATION | INSIDE HOUSE | | | OUTSIDE HOUSE | | | | | | | | |
| COC / LINE # | 981620-1 | | | 981620-2 | | | | | | | | |
| SAMPLE TYPE & VOLUME | Z5 - 25L | | | Z5 - 25L | | | | | | | | |
| SERIAL NUMBER | O398599 | | | O398599 | | | | | | | | |
| COLLECTION DATE | Sep 15, 2016 | | | Sep 15, 2016 | | | | | | | | |
| ANALYSIS DATE | Sep 20, 2016 | | | Sep 20, 2016 | | | | | | | | |
| CONCLUSION | ELEVATED | | | CONTROL | | | | | | | | |
| IDENTIFICATION | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total |
| Bipolaris/Drechslera | 3 | 120 | 1 | 10 | 420 | 2 | | | | | | |
| Cercospora | | | | 16 | 640 | 3 | | | | | | |
| Cladosporium | 20 | 800 | 7 | 169 | 6,800 | 34 | | | | | | |
| Curvularia | 5 | 200 | 2 | 15 | 600 | 3 | | | | | | |
| Epicoccum | 1 | 40 | <1 | | | | | | | | | |
| Nigrospora | | | | 15 | 600 | 3 | | | | | | |
| Other Ascospores | 13 | 520 | 4 | 111 | 4,460 | 22 | | | | | | |
| Other Basidiospores | 10 | 400 | 3 | 162 | 6,500 | 33 | | | | | | |
| Penicillium/Aspergillus | 53 | 2,190 | 18 | | | | | | | | | |
| Stachybotrys | 186 | 7,400 | 64 | | | | | | | | | |
| Unidentified Spores | 1 | 40 | <1 | | | | | | | | | |
| TOTAL SPORES | 282 | 11,620 | 100 | 498 | 19,940 | 100 | | | | | | |
| MINIMUM DETECTION LIMIT | 1 | 40 | | 1 | 40 | | | | | | | |
| BACKGROUND DEBRIS | Too heavy for accurate count | | | Light | | | | | | | | |
| Cellulose Fiber | 11 | 440 | | | | | | | | | | |
| Fiberglass | 3 | 120 | | | | | | | | | | |
| Pollen | | | | 7 | 280 | | | | | | | |

| OBSERVATIONS & COMMENTS | Counts are estimated Actual numbers of spores probably much higher | | | | | | | | | | | |

Background debris qualitatively estimates the amount of particles that are not pollen or spores and directly affects the accuracy of the spore counts. The categories of Light, Moderate, Heavy and Too Heavy for Accurate Count, are used to indicate the amount of deposited debris. Increasing amounts of debris will obscure small spores and can prevent spores from impacting onto the slide. The actual number of spores present in the sample is likely higher than reported if the debris estimate is Heavy or Too Heavy for Accurate Count. All calculations are rounded to two significant figures and therefore the total percentage of spore numbers may not equal 100%.
* Minimum Detection Limit: Based on the volume of air sampled, this is the lowest number of spores that can be detected and is an estimate of the lowest concentration of spores that could be read in the sample. NA = Not Applicable.

Spores that were observed from the samples submitted are listed on this report. If a spore is not listed on this report it was not observed in the samples submitted.

Interpretation Guidelines: A determination is added to the report to help users interpret the mold analysis results. A mold report is only one aspect of an indoor air quality investigation. The most important aspect of mold growth in a living species is the availability of water. Without a source of water, mold generally will not become a problem in buildings. These determinations are in no way meant to imply any health outcomes or financial decisions based solely on this report. For questions relating to medical conditions you should consult an occupational or environmental health physician or professional.
CONTROL is a baseline sample showing what the spore count and diversity is at the time of sampling. The control sample(s) are usually collected outside of the structure being tested and used to determine if this sample(s) is similar in diversity and abundance to the inside sample(s).
ELEVATED means that the amount and/or diversity of spores, as compared to the control sample(s), and other samples in our database, are higher than expected. This can indicate that fungi have grown because of a water leak or water intrusion. Fungi that are considered to be indicators of water damage include, but are not limited to: Chaetomium, Fusarium, Memnoniella, Stachybotrys, Scopulariopsis, Oidiodendron
NOT ELEVATED means that the amount and/or the diversity of spores, as compared to the control sample and other samples in our database, are lower than expected and may indicate no problems with fungal growth.
UNUSUAL means that the presence of current or former growth was observed in the analyzed sample. An abundance of spores are present and/or growth structures including hyphae and/or fruiting bodies are present and associated with one or more of the types of mold/fungi identified in the analyzed sample.
NORMAL means that no presence of current or former growth was observed in the analyzed sample. If spores are reported they are normally what is in the air and have settled on the surface(s) tested.



**Spores per cubic meter**



**PRO-LAB** 1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4446

| Identification | Outdoor Habitat | Indoor Habitat | Possible Allergic Potential (Not all cause discomfort/irritation) | Comments |
|---|---|---|---|---|
| Bipolaris/Drechslera | Common everywhere. Frequently associated with grasses, but also found on plant material, decaying food, and soil | | Common Type I (hay fever and asthma) fungal sinusitis | This is a group of similar looking spores that include Bipolaris, Drechslera, Exserohilum, and sometimes Helminthosporium. They cannot be consistently separated by spore morphology and are thus grouped together. Must be cultured to correctly separate the genera |
| Corn smuts | Common everywhere, especially growing on leaves | Not known to grow indoors | None known |
| Cladosporium | The most common spore type reported in the air worldwide. Found on dead and dying plant litter and soil | Commonly found on wood and wallboard. Commonly grows on window sills, textiles and towels | Type I (hay fever and asthma), Type III (hypersensitivity pneumonitis) allergies | A very common and important allergen source, both outdoors and indoors |
| Curvularia | Commonly found everywhere on soil and plant debris | Capable of growing on many cellulytic substrates like wallboard and wood | Type I (hay fever and asthma) and common cause of allergenic sinusitis | |
| Epicoccum | Commonly found everywhere. Grows on plant debris, linen, soil | Capable of growing on several different substrates, notably wallboard and paper | Type I (hay fever and asthma) allergies | Very common in the summer, especially in the midwest and during harvest time |
| Nigrospora | Commonly found everywhere. Grows on decaying plant material | Does not normally grow on building materials, but occasionally can be found growing on wallboard | Type I (hay fever and asthma) allergies | Very distinctive spore that is easy to identify |
| Ascospores | Common everywhere. Constitutes a large part of the dispersal outside. Can reach very high numbers in the air outside during the spring and summer. Can increase in numbers during and after rainfall | Very few of this group grow inside. The notable exception is Chaetomium, Ascoracina and Peziza | Little known for most of this group of fungi. Dependent on the type (see Chaetomium and Ascoracina) | |
| Basidiospores | Commonly found everywhere, especially in the late summer and fall. These spores are from Mushrooms | Mushrooms are not normally found growing indoors, but mushroom and wet lumber, especially in crawlspaces. Sometimes mushrooms can be seen growing on flower pots indoors | Some allergenicity reported. Type I (hay fever, asthma) and Type III (hypersensitivity pneumonitis) | Among this group of Mushrooms (Basidiomycetes) are some that are particularly destructive to buildings |
| Penicillium/Aspergillus | Common everywhere. Normally found in the air in small amounts in outdoor air. Grows on nearly everything | Walls, wallboard, wood, food, leather, etc. Able to grow on nearly any substrate indoors | Type I (hay fever and asthma) allergies and Type III (hypersensitivity pneumonitis) allergies | This is a combination group of Penicillium and Aspergillus and is used when only the spores are seen. The spores are so similar that they cannot be reliably separated into their respective genera |



1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4446

| Identification | Outdoor Habitat | Indoor Habitat | Possible Allergic Potential | Comments |
|---|---|---|---|---|
| | | | Not an opinion or interpretation | |
| Stachybotrys | Grows in the soil and decaying plant material | Wallboards and other paper products that are wetted. Needs high water content in the substrate to grow. Not normally seen growing indoors unless the building material has been wetted. Unusual (No) Normal to be growing indoors | Type I (hay fever and asthma) allergens | Wet spored mold that generally must be dried out and disturbed before spores can be found in the air. Spores of this type of mold should not be observed in significant numbers in the air above background/control. If growth and/or spore numbers are reported, corrective action should be considered to eliminate the water source. Reduce moisture levels and/or spore numbers in the living space. |
| Undentified Spores | Common everywhere. Grow on decaying plant litter and other plant-derived material | Wetted cellulosic material | None known | This group of spores is reserved for spores whose identity is unknown. These kinds of spores have usually never been seen before in spore traps by our laboratory and/or are of such morphology that they cannot be identified with any degree of certainty to a particular genus. |



1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4446

**Prepared for :** TEDDY BEAR RESTORATION

**Test Address :** HEIDI COCKSEY

208 PATRICK DR KAFB

BILOXI, MS  39531

## Indoor Air Quality Testing

### Introduction
The fungi are a large group of organisms that include mold. In nature, the fungi and mold help breakdown and recycle nutrients in the environment. Mold are the most common type of fungi that grow indoors. Mold are microscopic organisms that live on plants, in the soil, and on animals, in fact almost anywhere food and moisture are available. Mold is everywhere present in the outdoor and normal indoor environments. It is in the air and on surfaces as settled dust. Exposure to mold is inevitable in everyday life. Thus, exposure to mold is considered part of a normal activity for most people. Only environments for which extraordinary preparations have been taken don't have mold present in the air or on surfaces.

### Understanding Mold
Under the right conditions (moisture, a food source, and time) mold will grow, multiply and produce spores. Mold grows throughout nature as well as the built environment. Mold are the most common type of fungi that grow indoors. Mold reproduces by microscopic cells called "spores" that can be spread easily through the air. Mold spores are always present in the indoor and outdoor air. There are mold that can grow on any organic substrate including wood, paper, carpet, food, ceiling tiles, dried fish, carpet, or any surface where dust has accumulated. When excessive moisture or water accumulates indoors, mold growth will often occur, particularly if the moisture problem remains undiscovered or un-addressed. There is no practical way to eliminate all mold spores in the indoor environment. The way to control indoor mold growth is to control the amount of moisture available to the mold.

Mold growth can become a problem in your home or office where there is sufficient moisture and the right foodstuff is available. The key to preventing mold growth is to prevent all moisture problems. Of course, hidden mold can grow when there is water available behind walls, sinks, floors, etc. Indications of hidden moisture problems are discoloration of ceiling or walls, warped floors or condensation on the windows or walls.

### Controlling Moisture
The most critical step in solving a mold problem is to accurately identify and fix the source(s) of moisture that allowed the growth to occur. In order to prevent mold from growing, it is important that water damaged areas be dried within a 24-48 hour period. If a small amount of mold is present in the home, the mold can be cleaned up with a mild detergent and the excess water or moisture removed. It is not necessary to try and kill the mold or its spores. You can carefully remove the moldy materials if necessary. There are many common sources of excess moisture that can contribute to indoor mold growth. Some of the primary means of moisture entry into homes and buildings are water leakage (such as roof or plumbing leaks), vapor migration, capillary movement, air infiltration, humidifier use, and inadequate venting of kitchen and bath humidity. The key to controlling moisture is to generally reduce indoor humidity within 35% - 50% (depending what climate you live in) and fix all leaks whatever their cause.

### Mold Growth Sources
If the source of moisture is not easily detected or you have a hidden water leak, mold testing can be helpful. Often a roof leak or a plumbing leak can be identified as the source. The difficulty arises when there is an odor present or when an occupant shows signs of mold exposure but no visible mold can be seen. Excess water intrusion can also lead to dry rot of lumber and cause a serious structural defect in buildings.

### Health Related Risks
Based on the Institute of Medicine and the National Academy of Sciences, dampness and mold in homes is associated with increases in several adverse health effects including cough, upper respiratory symptoms, wheeze, and exacerbation of asthma. Mold and fungi contain many known allergens and toxins that can adversely affect your health. Scientific evidence suggests that the disease of asthma may be more prevalent in damp affected buildings. Dampness and mold in homes, office buildings and schools represent a public health problem. The Institute of Medicine concluded, "When microbial contamination is found, it should be eliminated by means that not only limit the possibility of recurrence but also limit exposure of occupants and persons conducting the remediation"



1675 North Commerce Parkway, Weston, FL  33326   (954) 384-4446

## Mold Sampling Methods

The goal of sampling is to learn about the levels of mold growth and amplification in buildings. There are no EPA or OSHA standards for levels of fungi and mold in indoor environments. There are also no standard collection methods. However, several generally accepted collection methods are available to inspectors to study mold (and bacteria) in indoor environments. Comparison with reference samples can be a useful approach. Reference samples are usually taken outdoors and sometimes samples can be taken from "non-complaint" areas. In general, indoor fungal concentrations should be similar to or lower than outdoor levels. High levels of mold only found inside buildings often suggest indoor amplification of the fungi. Furthermore, the detection of water-indicating fungi, even at low levels, may require further evaluation. There are several types of testing methods that can detect the presence of mold. They can be used to find mold spores that are suspended in air, in settled dust, or mold growing on surfaces of building materials and furnishings. There are different methods that can identify types of live mold and dead mold in a sampled environment. Mold spores can be allergenic and toxic even when dead.

All sampled material obtained in the laboratory is analyzed using modern microscopic methods, standard and innovative mycological techniques, analyzed at 630 – 1,000 times magnification.

Testing for mold with an accredited laboratory is the best way to determine if you have mold and what type of mold it is.

## Surface Sampling Methods

Surface sampling can be useful for differentiating between mold growth and stains of various kinds. This type of sampling is used to identify the type of mold growth that may be present and help investigate water intrusion. Surface sampling can help the interpretation of building inspections when used correctly. The following are the different types of surface samples that are commonly used to perform a direct examination of a specific location. Spore counts per area are not normally useful.

### Tape (or tape-lift)
These samples are collected using clear adhesive tape or adhesive slide for microscopic examination of suspect stains, settled dust and spores. Tape lifts are an excellent, non-destructive method of sampling. The laboratory is usually able to determine if the there is current of former mold growth or if only normally settled spores were sampled.

### Bulk
This is a destructive test of materials (e.g., settled dust, sections of wallboard, pieces of duct lining, carpet segments, return-air filters, etc.) to determine if they contain or show mold growth. Bulk sampling collects a portion of material small enough to be transported conveniently and handled easily in the laboratory while still representing the material being sampled. A representative sample is taken from the bulk sample and can be cultured for species identification or analyzed using direct microscopy for genus identification. The laboratory is usually able to determine if the there is current of former mold growth or if only normally settled spores were sampled.

### Swab
A sterile cotton or synthetic fiber-tipped swab is used to test an area of suspected mold growth. Samples obtained using this method can be cultured for species identification or analyzed using direct microscopy for genus identification. The laboratory is usually able to determine if there is current of former mold growth or if only normally settled spores were sampled. Identified spores are generally reported as "present/absent".

### Carpet (filter-type) Cassette
A carpet cassette is used with a portable air pump (flow rate usually doesn't matter) to collect mold, pollen and other particulates. Samples obtained using this method can be cultured for species identification or analyzed using direct microscopy for genus identification. This method is usually used to determine a presence or absence of water-indicating mold in a carpet. The laboratory is usually able to determine if the there is current of former mold growth or if only normally settled spores were sampled.



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL 33326  (954) 384-4446

## Air Sampling Methods

Air samples are possibly the most common type of environmental sample that investigators collect to study bioaerosols (mold, pollen, particulates). The physics of removing particles from the air and the general principles of good sample collection apply to all airborne materials, whether biological or other origin. Therefore, many of the basic principles investigators use to identify and quantify other airborne particulate matter can be adapted to bioaerosol sampling. Common to all aerosol samplers is consideration of collection efficiency. The following are the two most common forms of air sampling methods.

**"Non-Viable Methods"**  *(The Laboratory results are reported in "spores per cubic meter (sp/m3)*

### Z5 Cassette
The $Z^5$ spore trap is used with a portable air pump (5 liters/minute for 1 to 5 minutes) to rapidly collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small slit at the top of the cassette and spores are trapped on a sticky surface on a small glass slide inside the cassette. They are efficient at collecting spores as small as 1um.

### Micro5 Cassette
The Micro5 Microcell spore trap cassette is used with a portable air pump (5 liters/minute for 1 to 5 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small circular hole at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. They are efficient at collecting spores as small as 0.8μm.

### Air-O-Cell Cassette
The Air-O-Cell spore trap cassette is used with a portable air pump (15 liters/minute for 1 to 10 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small opening at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. These cassettes are efficient at collecting spores as small as 2.6μm.

### Allergenco-D Cassette
The Allergenco-D spore trap cassette is used with a portable air pump (15 liters/minute for 1 to 10 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small opening at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. These cassettes are efficient at collecting spores as small as 1.7μm.

**"Viable Methods"**  *(The Laboratory results are reported in "colony forming units per cubic meter (CFU/m3)*

### Agar Impaction Plates
The agar impaction plates are used with a portable air pump (28.3 liters/minute for 1 to 3 minutes) to collect airborne mold. This is called "viable sampling" because it only grows what is alive at the time of testing. Air is drawn through a 200-400 holes at the top of the impactor and spores are trapped in the agar media. The agar plate should be shipped to the laboratory immediately or kept cool until it can be shipped. These cassettes are 90% efficient at collecting spores as small as 0.7μm. The laboratory results are reported in "colony forming units per cubic meter (CFU/$m^3$)".



**PRO-LAB®**

1675 North Commerce Parkway, Weston, FL  33326   (954) 384-4446

## Data Interpretation

Information (data) on mold in buildings can consist of the simple observation of fungal growth on a wall, analytical measurements from hundreds of environmental samples, or the results of a survey of building occupants with and without particular building-related conditions. Data interpretation is the process whereby investigators make decisions on (a) the relevance to human exposure of environmental observations and measurements, (b) the strength of associations between exposure and health status, and (c) the probability of current or future risks. These interpretation steps are followed by decisions on what measures can be taken to interrupt exposure and prevent future problems.

### Remediation of Mold

Prevention of mold growth indoors is only possible if the factors that allow it to grow are identified and controlled. When prevention has failed and visible growth has occurred in a home or building, remediation and/or restoration may be required. The extent of the mold growth will determine the scope of the remediation required. The goal of remediation is to remove or clean mold-damaged material using work practices that protect occupants by controlling the dispersion of mold from the work area and protect the workers from exposure to mold. You should consult a professional when contemplating fixing a large area of mold growth. Generally, remediation requires (a) removal of porous materials showing extensive microbial growth, (b) physical removal of surface microbial growth on non-porous materials to typical background levels, and (c) reduction of moisture to levels that do not support microbial growth. Identification of the conditions that contributed to microbial proliferation in a home or building is the most important step in remediation  No effective control strategy can be implemented without a clear understanding of the events or building dynamics responsible for microbial growth Following the completion of the remediation process, mold testing should be performed to obtain clearance.

### Symptoms of Mold Exposure

The most common symptoms of mold exposure are runny nose, eye irritation, cough, congestion, and aggravation of asthma. Individuals with persistent health problems that appear to be related to mold or other types of air quality contaminant exposure should see their physicians for a referral to specialists who are trained in occupational/environmental medicine or related specialties and are knowledgeable about these types of exposures. Decisions about removing individuals from an affected area must be based on the results of such medical evaluation. Mold is naturally present in outdoor environments and we share the same air between the indoor and outdoor, it is impossible to eliminate all mold spores indoors

### Ten Things You Should Know About Mold

1)  Potential health effects and symptoms associated with mold exposures include allergic reactions, asthma, and other respiratory problems.

2)  There is no practical way to completely eliminate mold and mold spores in the indoor environment  The way to control indoor mold growth is to control moisture.

3)  If mold is a problem in your home or building, you must clean up the mold and eliminate sources of moisture

4)  To prevent mold growth any source of a water problem or leak must be repaired.

5)  Indoor humidity must be reduced (generally below 60%) to reduce the chances of mold growth by: adequately venting bathrooms, dryers, and other moisture-generating sources to the outside; using air conditioners and de-humidifiers; increasing ventilation; and using exhaust fans whenever cooking, dishwashing and cleaning

6)  Clean and dry any damp or wet building materials and furnishings within 24-48 hours to prevent mold growth.

7)  Clean mold off of hard surfaces with water and detergent and dry completely.

8)  Prevent condensation: reduce the potential for condensation on cold surfaces (e g , windows, piping, exterior walls, roof, or floors) by adding insulation.

9)  In areas where there is a perpetual moisture problem on the floor, do not install carpeting

10)  Mold can be found almost anywhere. Mold can grow on wood, paper, carpet, foods; almost anything can support some mold growth provided there is moisture, time to grow and food to eat.



1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

## References & Resources

Bioaerosols: Assessment and Control. Janet Macher, Sc.D., M.P.H., Editor. 1999. ACGIH. 1330 Kemper Meadow Drive, Cincinnati, OH 45240-1634.

Health Implications of Fungi in Indoor Environments. Edited by R.A. Samson. 1994. Elsevier Science, P.O. Box 945, Madison Square Station, New York, NY 10159-0945.

Damp Indoor Spaces and Health. Institute of Medicine of the National Academies, Washington, DC, 2004.

Field Guide for the Determination of Biological Contaminants in Environmental Samples, 2nd Edition. Edited by L-L Hung, et al. AIHA, Fairfax, VA, 2005.

Recognition, Evaluation, and Control of Indoor Mold. Edited by B. Prezant, et al. AIHA, Fairfax, VA, 2008.

## Useful Websites

www.acgih.org/resources/links.htm
American Conference of Governmental Industrial Hygienists - information on Indoor Air Quality and useful links

www.cal-iaq.org
California Indoor Air Quality Program - California indoor Air Quality resources and useful links

www.health.state.ny.us/environmental/indoors/air/mold.htm
New York State Department of Health - New York state recommendations for IAQ, indoor mold inspections, remediation, and prevention

http://www.nyc.gov/html/doh/html/epi/moldrpt1.shtml
Guidelines for Assessment and Remediation of Fungi in Indoor Environments – a good reference for mold clean up and removal

orf.od.nih.gov/PoliciesAndGuidelines/ORFPolicies/MoldPrevPolicy.htm
National Institutes of Health - information mold prevention and remediation

http://www.niehs.nih.gov/health/topics/agents/mold/index.cfm
National Institute of Environmental Health Sciences - information on mold

www.epa.gov/mold/
United States Environmental Protection Agency website on mold and moisture

www.aaaai.org/nab/index.cfm?p=faq
American Academy of Allergy, Asthma, and Immunology – information on mold and allergies and outdoor allergens

http://www.aanma.org/?s=mold
Allergy & Asthma Network – information for homes about allergies and asthma

http://www.homeenergy.resourcomn.org
Minnesota Department of Commerce Energy Information Center – good information on moisture control in homes

http://eetd.lbl.gov/ie/
Governmental Indoor Environment Department – good information on indoor health, comfort and energy efficiency in buildings

http://www.osha.gov/dts/shib/shib101003.html
Occupational US Department of Labor (OSHA) - A Brief Guide to Mold in the Workplace

Prepared for

Site Address

City                                              State              Zip

Inspector

Date                                              Time


This inspection for mold or fungi is performed for a fee to visually inspect for signs of a mold like substance, fungi or growth. It may also include air, swab or bulk tests to be performed with their associated lab fees.

A fee is charged per sample. All fees must be paid prior to sending in any samples. Sample tests should be considered at each area that visible evidence is present. Whether this report reveals mold in the building or not, the customer, building owner or potential buyer should consider:

1. Whether or not to have any sample tests performed at any area that was noted in the report

- We always suggest to have a Direct ID Sample for visible microbial growth.
- If someone is sick in your home, we always suggest to have the areas they spend most of their time in to be tested.

2. Whether or not to hire a qualified mold remediation company or industrial hygienist for further consultation, inspection or corrective procedures, either now, before the lab tests results, or afterwards

Important: If you do have mold and it must be removed, you are strongly encouraged to obtain the services of a qualified remediation contractor. If a homeowner or contractor unfamiliar with containment, removal and safety practices performs remediation activities, building occupants can be put at elevated health risks and mold may spread to areas that previously had no contamination. Failure to eliminate source(s) of moisture in the building that are allowing mold to flourish will render remediation efforts ineffective

Client Present          Age of Home          Weather          Exterior Temp



**EXHIBIT**

C



**52-Point Visual Inspection**

# OUTSIDE

| | | | |
|---|---|---|---|
| 1 | Is there standing water in the yard? | Yes ☐ | No ☑ |
| 2 | Does the land slope towards the home or building? | Yes ☐ | No ☑ |
| 3 | Are gutters present? | Yes ☑ | No ☐ |
| 4 | Are downspouts present? | Yes ☑ | No ☐ |
| 5 | Is there vegetation against house or building? | Yes ☐ | No ☑ |

Comments: (Note anything visible)

## ROOF (Do not climb onto roof)

| | | | | |
|---|---|---|---|---|
| 6 | Are there missing or broken shingles? | How many? | Yes ☐ | No ☑ |
| 7 | Are the shingles older than 10 years? | | Yes ☐ | No ☑ |
| 8 | Are any flanges around the vents loose? | | Yes ☐ | No ☑ |
| 9 | Is any flashing loose? | | Yes ☐ | No ☑ |

Comments: (Note anything visible)

## Foundation Type

| 10 | Basement ☐ | Crawl ☑ | Slab ☐ |
|---|---|---|---|

## Basement

| | | | |
|---|---|---|---|
| 11 | Is there a dehumidifier in place? | Yes ☐ | No ☑ |
| 12 | Are there any carpeted areas? | Yes ☑ | No ☐ |
| 13 | Is there a sump pump? | Yes ☐ | No ☑ |

Comments:



## 52-Point Visual Inspection

### Craw Space (Enter only if safe to do so)

| | | | |
|---|---|---|---|
| 14 | Are there any leaks? | Yes ☒ | No ☐ |
| 15 | Is there microbial growth? | Yes ☒ | No ☐ |
| 16 | Is there a vapor barrier? | Yes ☒ | No ☐ |
| 17 | Is the vapor barrier totally sealed and intact? | Yes ☒ | No ☐ |
| 18 | Is the crawl space totally encapsulated? | Yes ☒ | No ☐ |
| 19 | Is there room for you to crawl? | Yes ☒ | No ☐ |
| 20 | Is there any rot? | Yes ☐ | No ☒ |
| 21 | Is the insulation intact? | Yes ☒ | No ☐ |
| 22 | Is the insulation wet? | Yes ☐ | No ☒ |
| 23 | Is the duct work intact? | Yes ☒ | No ☐ |
| 24 | Any condensation around the ducts? | Yes ☐ | No ☒ |
| 25 | Are the floor joists intact? | Yes ☒ | No ☐ |
| 26 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 27 | Are any vents blocked off? | Yes ☐ | No ☒ |

Comments:



## 52-Point Visual Inspection

# INSIDE

## Microbial Activity

|  |  | | |
|---|---|---|---|
| 30 | Any Microbial Activity? (e.g., carpet, drapes, walls, ceilings, cabinets, etc.) | Yes ☐ | No ☑ |
| 31 | Is there a musty odor present? | Yes ☐ | No ☑ |
| 32 | Are there any water marks? | Yes ☑ | No |

Comments:

## Attic

| 33 | Anything suspicious? (including lack of proper ventilation) | Yes ☐ | No ☑ |

**DUE TO LIABILITY, WE DO NOT GO INTO THE ATTIC UNLESS THERE IS A SUSPECTED AREA OF CONCERN.

Comments:

## Kitchen and Laundry

| 34 | Is the dryer ventilation intact? | Yes ☑ | No ☐ |
| 35 | Are there any leaks behind the washer? | Yes ☐ | No ☑ |
| 36 | Are there any leaks under or behind refrigerator? | Yes ☐ | No ☑ |
| 37 | Are there any leaks under kitchen sink? | Yes ☐ | No ☑ |

Comments:



## 52-Point Visual Inspection

## Bedroom/Office(s)

| **Indicate Name of Bedroom/offices | R01 | | R02 | |
|---|---|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☒ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40  Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☒ |
| 41  Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| **Indicate Name of Bedroom/offices | R03 | | R04 | |
| 38  Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40  Are HVAC vents clean? | Yes ☐ | No ☒ | Yes ☐ | No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| **Indicate Name of Bedroom/offices | R05 | | R06 | |
| 38  Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40  Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| **Indicate Name of Bedroom/offices | R07 | | R08 | |
| 38  Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40  Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| **Indicate Name of Bedroom/offices | R09 | | R10 | |
| 38  Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40  Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| **Indicate Name of Bedroom/offices | R11 | | R12 | |
| 38  Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40  Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

Comments:

**52-Point Visual Inspection**

## Bathroom(s)

**If more than 2 bathrooms, please describe in comment section

| | | Bathroom 1 | | Bathroom 2 | |
|---|---|---|---|---|---|
| 42 | Exhaust fan(s) present and getting proper suction? | Yes ☑ | No ☐ | Yes ☑ | No ☐ |
| 43 | Any leaks under the sink? | Yes ☐ | No ☑ | Yes ☐ | No ☑ |
| 44 | Are all bathtub seals intact? | Yes ☑ | No ☐ | Yes ☑ | No ☐ |
| 45 | Are there any leaks around the bathtub? | Yes ☐ | No ☑ | Yes ☐ | No ☑ |
| 46 | Any leaks around hot the water heater? | Yes ☐ | No ☑ | Yes ☐ | No ☑ |

Comments:



## HVAC

| 47 | Is there a return vent? | Yes ☑ | No ☐ |
|---|---|---|---|
| 48 | Is any furniture sitting on top or blocking HVAC registers? | Yes ☐ | No ☑ |

Comments: (Note condition of return and ducts)

## Relative Humidity Indoors

49. Readings /Comments:

## Moisture Indoors

50. Readings /Comments:



## 52-Point Visual Inspection

Do You Recommend Remediation?     Yes     No     Possibly ☒

49 Explanation:

## Issues of Concern

50. Comments:

51. Recommended Preventative Measures:

## Inspector Recommends These Areas to Test

52. *We always recommend a Tape Lift Sample for anything visual that appears to be microbial.*



## 52-Point Visual Inspection

### THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days. *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial Laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.
   **\*If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!**

Please call the office before sampling. Thank you!
877-554-6653 (Office Hours 9am-7pm EST, MON-FRI)
Our customer spoke with_____at MTUSA.

Please have Customer Initial the following:

I agree to pay $_____ for the inspection and testing. The inspector completed the 52 Point Inspection and I am satisfied with services rendered.                                                         Initial:

## Signatures

Inspector Signature:

Date:
10·22·2016

Customer Signature:

Date:

Would you like Mold Test USA to recommend professionals to give you estimates on needed repairs?          Yes          No

I do not wish to have a written protocol at this time. If I choose to have protocol written at a later date and it exceeds 7 days, Mold Test USA will need to retest in order to have a properly written protocol.

Inspector Signature:

Date:
10-28-2016

Customer Signature:

Date:

# NML-20161031-Rushing and Guice PLLC - 208 Patrick Dr

Spore Analysis Completed for

1101 1st Street South EXT Suite B Columbia SC 29209

803-776-0562

admin@mpdct.stusa.com

Spore Analysis Completed by

Janna Komorowski

Laboratory Director : B A in Biological Sciences

Crystal Hernandez

Operations Director : B A in Biology

1101 1st Street South EXT Suite C, Columbia SC 29209

EXHIBIT

D

©2013-2016 Newton Microbial Laboratory

Laboratory

2016 (D3) Rushing and Guice PLLC - 208 Patrick Dr

Newton ML ID #  - 208 Patrick Dr

| Property/Customer Name | | Site Street Address | | Site City | Site State | Job # |
|---|---|---|---|---|---|---|
| Rushing and Guice PLLC - 208 Patrick Dr | | 208 Patrick Dr | | Biloxi | MS | 38531 |

| Company (mail) | Company Phone Number | | | Date Collected | Date Received |
|---|---|---|---|---|---|
| | 803-776-0562 | | | 10/28/2016 | |

| Company Address | Company Name | | | Sampled/Collected By | Date Reported |
|---|---|---|---|---|---|
| 1101 1st Street South EXT, Suite B, Columbia, SC 29209 | Mold TEST USA | | | Jumal Smith | 10/31/2016 |

| | 2016 (D3) Rushing and Guice PLLC - 208 Patrick Dr | 2016 (D3) Rushing and Guice PLLC - 208 Patrick Dr |
|---|---|---|
| Newton ML ID Number | SPC-0001 | SPC-0002 |
| Sample Name/Location | Control/Outside | Outside |
| Volume (L) | 150 | 150 |
| Background* | 4 | 4 |
| Limit of Detection (Spore/M³) | 7 | 7 |
| Sample Type | | |

| | Spore Count | | | Spore Count | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Organism | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total |
| Alternaria | 1 | 7 | 4.55% | Not Detected | | | | | | | | |
| Ascospores | Not Detected | | | 1 | 33 | 5.88% | | | | | | |
| Aspergillus|Penicillium | 3 | 20 | 13.64% | 5 | 33 | 29.41% | | | | | | |
| Basidiospores | Not Detected | | | Not Detected | | | | | | | | |
| Bipolaris|Drechslera | 8 | 53 | 36.36% | 5 | 33 | 29.41% | | | | | | |
| Chaetomium | Not Detected | | | Not Detected | | | | | | | | |
| Cladosporium | 3 | 20 | 13.64% | 1 | 7 | 5.88% | | | | | | |
| Curvularia | 2 | 13 | 9.09% | 1 | 7 | 5.88% | | | | | | |
| Epicoccum | Not Detected | | | Not Detected | | | | | | | | |
| Fusarium | Not Detected | | | 1 | 7 | 5.88% | | | | | | |
| Memnoniella | Not Detected | | | Not Detected | | | | | | | | |
| Myxomycetes|Smuts | 3 | 20 | 13.64% | 2 | 13 | 11.76% | | | | | | |
| Pithomyces | 1 | 7 | 4.55% | Not Detected | | | | | | | | |
| Stachybotrys | Not Detected | | | Not Detected | | | | | | | | |
| Stemphylium | Not Detected | | | Not Detected | | | | | | | | |
| Torula | Not Detected | | | Not Detected | | | | | | | | |
| Trichoderma | Not Detected | | | Not Detected | | | | | | | | |
| Ulocladium | Not Detected | | | Not Detected | | | | | | | | |
| Unspecified Spore | 1 | 7 | 4.55% | 1 | 7 | 5.88% | | | | | | |
| Total | 22 | 147 | 100.00% | 17 | 113 | 100.00% | | | | | | |

| Hyphal Fragment | | 7 | | | Not Detected | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spore Ct + | Dander | na | | | na | | | | | | | |
| | Fiber | na | | | na | | | | | | | |
| | Pollen | na | | | na | | | | | | | |

Comments

| Color Code | Common Outdoor | Common Indoor | Water Damage Indicator | Elevated Counts |
|---|---|---|---|---|

©2013-2016 Newton Microbial Laboratory

Laboratory

Newton ML ID #
2016 ID31 Rushing and Guice PLLC - 208 Patrick Dr

Alternaria

Ascospores

Aspergillus/Penicillium

Basidiospores

Bipolaris/Drechslera

Chaetomium

Cladosporium

Curvularia

Epicoccum

Fusarium

Memnoniella

Myxomycetes/Smut

Pithomyces

Stachybotrys

Stemphylium

Torula

Trichoderma

Ulocladium

Unspecified Spore

©2013-2016 Newton Microbial Laboratory

Newton MI ID &
2016 1031 Rushing and Gunce PLLC . 206 Patrick Dr

Laboratory

# Spore Trap Count Explanation

| | |
|---|---|
| Volume | Flow Rate * Flow Rate Minute |
| Background | None: Recollect |
| | 1: <5% |
| | 2: 5% ≤ Background Coverage < 25% |
| | 3: 25% ≤ Background Coverage < 70% |
| | 4: 70% ≤ Background Coverage < 90% |
| | 5: 90% ≤ Background Coverage < 100%, Recollect |
| Cts/M³ | Spore Counts per Cubic Meter |
| Hyphal Fragment | Fragments of hyphae. Can be an additional indicator of possible mold presences |
| Unspecified Spore | Less commonly identified spore type |
| Limit of Detection | 1 spore count per coverage examined area |
| **Sample Type** | |
| Spore Count | Spore Trap Cassettes   Identification & Enumeration of Fungal Spores |
| Spore Count+ | Spore Trap Cassettes   Identification & Enumeration of Fungal Spores |
| | + Total Dander, Fiber, and Pollen Count |

**Uncertainty availble upon request

2016.031 Rushing and Guice PLLC ... Newton Mt ID #
- 208 Patrick Dr

Laboratory

| Site Name | Rushing and Guice PLLC - 208 Patrick Dr | | Site Address | 208 Patrick Dr | | Site Name | Biloxi | | Site Zip | 39531 |
| Company Email | admin@moldtestusa.com | | Company Phone Number | 803-776-0562 | | Date Collected | 10/28/2016 | | Date Received | 10/31/2016 |
| Company Address | 1101 1st Street South EXT. Suite B, Columbia, SC 29209 | | Company Name | Mold TEST USA | | Sampled/Collected By | Jamal Smith | | Date Reported | 10/31/2016 |

Newton Mt ID Number
Sample ID Number: DIR 0001
Sample Name: Downstairs HVAC Vent
Sample Type: Direct ID - Tape

| Organism | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alternaria | ND | | | | | | | | | | | | | | | |
| Ascospores | ND | | | | | | | | | | | | | | | |
| Aspergillus\|Penicillium | ND | | | | | | | | | | | | | | | |
| Basidiospores | ND | | | | | | | | | | | | | | | |
| Bipolaris\|Drechslera | ND | | | | | | | | | | | | | | | |
| Chaetomium | ND | | | | | | | | | | | | | | | |
| Cladosporium | ND | | | | | | | | | | | | | | | |
| Curvularia | ND | | | | | | | | | | | | | | | |
| Epicoccum | ND | | | | | | | | | | | | | | | |
| Fusarium | ND | | | | | | | | | | | | | | | |
| Memnoniella | ND | | | | | | | | | | | | | | | |
| Myxomycetes\|Smuts | ND | | | | | | | | | | | | | | | |
| Pithomyces | ND | | | | | | | | | | | | | | | |
| Stachybotrys | ND | | | | | | | | | | | | | | | |
| Stemphylium | ND | | | | | | | | | | | | | | | |
| Torula | ND | | | | | | | | | | | | | | | |
| Trichoderma | ND | | | | | | | | | | | | | | | |
| Ulocladium | ND | | | | | | | | | | | | | | | |
| Unspecified Spore | ND | | | | | | | | | | | | | | | |

ND = Not Detected

| Hyphal Fragment | Heavy | |
| Background Debris | Light | |

Comments

Color Code        Common Outdoor        Common Indoor        Water Damage Indicator        Color Code

©2013-2016 Newton Microbial Laboratory

Laboratory

# Direct Identification Explanation

**Direct ID**

| | |
|---|---|
| Trace | Spore Count less than 10 |
| Light | Estimated Spore Counts between 11 and 100 |
| Medium | Estimated Spore Counts between 101 and 1000 |
| High | Estimated Spore Counts above 1000 |

**Hyphal Fragment/Background Debris**

| | |
|---|---|
| Not Detected | Not Found in the Sample |
| Light | Found Traces throughout the Sample |
| Moderate | Found Some throughout the Sample |
| Heavy | Found All throughtout the Sample |

**Unspecified Spore**   Less commonly identified spore type

**Sample Type**

| | |
|---|---|
| Direct ID-Swab | Swab for ID only |
| Direct ID-Swab+ | Swab for ID + Spore Count |
| Direct ID-Tape | Swab for ID only |
| Direct ID-Tape+ | Swab for ID + Spore Count |
| Direct ID-Bulk- | Swab for ID only |
| Direct ID-Bulk+ | Swab for ID + Spore Count |
| Culture | Air Plate, Swab, Bulk |

| |
|---|
| ID and Quantitative Enumeration of Spores |
| ID and Enumeration with Spore Count |
| ID and Quantitative Enumeration of Spores |
| ID and Enumeration with Spore Count |
| ID and Quantitative Enumeration of Spores |
| ID and Enumeration with Spore Count |
| *Identification and Enumeration of Mold only* |

©2013-2016 Newton Microbial Laboratory

Newton MI, IO #
2016-051 Rushing and Guice PLLC - 206 Patrick Dr

laboratory





## Growth & Distribution

- Alternaria is one of the most common and widely distributed molds on the planet (2). The reproductive spores become airborne easily and are prolific in the atmosphere worldwide.

- **Growth Rate:** Rapid Mature with 0.5 to 8 days (34)

- **Water activity:** 0.85-0.88 (1)

- **Outdoors:** In the outdoor environment, Alternaria is found in soil, water and plant material. It plays an important role in vegetable matter decomposition (1). Airborne Alternaria spore counts are often higher around farming and agricultural operations, particularly during harvesting processes when spores are released into the air in large numbers. (3) It is well studied as a plant pathogen having saprophytic effects on a wide variety of vegetation and is often the source of early blights in crops (2). It reaches peak concentrations during late summer and fall (2).

- **Indoors:** Alternaria can be found growing indoors on textiles, dust, wood, carpeting, flooring, drywall or gypsum board, wall paper, furniture, and other cellulose materials. It can be found in humidifiers, heating and air conditioning units, inside of ductwork, and surrounding damp areas i.e. sinks, showers, and windows(1).

## Health Effects

- **Allergenic**

  – Considered by some to be among the most common mold allergens in the US (1).

  – Alternaria can cause allergy symptoms following ingestion, inhalation, injection or direct contact.

  – Alternaria spores are airborne allergens (1). Reactions due to inhalation may increase during peak concentration times, in late summer and early fall.

  – Inhalation of high concentrations by sensitive individuals may manifest in Type I and Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III).

- **Pathogen**

  – Invasion is rare but can occur, particularly in immunocompromised individuals. Cases of onychomycosis (nail infection), sinusitis, ulcerated cutaneous infections, keratitis, phaeohyphomycosis, as well as osteomyelitis and peritonitis in patients undergoing peritoneal dialysis have been reported  (1,4).

  – Can occasionally cause phaeohyphomycosis (fungal infection), usually in subcutaneous tissue (6).

- **Toxins/ Metabolites**

  – Alternariol (antifungal uses), AME (alternariol monomethylether),  tenuazonic acid, & altertoxins (1)

Found in Sample(s)
AIR          •Control/Outside••••••••••••••                                         ( List of references can be found at http://newtonlaboratory.com/sources
DIRECT      ••••••••••••••••

©2013-2016 Newton Microbial Laboratory

Laboratory



## Growth and Distribution

Ascospores refers to spores produced in a sac-like structure known as an ascus (plural asci). These spores are specific to fungi of the phylum Ascomycota. Ascomycota is a broad division containing a large number of genera and individual species. Identification of the genus and/or species based on spore morphology alone is not always possible, therefore these spores are often given the more general classification of "Ascospores" in microscopic analysis.

- Ascospores are found worldwide with prevalence and distribution depending on particular genus and species.
- **Outdoors:** Ascospores are found ubiquitously in outdoor environments; often found on dead and decaying plant material. Many types are known to have pathogenic or parasitic properties in plants.
- **Indoors:** Common substrates include damp building materials such as gypsum or lumber, carpeting, dust, and other organic materials.

## Health Effects

- **Allergen**
  - Ascospores can be allergenic to sensitive individuals, most often producing Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III). (5)
  - Reactions due to spore inhalation may increase following rain or high humidity. (5)
  - Unlike some fungi which rely on air currents for spore dispersal, ascomycetes are capable of a more active form of spore dispersal that utilizes water droplets to catapult their spores into the air. Various species of Ascospores are known to use this method to liberate spores every single day, regardless of air flow. Subsequently, exposure to ascospores may be more consistent from day to day than exposure to other spores which are only dispersed with adequate air currents. For this reason these spores may be of particular interest in cases of chronic respiratory disease such as asthma and rhinitis (5).

- **Pathogen**
  - Some types can be pathogenic; dependent upon genus and species.

- **Toxins\Metabolites**
  - Vary greatly depending on genus and species.

(List of references can be found at http://newtonlaboratory.com/glossary

Isolated or Sample(s)
AIR          **Outside••••••••••••
DIRECT       •••••••••••••••

©2013-2016 Newton Microbial Laboratory



Laboratory

## ASPERGILLUS/PENICILLIUM

**Growth & Distribution (7):**

— Aspergillus & Penicillium are incredibly adaptive and abundant organisms. Their distribution is world-wide with many species possessing abilities to tolerate environmental conditions that challenge other molds (i.e. extreme temperatures & pH levels, restricted water availability and exposure to radiation). Colony growth rates are rapid for many species. Mature colonies are capable of quickly producing large numbers of spores. Because of the morphological similarity of the spores, the two genera are typically grouped together as "Aspergillus-Penicillium."

- **Growth Rate:** Usually Rapid – Mature within 3-4 days; however, some species are slower(6).
- **Water Activity:** Aspergillus: 0.93-0.97 & Penicillium: 0.88 – 0.99 (33, 35)
- **Outdoors:** Both can be found outdoors on a variety of substrates - particularly plant materials such as cereals, grains, decaying wood, and soil (7).
- **Indoors:** Found indoors on organic materials such as wood, textiles, cellulose materials, carpeting, painted surfaces, and food stuffs such as cheeses, butter/margarine meats, breads, fruits and vegetables. Halotolerant species may be found growing on refrigerated foods (7). Penicillium is used in cheese production and is responsible for the veins in blue cheese.

**Health Effects**

- **Allergen:**

  - Because these spores are so abundant, daily exposure to Aspergillus/Penicillium is very common in both indoor and outdoor environments. Often this exposure occurs without any noticeable reaction or symptoms. However, sensitivities may develop in some instances- especially with prolonged exposure to high spore concentrations. This can result in allergic responses.

  - Spores may progress further into the respiratory system than other common spores due to their small aerodynamic diameter.

  - Penicillium is the mold from which the antibiotic Penicillin was first derived. Penicillin is now made synthetically. It does not contain the mold Penicillium. Allergy to one does not necessarily imply allergy to the other.

- **Pathogen (6,7):**

  - There are approximately 175 species of Aspergillus, only about 20 of which are known to cause disease in humans.
  - Diseases caused by Aspergillus are known as aspergillosis and include invasive infection, colonization, & toxicosis.
  - Certain species of Penicillium are considered pathogens. Infection may occur in skin, blood, bone marrow, internal organs or lymph nodes. (6). In the immunocompromised (particularly HIV patients or those who have recently been in Southeast Asia) P. marneffei can cause severe infection capable of affecting respiratory, lymphatic, and nervous systems.

- **Toxins/Metabolites:**

  - Different species of Aspergillus/Penicillium are associate with an array of mycotoxins and metabolites, some of which are medically significant in humans. The importance of these toxins can vary from species to species and depends largely on the prevalence of that species.

(List of references can be found at http://newtonlaboratories.com/glossary

Found in Sample(s)
AIR =Control/Outside·Outside············
DIRECT ················

Newton MI, IO a
2016103, Nothing and Surce PLLC - 208 Prince Dr

Laboratory

# Bipolaris / Drechslera / Exserohilum / Helminthosporium



## Growth & Distribution:

– Bipolaris, Drechslera, Exserohilum, & Helminthosporium are dematiaceous fungi, producing spores which are elongate, cylindrical, often with numerous septations or cells. These genera are grouped together due to spore similarity. These spores are common in both indoor and outdoor environments.   They are found world wide with some species being exceptionally tolerant of dry environments (6).

– **Growth Rate:** Rapid – Mature within 5 days (6)

– **Water Activity:** 0.80 (this is a generalized number for common molds) (26)

– **Outdoors:** These molds are most commonly found on grasses, grains and other plant materials. Bipolaris can be a plant pathogen causing spots, blights, rots, and other symptoms in staple crops like rice, wheat, and sorghum.  In the past, plant disease caused by Bipolaris invasion has caused starvation of large human populations.  In 1943-1944 the Bengal famine in India was caused by *Bipolaris oryzae* disease in rice.  In the 1970s, *Bipolaris maydis* was responsible for a devastating leaf blight resulting in huge losses of corn crops in the USA & UK. (11)

– **Indoors:** These mold may be found on water damaged materials, food stuffs, houseplants, and other organic materials.

## Health Effects:

– **Allergenic:**
  - These molds are highly common in both indoor and outdoor environments; most people have some level of exposure on a daily basis.
  - In sensitive individuals can manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

– **Pathogenic:**
  - Bipolaris (rapid growth – mature within 5 days) can be pathogenic in rare instances, particularly in immunocompromised. May invade bone, cornea (keratomycosis), skin, aorta, lung, central nervous system or cause brain lesions (6).
  - Exserohilum (rapid growth – mature within 5 days) can cause phaeohyphomycosis (infection of mycelia/hyphae of dematiaceous fungi), most commonly in nasal sinuses, skin, subcutaneous tissue, and cornea.  Rare reports of fatal disseminated infection (6).

– **Mycotoxins/Metabolites:**
  - Cytochalasin, sporidesmin, sterigmatocystin (7)

Found in Sample(s)
AIR
DIRECT

•Control/Outside/Outside••••••••••••
••••••••••••••••

[ List of references can be found at http://newtonlaboratory.com/tleaure ]

©2013-2016 Newton Microbial Laboratory

Newton MI, ID #
2016031 Rushing and Guice PLLC - 208 Paired, Dr

Laboratory



**Growth & Distribution:**

- Cladosporium are found in air and soil worldwide. Cladosporium are among the most common airborne fungi (4). Spores are produced in abundance and easily disperse through the air. Extremely common on decaying organic matter. These mold are common plant pathogens. Molds of this genus are dematiaceous with over 40 named species (1).
- **Growth Rate:** Moderately Rapid – Mature within 7 days. (6)
- **Water Activity:** 0.85-0.88 (1)
- **Outdoors:** Cladosporium can be found on food sources such as cereals, fruit, vegetables. Commonly found on dead plants and shrubs in temperate regions. Halotolerant (salt tolerant) species exist. (7) The most common species isolated from plant materials & soils (C. cladosporioides) experiences peak airborne spore concentrations between June/July and September/October in temperate climates (2).
- **Indoors:** Cladosporium can be found on water damaged materials (i.e. plaster, paint, textiles, gypsum, wall paper, wood, moist window sills). May affect food sources such as cheeses, butter/margarine, vegetables, fruits and vegetables(7). Often found on the surface of fiberglass duct liners, in bathroom showers, and on basement walls (2). Some studies have reported Cladosporium in 70% of homes examined in the US & 100% of homes examined in Canada (1).

**Health Effects:**

- **Allergen:**
  - Allergic reaction to airborne spores are of particular importance because these spores exist in such high concentrations in the air. Symptoms may increase during peak concentrations from June-October. Sensitization may occur. (1)
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)
- **Pathogen:**
  - Is pathogenic in humans very rarely, reported cases include skin lesions, keratitis, onychomycosis, sinusitis, pulmonary infections (1).
- **Mycotoxins/Metabolites:**
  - Cladosporic acid (12)
  - Gibberellin (hormone influencing developmental processes in plants) & ergosterol (precursor to vitamin D2 which may have anti-tumor properties). (1)
  - Toxic effects have been seen in animals (chicken embryos & horses) but not known to be reported in humans to date (1,2).

(List of references can be found at http://www.newtonlabs.com/pdfusers

Found in Sample(s)
AIR
DIRECT          •Control/Outside-Outside••••••••••••
                ••••••••••••••••

©2013-2016 Newton Microbial Laboratory

Laboratory




# Curvularia

## Growth & Distribution

- Curvularia is found world-wide with a particular preference for the tropics and warmer climates (7). Spores usually have a unique curved shape caused by an enlarged central cell (2). Airborne spores are common in both indoor and outdoor environments worldwide.

- **Growth Rate:** Moderately rapid - 4 to 12 days (32)

- **Water activity:** 0.80 (this is a generalized number for common molds) (26)

- **Outdoor:** Curvularia is typically seen growing on plant material. They are weakly pathogenic to plants and are the cause of leaf spots, seedling blight, and failing of seedling germination (2).

- **Indoors:** Curvularia may be found growing on materials containing cellulose such as woods and grains. Growth is less frequent indoors but may be seen on food.(7)

## Health Effects:

- **Allergen:**
  - Poorly studied but believed to be an allergen and irritant (13).
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis &allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Believed to cause corneal infections in the immunocompromised (14)
  - Opportunistic infections of cornea and sinuses, nails, subcutaneous tissue, and systemic organs. Dissemination to the brain can occur rarely. (6)
  - Can be causal agent in mycetoma (6):
    - Infections of subcutaneous tissue and skin. Untreated, chronic infections may progress to involve muscle, fascia & bone. Typically seen on the lower leg or foot, rarely disseminated.
    - Fungi enters the skin via wound, a nodule slowly develops into a tumor or abnormal tissue mass beneath the skin, cavities are formed within the mass and discharge occurs.
    - This is a rare condition which is not contagious. (6) Most infections occur in immunocompromised hosts. (2)

- **Toxins/Metabolites:**
  - Some toxins produced- mainly studied in plants.



Level = Sample(s)
AIR
DIRECT
•Control/Outside•Outside••••••••••••
••••••••••••••••

(The list of references can be found at: http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Laboratory



## Growth & Distribution

— Worldwide distribution. Spores are sickle-shaped and contain numerous cells. Spores are common in both indoor and outdoor air.

- **Growth Rate:** Rapid – Mature within 4 days (6)
- **Water Activity:** 0.86-0.91 (4)
- **Outdoors:** Fusarium is common on plant materials (particularly cereals such as grain) and in soil. Many species are pathogenic in plants and may cause root rot, stem rot, vascular wilt, or fruit rot (4). Can also cause rot and mycotoxin contamination of stored crops and grains (4). Spore concentrations are typically higher around water sources, agricultural areas, and during summer (1).
- **Indoors:** Fusarium spores are commonly found indoors as a result of normal air exchange from the outdoor environment. However, growth of Fusarium colonies indoors is rare & is typically a sign of high moisture. This mold may be found on water damaged cellulose, in heating & air conditioning units or ductwork, in stagnant dehumidifier water, in or around appliances such as dishwashers or washing machines, and in bathrooms or kitchens. (4)

## Health Effects:

- **Allergen:**
  - One of the most common positive dermal tests in mold allergen panels (1).
  - Studies have shown that Fusarium can cause eye irritation and erythema (skin redness) (1).
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)
  - Reactions due to spore inhalation may be increased with proximity to agricultural/farming operations or during peak concentration in summer seasons.

- **Pathogen:**
  - Numerous species of Fusarium can cause infections including mycetoma, eye infections, sinusitis, septic arthritis, and nail infections (6). Typically seen in the immunocompromised.
  - Cause of disseminated systemic infections in severely neutropenic (neutrophil deficient) hosts (6). Unfortunately fatality rates in these instances are high, with the prognosis depending on the immune status of the host (1).
  - Agent of Hyalohyphomycoses (formation a colorless, septate hyphae in tissue; can cause acute inflammation & necrosis or invasion of blood vessels resulting in thrombosis & infarction)(6).

- **Toxins/Metabolites:**
  - Fumonisin, fusaric acid, fusarin, fusarochromanone, moniliformin, trichothecenes (deoxynivalinol, T2 toxin), zearlenol, Zearalenone (12)
  - Ingesting food prepared from grain contaminated with toxigenic species can result in disease (6). Possible cytotoxic, nephrotoxic, tremorgenic, immunosuppressive, & carcinogenic effects in humans and animals (1).

\*A list of references can be found at http://www.newtonlabs.com/glossary

**Outside••••••••••
••••••••••••**

Found = Sample(s)
AIR
DIRECT

Newton ML ID #
20161031 Rushing And Guice PLLC - 208 Patrick Dr

Laboratory



## Growth & Distribution

- Myxomycetes is a large class with approximately 500 individual species and worldwide distribution (25). Interestingly, these organisms are no longer considered to be true fungi like other molds, but have been reclassified as protozoans. These organisms belong to group commonly called "slime molds" that exhibit an amoeba-like stage. Spores are common in both indoor and outdoor environments worldwide (15). Spores can be dispersed by air, arthropods and other animals due to their small size (4 – 20 μm)(25).

- **Growth Rate:** Generally Rapid – Mature within 2 to 4 day; however, specific growth rate does depend on species (24).

- **Water Activity:** 0.80 (this is a generalized number for common molds)(26).

- **Outdoors**
  - Found in soil, decaying plant material (especially damp wood), and dung. Species of Myxomycetes are not as geographically constricted as most organisms; most Myxomycetes species can be found world wide. (15)

- **Indoors**
  - Can be found growing indoors on damp building materials such as cardboard, wallpaper, gypsum board, wood, etc.

## Health Effects:

- **Allergen:**
  - These spores are very common in both indoor and outdoor air. They are small, foreign particles which may be inhaled deep into the respiratory system and may cause allergic responses.
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Unknown

- **Toxins/Metabolites:**
  - Unknown

‖ Loaded in
AIR
Direct

•Control/Outside=Outside•••••••••••••
•••••••••••••••••••

† List of references can be found at http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton MI ID #

20161 (B3) Roshing and Guice PLLC - 208 Patrick Dr

Laboratory



## Growth & Distribution:

The colonies grow fairly fast, usually dark (grey to black) in color, while occasionally being yellowish white in color, suede- like to downy, with multicellular conidia (phragmo- or dictyoconidia) forming on peg- like extensions. The conidia extensions are oblong, segmented, verrucose and light brown in color. (4, 29) These spores can be distributed by light winds, rain, and by grazing sheep (27).

- **Growth Rate:** Rapid – Mature within 5 days (6)

- **Water Activity:** 0.80 – 0.89 (28)

- **Outdoors**

  - Can be found on soil and litter (4). During sheep grazing can be found on herbage due to dry litter. (27)

- **Indoors**

  - Can be found on paper (30).

## Health Effects:

- **Allergen:**

  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**

  - Can very rarely cause infection in the immunocompromised (6).
  - Can cause onychomycosis (29).
  - One case of peritonitis reported in a patient with vulvar cancer. (29)

- **Toxins/Metabolites:**

  - Sporidesmin (a mycotoxin which causes facial eczema in sheep)(31).

[ List of references can be found at http://newtonlabratory.com/glossary

Found in Sample(s)
AIR        •Control/Outside•••••••••••••••
DIRECT     ••••••••••••••••

©2013-2016 Newton Microbial Laboratory

20161031 Rushing and Guice PLLC - 208 Patrick Dr      Newton ML 10 z

# Stachybotrys






## Growth & Distribution

- Stachybotrys is found worldwide. One species in particular, *Stachybotrys chartarum* (sometimes called "black mold" or "toxic mold"), has gained attention recently following concerns about indoor air quality and mold contamination.

- **Growth Rate:** Moderately Rapid – Usually mature with 7 days. Growth may be slower on medias that are not high in cellulose.

- **Water Activity:** Minimal 0.94; Optimal >0.98 (1)

### Outdoors

- Found on decaying plant material and in soil. May contaminate grains, tobacco, wood pulp, and other plant debris. Spore concentrations are generally low in outside air.

### Indoors

- Typically found growing indoors on materials containing cellulose with high water content. This can include water damaged building materials such as wood, gypsum board, wall paper, textiles, carpeting, and cardboard. Stachybotrys does not generally grow without prolonged access to moisture, usually lasting days or weeks. It is also not well suited for competition against other molds. Spores do not become airborne easily and generally settle out of the air quickly. For this reason, airborne spores are often the result of recent physical disturbance of colonies. (1)

## Health Effects:

- **Allergen:**

  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**

  - No reported cases of human or animal infection (1).

- **Toxins/Metabolites:**

  - May be associated with pulmonary hemorrhage & hemosiderosis in infants (6).
  - Has frequently been suggested as a contributing agent in a variety of illnesses reported by occupants of water damaged buildings; however, establishing a firm causal relationship requires further study (6).
  - The species *S. chartarum* produces several mycotoxins that may affect humans and animals after ingestion, inhalation, or absorption (1).
  - Griseofulvin, trichothecenes (isosatratoxin, roridin, satratoxin, trichodermol, trichoverrol (12)

* List of references can be found at http://newtonlaboratory.com/glossary



Found in Sample(s)

AIR                  ••••••••••••

DIRECT           •Downstairs HVAC Vent•••••••••••••••••••

©2013-2016 Newton Microbial Laboratory

Laboratory